**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **ATRIUS DEVELOPMENT GROUP CORPORATION, INC.,**<br><br>**Plaintiff,**<br>**v.**<br><br>**ABC IP, LLC,**<br>**RARE BREED TRIGGERS, INC.,**<br>**RARE BREED FIREARMS LLC,**<br>**LAWRENCE DEMONICO,**<br>**KEVIN MAXWELL, and COLE LELEUX**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **In Re: Rare Breed Triggers Patent Litigation**<br>**MDL No. 4:26-md-03176-ALM**<br><br>**Member Case No. 4:26-cv-00448-ALM**<br><br>**JURY TRIAL DEMANDED** |

**SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

Atrius Development Group Corporation, Inc. ("Atrius"), by and through the undersigned counsel, for its Second Amended Complaint against ABC IP, LLC ("ABC"), Rare Breed Triggers, Inc., Rare Breed Firearms LLC (collectively, "RBT"), Lawrence DeMonico, Kevin Maxwell, and Cole LeLeux (altogether, "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1. This action arises from Defendants' ongoing efforts to unlawfully disrupt Atrius' relationships with its valued customers by aggressively and repeatedly asserting unfounded claims of patent infringement through lawsuits against Atrius's resellers (but not Atrius) targeting an Atrius product known as the "Atrius Forced Reset Selector" ("FRS"). Defendants are currently engaged in a campaign of intimidation directed at manufacturers, distributors, and resellers of firearm components known as forced reset triggers ("FRTs") and forced reset safety mechanisms for AR-15 pattern firearms.

2. This action seeks: (i) declaratory judgment of non-infringement of United States Patent Nos. 12,031,784 ("the '784 patent"), 12,038,247 ("the '247 patent"), and 12,578,159 ("the '159 patent") (collectively, "the Asserted Patents"), pursuant to 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, including Title 35, United States Code; (ii) declaratory judgment that the Asserted Patents are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112; (iii) declaratory judgment that the '247 and '159 patents are unenforceable due to inequitable conduct; (iv) antitrust and unfair competition relief arising, among other reasons, from Defendants' *Walker Process* fraud and sham patent enforcement tactics; and (v) relief from Defendants' tortious interference with Atrius's existing and potential business relationships.

3. On September 5, 2023, a district court in the Eastern District of New York granted the Department of Justice's motion for a preliminary injunction, enjoining Defendants and their principals from making and selling FRT triggers, which the court found were likely illegal "machineguns" under 26 U.S.C. § 5845(b). *United States of America v. Rare Breed Triggers, LLC*, 1:23-cv-369 (E.D.N.Y.), ECF No. 139.

4. Prior to this injunction, on information and belief, Defendants amassed significant revenues (nearing $40 million) during a two-year stretch while the litigation was underway. But during that time, Defendants were the only participant in the marketplace; all lawful FRT manufacturers and sellers complied with the then-enforced and lawful classification of FRTs as "machineguns." Defendants profited from this defiance, often flaunting their "fight" while other manufacturers rightly complied with the then-enacted law.

5. On July 24, 2024, however, in a different lawsuit brought by a non-profit gun rights organization challenging the Bureau of Alcohol, Tobacco, Firearms and Explosive's ("ATF") classification of FRTs as "machineguns," a district court in the Northern District of Texas

(Fort Worth Division) entered a final judgment declaring that classification unlawful. *National Association for Gun Rights, Inc. v. Garland*, 4:23-cv-830 (N.D. Tex.), ECF No. 101.

6. On February 7, 2025, President Trump signed Executive Order 14206, which ordered the Attorney General ("AG") to, within 30 days, examine all actions of executive departments and agencies and the ATF's rules promulgated in the prior four years to determine whether any actions or rules are impinging upon the Second Amendment rights of citizens. The Executive Order also instructed the AG and the Domestic Policy Advisor to formulate a plan of action.

7. On May 13, 2025, while the judgment of the Northern District of Texas was on appeal, the Department of Justice settled the case along with the case against RBT, thereby rendering FRTs legal under federal (and Texas) law, though FRTs remain illegal under state law in approximately 15 states.

8. Defendants responded by immediately filing a wave of predatory patent infringement lawsuits targeting retail outlets that carry FRT-type products, including stores that carry Atrius's FRS product. To date, Defendants have never filed suit against these products' manufacturers.

9. Since May 16, 2025, Defendants have filed at least twenty-one patent infringement lawsuits alleging infringement of the Asserted Patents and at least seven additional lawsuits alleging infringement of other FRT-related patents.

10. Since January 7, 2026, Defendants ABC and RBT have filed at least nine lawsuits against resellers of the Atrius FRS alleging infringement of the Asserted Patents (collectively, "Customer Lawsuits"), including the following cases spread across the United States:

*ABC IP, et al. v. Hawkphin Sales, LLC.*, et al., 4:26-cv-00015 (S.D. Iowa).

*ABC IP, et al. v. Webcorp., Inc., et al.*, 4:26-cv-00018 (E.D. Mo.).

*ABC IP, et al. v. PistolCap Limited Company, d/b/a Frisco Guns et al.*, 2:26-cv-00053 (E.D. Tex.)

*ABC IP, et al. v. ProSource Firearms, LLC*, 2:26-cv-00055 (E.D. Tex.)

*ABC IP, et al. v. Mister Guns, LLC et al.*, 2:26-cv-00056 (E.D. Tex.)

*ABC IP, et al. v. Superior Firearms of Texas, LLC*, 2:26-cv-00058 (E.D. Tex.)

*ABC IP, et al. v. Optics Planet, Inc. d/b/a OpticsPlanet*, 1:26-cv-01072 (N.D. Ill.)

*ABC IP, et al. v. HK Parts Inc.*, 2:26-cv-90 (D. Utah)

*ABC IP, et al. v. Orion Arms Corp. d/b/a Orion Wholesale*, 4:26-cv-00032 (S.D. Ind.)

11. Defendants themselves have acknowledged that the Atrius-related reseller actions involve overlapping factual, technical, infringement, validity, claim-construction, customer-suit, and discovery issues concerning the Atrius FRS product and the Asserted Patents. In submissions to the Judicial Panel on Multidistrict Litigation, Defendants grouped the Atrius-related reseller cases together as involving the same accused Atrius FRS product and represented that coordinated treatment was necessary to avoid inconsistent rulings regarding infringement, validity, claim construction, customer-suit issues, and overlapping discovery. *See* MDL No. 3176, Dkt. 41-1 at 3, 8–10.

12. Defendants have never alleged or communicated that the Atrius FRS infringes any of the Asserted Patents before filing the Customer Lawsuits. Instead of bringing suit directly against Atrius—the actual designer and manufacturer of the FRS product accused of infringing the Asserted Patents[1]—Defendants filed a series of unfounded lawsuits against customers and resellers. While Defendants have not named Atrius as a defendant in any of the Customer Lawsuits, the complaints identify the Atrius FRS (among, in some cases, other FRT-related products).

[1] Defendants themselves have referred to Atrius as the "Manufacturer" of the accused "Atrius Forced Reset Selector" in submissions to the JPML. *See* MDL No. 3176, Dkt. 41-1 at 11.

13. Each existing (and potential future) Customer Lawsuit has caused, and will continue to cause, harm to Atrius, including through financial loss, litigation burden, business disruption, reputational damage, and strain on customer relationships.

14. It is not in the substantial interest of justice or an efficient use of judicial resources for Atrius to be forced to defend itself and its customers from Defendants' unjustified patent infringement claims serially and/or in multiple lawsuits in various district courts across the United States. The core technical, operational, prior-art, inequitable-conduct, and infringement issues relating to the FRS are common across the Customer Lawsuits and centrally concern the design and operation of the FRS itself, making Atrius the proper party to litigate those issues.

15. Atrius seeks relief to resolve the controversy between the real parties in interest, Atrius and Defendants, to protect Atrius's existing and prospective customer relationships, to protect Atrius's lawful, independent innovation, and to remove the uncertainty and false accusations of patent infringement targeting the FRS in district courts across the country. Atrius asks this Court to eliminate the harm and risk Atrius has faced, and continues to face, from Defendants' ongoing campaign of intimidation and bad-faith and anticompetitive litigation by declaring that: (i) the FRS product has not and does not infringe any claim of the Asserted Patents; (ii) the reselling and use of the FRS have not and do not infringe any valid claim of the Asserted Patents; (iii) all claims of the Asserted Patents are invalid; (iv) the '247 and '159 patents are unenforceable due to inequitable conduct; (v) Defendants have attempted to acquire monopoly power through its anticompetitive conduct in violation of the Sherman Act; and (vi) Defendants have tortiously interfered with Atrius's current (and prospective) business relations.

## PARTIES

16. Plaintiff Atrius is a corporation organized and existing under the laws of the State of Texas and with an address of 200 Congress Ave., Unit 31W, Austin, TX 78701.

17. Atrius's FRS product (pictured below) is a drop-in replacement safety selector compatible with standard AR-15 fire control groups, with no modifications required. The FRS enables a user to have three positions: SAFE, SEMI-AUTOMATIC (traditional), and FULL-SEMI.



18. On information and belief, Defendant ABC is a limited liability company organized and existing under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, DE 19901.

19. On information and belief, Defendant ABC does not make, use, sell, or offer for sale any products in the United States.

20. On information and belief, Defendant Rare Breed Triggers is a corporation organized and existing under the laws of the State of Texas with addresses of 2710 Central Freeway, Suite 150-151, Wichita Falls, TX 76306 and 15511 Highway 71 West, Ste. 110444, Austin, TX 78738. Based on records available from the Texas Secretary of State, Defendant Rare Breed Triggers' registered agent for service of process is Samuel Eastman with an address of 2110 S. Lamar Blvd., Suite G, Austin, TX 78704.

21. On information and belief, Defendant Rare Breed Firearms is a limited liability company organized and existing under the laws of the State of Texas with an address at PO Box 341194, Austin, TX 78734. Based on records available from the Texas Secretary of State, Defendant Rare Breed Firearms' registered agent for service of process is Eastman Meyler PC with an address of 2301 E Riverside Dr., Suite A-50, Austin, TX 78741.

22. On information and belief, Defendant RBT makes, uses, sells, and offers for sale products in the United States, including a trigger mechanism called the FRT-15L3 (pictured below).




23. On information and belief, Defendants do not contend that any claim of the Asserted Patents covers the FRT-15L3.

24. On information and belief, Defendant Lawrence DeMonico is an individual residing at 6124 Osceola Trail, Austin, TX 78738. On information and belief, Mr. DeMonico is the President of RBT and a Manager of ABC. On information and belief, Mr. DeMonico owns LAD, LLC, which is a Member and affiliate of ABC.

25. On information and belief, Defendant Kevin Maxwell is an individual residing at 1095 Torren Pt., Geneva, FL 32732. On information and belief, Mr. Maxwell is the general counsel of RBT and a Manager of ABC. On information and belief, Mr. Maxwell owns An 1861 LLC, which is a Member and affiliate of ABC.

26. On information and belief, Defendant Cole LeLeux is an individual residing at 2118 White Jasmine Ct., Apopka, FL 32712. On information and belief, Mr. LeLeux is a Manager of ABC. On information and belief, Mr. LeLeux previously held an ownership interest in RBT. On information and belief, Mr. LeLeux owns LeLeux LLC, which is a Member and affiliate of ABC.

**Organizational Structure and Alter Ego**

27. As part of the DOJ's case against RBT, *United States of America v. Rare Breed Triggers, LLC*, 1:23-cv-369 (E.D.N.Y.), ATF agents examined the corporate and financial records of RBT and its closely associated companies: ABC IP, LLC; XYZ Distribution LLC (f/k/a "XYZ Distrubution [*sic*]" or "RB Trig LLC"); and DEF Consulting LLC. The agents also had information from a confidential source with knowledge of RBT's inner workings, who provided the ATF with sales records. The allegations in this subsection are largely based upon those reports. 1:23-cv-369, ECF Nos. 7, 24, 26 (including exhibits).

28. On information and belief, Defendant RBT was incorporated as a Florida LLC in April 2020. On information and belief, four individuals held ownership interests in RBT at the

time of its formation or incorporation: Defendants DeMonico, Maxwell, LeLeux, and a fourth individual, Michael Register.

29. On information and belief, later that year, DeMonico, LeLeux, and Register divested their ownership interest in RBT, thus leaving Maxwell as the company's sole owner. Over the intervening years, Defendants reorganized the company from a single corporate structure to a complex web of interlocking companies, including the original Florida LLC, at least one North Dakota LLC, at least one Texas LLC, at least one Texas corporation, and at least one Delaware LLC.

30. On information and belief, the proceeds from RBT's sales of its FRT products are distributed to a holding company, XYZ Distrubution[2] [*sic*]. On information and belief, after paying its suppliers and manufacturers, RBT's proceeds flow through XYZ to either ABC or DEF Consulting, another entity owned solely by the individual Defendants, or both.

31. On information and belief, as recent as September 18, 2024, ABC was owned by the following Members with the following Percentage Interest:

- LAD, LLC [27.5%]
- AN 1861, LLC [17.5%]
- LeLeux, LLC [17.5%]
- Spider Hole, LLC [27.5%]

32. On information and belief, ABC has three Managers: Defendants DeMonico, Maxwell, and LeLeux. On information and belief, Michael Register was or has, at one time, been a Manager of ABC, but has recently been embroiled in his own litigation against ABC and DeMonico. *ABC IP, LLC et al. v. Spider Hole, LLC et al.*, No. 1:25-cv-00864-ADA (W.D. Tex.).

---

[2] According to one ATF agent, "'XYZ Distrubution' was purposely misspelled in order to mislead possible investigations" into Defendants' financial arrangements. 1:23-cv-369, ECF No. 7 at 4.

33. Records from the Florida Division of Corporations reveal that DEF Consulting was dissolved in 2024, but that its managers included the same LLCs that owned ABC and were owned by the individual Defendants, including LAD, AN 1861, and LeLeux.

34. On information and belief, Defendants ABC and RBT—in addition to their former iterations, DEF Consulting, and, presumably, XYZ Distrubution—all share owners, officers, business addresses, and counsel.

35. On information and belief, payments made between these companies for "consulting services," are not. Rather, they are created to obscure the fact that DeMonico, Maxwell, and LeLeux own and control RBT.

36. On information and belief, the money received by RBT for sales was immediately sent to various bank accounts ostensibly held in the names of other companies. Those funds were sent on to various other bank accounts. Ultimately, the profits from the sales were divided among DeMonico, Maxwell, and LeLeux.

37. On information and belief, as of early 2023, RBT sales generated between $30,000,000 and $40,000,000 in revenue. All or most of the profits from sales were distributed to DeMonico, Maxwell, and LeLeux.

38. On information and belief, ABC, which does not make, use, sell, or offer for sale any products, and exists solely to enforce patents, is inadequately capitalized to satisfy potential judgments. ABC was formed and is maintained as a judgment-proof vehicle to prosecute Defendants' abusive litigation campaign while shielding the individual Defendants and RBT from counterclaims and liability.

39. A civil complaint filed by Defendants ABC and DeMonico against Register and Spider Hole confirms that ABC lacks adequate operating capital. *See ABC IP, et al., v. Spider Hole, LLC, et al.*, No. 1:25-cv-864-ADA (W.D. Tex.), ECF No. 1:

- "Register made promises to be the 'Money Guy' and finance the operations of ABC. … Spider Hole, an entity owned solely by Register, would be the only party to provide capital to ABC." (¶ 13)
- "Mr. Register knew well before signing the Operating Agreement … that he would not be able to provide capital to ABC." (¶ 14)
- "Spider Hole was solely responsible for providing the capital contributions necessary to fund the Company's endeavors." (¶ 18)
- "On March 20, 2025, the managers of ABC met and voted on making a capital call to Spider Hole in the amount of $4,000,000 to be paid on or before March 31, 2025." (¶ 19)
- "Spider Hole failed to meet the required capital contribution timely." (¶ 20)
- "Because of Spider Hole's failure to contribute capital to ABC, ABC was unable to fund the enforcement of its patents …" (¶ 22)
- "Spider Hole [] failed to remit payment to ABC from the improper sales resulting in damages to the Company and its members of more than $280,000 …" (¶ 33)

40. On information and belief, RBT is similarly inadequately capitalized to satisfy potential judgments, as its revenues have been siphoned through a complex web of affiliate companies to pay the individual Defendants' personal LLCs.

41. Furthermore, Defendants' convoluted, multi-layered corporate structure was designed to insulate the individual Defendants from personal liability for their inequitable, anticompetitive, and tortious conduct—both related to, and separate from, their abusive patent enforcement campaigns.

**Agency Relationships and Vicarious Liability**

42. On information and belief, ABC and RBT operate as interrelated and coordinated entities with overlapping ownership, management, finances, litigation control, and business operations, including coordinated assertion and enforcement of the Asserted Patents.

43. ABC is an agent of RBT.

44. ABC directs and controls the actions, operations, and performance of RBT, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

45. ABC conditions the benefits derived by RBT on the performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

46. ABC specifies the timing and manner of the RBT's performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

47. ABC profits from RBT's activities.

48. ABC is vicariously liable for RBT's conduct, actions, and operations, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

49. RBT is an agent of ABC.

50. RBT directs and controls the actions, operations, and performance of ABC, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

51. RBT conditions the benefits derived by ABC on the performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

52. RBT specifies the timing and manner of ABC's performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

53. RBT profits from the activities of ABC.

54. RBT is vicariously liable for ABC's conduct, actions, and operations, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

55. The individual Defendants (*i.e.*, DeMonico, Maxwell, and LeLeux), by and through their personal LLCs, are agents of ABC and/or RBT.

56. The individual Defendants, by and through their personal LLCs, direct and control the actions, operations, and performance of ABC and/or RBT, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

57. The individual Defendants, by and through their personal LLCs, condition benefits derived by ABC and/or RBT on the performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

58. The individual Defendants, by and through their personal LLCs, specify the timing and manner of the performance of activities by ABC and/or RBT, including those related to

Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

59. The individual Defendants, by and through their personal LLCs, profit from the activities of ABC and/or RBT.

60. The individual Defendants, by and through their personal LLCs, are vicariously liable for ABC's and/or RBT's conduct, actions, and operations, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

## ASSERTED PATENTS

61. The '784 patent is entitled "Adapted Forced Reset Trigger" and was issued by the United States Patent and Trademark Office on July 9, 2024. Ex. A is a true and correct copy of the '784 patent.

62. The '247 patent is entitled "Firearm Trigger Mechanism" and was issued by the United States Patent and Trademark Office on July 16, 2024. Ex. B is a true and correct copy of the '247 patent.

63. The '159 patent is entitled "Firearm Trigger Mechanism" and was issued by the United States Patent and Trademark Office on March 17, 2026. Ex. C is a true and correct copy of the '159 patent.

64. Defendant ABC asserts in ongoing litigation that it is the current owner by assignment of all right, title, and interest in and to the Asserted Patents. On information and belief, Defendant ABC's business is limited to owning and enforcing patents through repeated lawsuits in this District and elsewhere.

65. Defendant RBT asserts in ongoing litigation that it is the exclusive licensee of the Asserted Patents.

66. Defendants, together with their attorney Glenn Bellamy, fraudulently obtained the ’247 patent through a pattern of deceit during patent prosecution, including intentionally withholding at least three material prior art references with the intent to deceive the United States Patent and Trademark Office (“USPTO”), as detailed below. Similarly, because the ’159 patent issued from an application that was a continuation of the application that issued as the ’247 patent, the ’159 patent was also fraudulently obtained and suffers from infectious unenforceability.

## JURISDICTION AND VENUE

67. This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the patent laws of the United States, including Title 35, United States Code, and the Sherman Antitrust Act, 15 U.S.C. §§ 1-7.

68. The Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1338(a), and/or 2201, and 2202.

69. This action was originally filed in the United States District Court for the Western District of Texas, Midland/Odessa Division, as *Atrius Development Group Corporation, Inc. v. ABC IP, LLC et al.*, No. 7:26-cv-00057-DC-DTG. The Judicial Panel on Multidistrict Litigation conditionally transferred this action to the Eastern District of Texas for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Atrius maintains that the Western District of Texas is the proper transferor forum for purposes of trial and any remand following completion of MDL pretrial proceedings.

70. On April 28, 2026, Atrius filed a Motion to Remand this action to its original forum in the Western District of Texas. *See* MDL No. 3176, Dkt. 74. As of the date of filing of this Amended Complaint, that motion remains pending.

71. Personal jurisdiction over Defendant Rare Breed Triggers, Inc. is proper in Texas because, on information and belief, Rare Breed Triggers, Inc. is organized under Texas law and maintains Texas business addresses, including addresses in Wichita Falls and Austin, Texas.

72. Personal jurisdiction over Defendant Rare Breed Firearms LLC is proper in Texas because, on information and belief, Rare Breed Firearms LLC is organized under Texas law and maintains a Texas business address.

73. Specific personal jurisdiction over Defendants is proper because they have purposefully directed activities or transactions to the State of Texas and have performed acts purposefully availing themselves of the privilege of conducting activities in Texas, and have engaged in conduct directed at Atrius and its Texas-based business relationships, including by filing and maintaining patent infringement lawsuits in Texas federal courts accusing resellers of the Atrius FRS of infringing the Asserted Patents. For example, Defendant RBT conducts business on an ongoing basis in Texas and elsewhere in the United States, and Defendants ABC and RBT have together filed at least one patent infringement lawsuit in the Western District of Texas alleging infringement of the ’247 patent. *See*, *e.g.*, *ABC IP, et al. v. Hanes Tactical LLC et al.*, 3:25-cv-00201-DCG (W.D. Tex.). Defendants ABC and RBT have filed at least nine patent infringement lawsuits in judicial districts in the State of Texas, including at least one lawsuit in the Western District of Texas, one in the Southern District of Texas, and seven in the Eastern District of Texas. Certain of those cases are identified above. Additionally, ABC IP has brought two suits in the Western District of Texas pertaining to sales of FRTs. *See ABC IP, et al. v. Spider Hole, et al.*, 1:25-cv-864-ADA (W.D. Tex.); *ABC IP, et al. v. Spider Hole, et al.*, 1:25-cv-1626-ADA (W.D. Tex.).

74. Specific personal jurisdiction over Defendants DeMonico, Maxwell, and LeLeux is also proper because, on information and belief, each personally participated in, directed, authorized, controlled, ratified, and/or benefited from the conduct giving rise to Atrius's claims, including Defendants' acquisition, ownership, licensing, assertion, enforcement, and monetization of the Asserted Patents; the filing and maintenance of patent infringement lawsuits in Texas federal courts, including lawsuits in the Eastern District of Texas accusing resellers of the Atrius FRS of infringement; and the anticompetitive and tortious conduct alleged herein directed at Atrius and its Texas-based business relationships. These contacts are not based merely on the individual Defendants' corporate titles or statuses, but on their own purposeful acts and participation in the challenged conduct.

75. Personal jurisdiction over Defendants is also proper under principles of agency, alter ego, conspiracy, concerted action, and/or purposeful direction because, on information and belief, Defendants acted jointly and in concert through ABC, RBT, Rare Breed Firearms LLC, and affiliated entities to obtain, assert, enforce, license, and monetize the Asserted Patents and to direct the challenged conduct toward Atrius and its Texas-based business relationships.

76. Defendants are subject to this Court's specific personal jurisdiction consistent with constitutional due process and the Texas Long-Arm Statute because, among other things, Defendants purposefully directed the challenged conduct toward Texas, Atrius, and Atrius's Texas-based business relationships through their business operations, patent-enforcement activities, litigation conduct, and other actions alleged herein, and should reasonably anticipate being haled into court in Texas in connection with such conduct.

77. Defendants Rare Breed Triggers, Inc. and Rare Breed Firearms LLC are also subject to general personal jurisdiction in Texas because, on information and belief, they are

organized under Texas law, maintain principal places of business and/or continuous and systematic operations in Texas and are therefore "at home" in Texas for purposes of general jurisdiction.

78. Venue was proper when this action was filed in the Western District of Texas under at least 28 U.S.C. §§ 1391(b), (c) and/or 28 U.S.C. § 1400(b) because Atrius resides in Texas, Defendant Rare Breed Triggers, Inc. resides in Texas, personal jurisdiction is proper over Defendants in Texas, and a substantial part of the events, omissions, and injuries giving rise to Atrius's claims occurred in Texas, including in the Western District of Texas. Venue for coordinated or consolidated pretrial proceedings in this Court is proper pursuant to 28 U.S.C. § 1407 and the transfer orders entered by the Judicial Panel on Multidistrict Litigation in MDL No. 3176.

79. This Court also has supplemental jurisdiction over Atrius's related state-law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Atrius's federal patent and antitrust claims.

**COUNT ONE:**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '784 PATENT**

80. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

81. ABC has asserted that it is the current owner by assignment of all right, title, and interest in and to the '784 patent.

82. RBT has asserted that it is the exclusive licensee of the '784 patent.

83. Defendants have asserted in ongoing litigation that the FRS embodies the technology claimed in the '784 patent and that the standalone FRS product infringes the '784 patent.

84. Defendants have also asserted in ongoing litigation that the FRS infringes the ’784 patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm.

85. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding infringement to warrant the issuance of a declaratory judgment of non-infringement.

86. A judicial declaration is necessary and appropriate so that Atrius may ascertain its rights regarding the FRS and the ’784 patent.

87. The FRS and uses thereof do not infringe and have not infringed the ’784 patent, and Atrius has not contributed to or induced infringement of any claim of the ’784 patent, at least because the FRS, whether as a standalone part or installed and used as intended, does not embody the limitations of any claim of the ’784 patent.

88. The ’784 patent is directed to solving a problem relating to applying the invention of United States Patent No. 10,514,223 (“the ’223 patent”) to an AR-10 pattern firearm.

89. As Defendants know, the FRS is compatible with mil-spec AR-15 pattern firearms.

90. As Defendants know, the FRS is not compatible with AR-10 pattern firearms.

91. The ’784 patent discloses two embodiments of the claimed “locking member.”

92. Two disclosed embodiments of the claimed “locking member” in the ’784 patent are locking member (bar) 12 and locking member (bar) 48.

93. When locking member (bar) 12 of the ’784 patent is in a first position in which it locks trigger member 14 against pulling movement, locking member body 26 directly contacts trigger member 14.

94. Locking member 12 of the ’784 patent, including locking member body 26 and foldable extension 22, pivots as a unit when actuated by bolt carrier assembly 16 traveling forward.

95. Locking member 12 of the ’784 patent is supported by trigger housing 18 and pivot pin 20.

96. Locking member 12 of the ’784 patent, including locking member body 26 and foldable extension 22, pivots on pivot pin 20 when actuated by bolt carrier assembly 16 traveling forward.

97. The ’784 patent does not disclose an embodiment of the claimed “locking member” that is or includes a firearm’s safety selector.

98. The ’784 patent does not disclose an embodiment in which the claimed “locking member” is supported by a safety selector.

99. The FRS is not and does not contain a locking member with a body portion and an upwardly extending deflectable portion as disclosed and described in the ’784 patent.

100. By way of example, and without limitation, the FRS does not infringe, has not infringed, and cannot be and has not been used to infringe at least one or more of the following limitations as recited in claim 1 of the ’784 patent, whether sold as a standalone product or installed and used as intended:

- “extended trigger member locking device”
- “a locking member”
- “the locking member configured to be movably supported by a frame and including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier”

- "such actuating contact causing the locking member to move from the first position to the second position"
- "the locking member having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position."

101. For at least these reasons, the FRS, whether sold alone or installed and used as intended, does not infringe, and has not infringed, any claim of the '784 patent.

102. Atrius is entitled to a declaratory judgment that Atrius and the FRS and uses thereof do not infringe, and have not infringed, either directly or indirectly, literally or under the doctrine of equivalents, any claim of the '784 patent.

**COUNT TWO:**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE '784 PATENT**

103. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

104. Defendants have asserted in ongoing litigation that the FRS embodies the technology claimed in the '784 patent and that the standalone FRS product infringes claims of the '784 patent.

105. Defendants have also asserted in ongoing litigation that the FRS infringes the '784 patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold as part of a complete firearm.

106. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding the validity of the claims of the '784 patent to warrant the issuance of a declaratory judgment of invalidity. Accordingly, there exists an actual and justiciable controversy between the parties regarding the validity of the claims of the '784 patent.

107. The claims of the ’784 patent fail to meet one or more requirements of the patent laws of the United States, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

108. A judicial declaration of invalidity is necessary and appropriate so that Atrius may ascertain its rights regarding the ’784 patent.

## COUNT THREE: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE ’247 PATENT

109. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

110. ABC has asserted that it is the current owner by assignment of all right, title, and interest in and to the ’247 patent.

111. RBT has asserted that it is the exclusive licensee of the ’247 patent.

112. Defendants have asserted in ongoing litigation that the FRS embodies the technology claimed in the ’247 patent and that the standalone FRS product infringes at least claim 15 of the ’247 patent.

113. Defendants have also asserted in ongoing litigation that the FRS infringes at least claim 15 of the ’247 patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm.

114. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding infringement to warrant the issuance of a declaratory judgment of non-infringement.

115. A judicial declaration is necessary and appropriate so that Atrius may ascertain its rights regarding the FRS and the ’247 patent.

116. The FRS and uses thereof do not infringe and have not infringed the ’247 patent, and Atrius has not contributed to or induced infringement of any claim of the ’247 patent at least

because the FRS, whether as a standalone part or installed and used as intended, does not practice or embody the limitations of any claim of the ’247 patent.

117. All claims of the ’247 patent include a requirement that, during operation in forced reset semi-automatic mode, the firearm’s disconnector hook is prevented from catching the firearm’s hammer hook during rearward movement of the bolt carrier.

118. During operation of an AR-15 pattern firearm with the FRS installed and set to “FULL-SEMI” mode, the firearm’s disconnector hook catches the hammer hook during rearward movement of the bolt carrier.

119. During the operation of an AR-15 pattern firearm with the FRS installed and set to “FULL-SEMI” mode, the firearm’s disconnector hook is not prevented from catching the hammer hook.

120. The ’247 patent discloses cam 72 as a component that is separate from safety selector 110.

121. The ’247 patent discloses cam lobe 78 interacting with cam follower 58 of trigger member 38.

122. Trigger member 38, hammer 36, and disconnector 60 of the ’247 patent are not standard (i.e., mil-spec) AR-15 trigger, hammer, and disconnector.

123. The ’247 patent does not disclose cam 72 interacting with safety selector 110.

124. The ’247 patent does not disclose cam 72 contacting safety selector 110.

125. The FRS includes a safety selector.

126. The FRS does not include a cam as disclosed and described in the ’247 patent.

127. The FRS does not require the installation of a non-mil-spec trigger, non-mil-spec hammer, or non-mil-spec disconnector.

128. By way of example, and without limitation, the FRS does not infringe, has not infringed, and cannot be and has not been used to infringe at least one or more of the following limitations as recited in claim 15 of the ’247 patent, whether sold as a standalone product, installed in a receiver, or sold or used as part of a complete firearm:

- “a cam having a cam lobe . . . said cam being movable between a first position and a second position, in said second position said cam lobe forces said trigger member toward said set position”
- “whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catch said hammer hook.”

129. For at least these reasons, the FRS and uses thereof do not infringe, and have not infringed, the ’247 patent.

130. Atrius is entitled to a declaratory judgment that Atrius and the FRS and uses thereof do not infringe, and have not infringed, either directly or indirectly, literally or under the doctrine of equivalents, any claim of the ’247 patent.

## COUNT FOUR: DECLARATORY JUDGMENT OF INVALIDITY OF THE ’247 PATENT

131. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

132. Defendants have asserted in ongoing litigation that the FRS embodies the technology claimed in the ’247 patent and that the standalone FRS infringes claims of the ’247 patent.

133. Defendants have also asserted in ongoing litigation that the FRS infringes the ’247 patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm.

134. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding the validity of the claims of the ’247 patent to warrant the issuance of a declaratory judgment of invalidity. Accordingly, there exists an actual and justiciable controversy between the parties regarding the validity of the claims of the ’247 patent.

135. The claims of the ’247 patent fail to meet one or more requirements of the patent laws of the United States, including without limitation 35 U.S.C. §§ 101, 102, 103, and 112, and the rules, regulations, and laws pertaining thereto.

136. A judicial declaration of invalidity is necessary and appropriate so that Atrius may ascertain its rights regarding the ’247 patent.

## COUNT FIVE: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE ’247 PATENT DUE TO INEQUITABLE CONDUCT

137. A patent is unenforceable due to inequitable conduct if: “(1) an individual associated with the filing and prosecution of the patent application made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false information; and (2) the individual did so with a specific intent to deceive the PTO.” *In re BP Lubricants USA, Inc*., 637 F.3d 1307, 1327 n.3 (Fed. Cir. 2011).

138. A pleading of inequitable conduct “must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.” *Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1328 (Fed. Cir. 2009).

139. Each individual associated with the filing and prosecution of a patent application has a duty of candor to and a duty of good faith in dealing with the USPTO. This includes a duty

to disclose to the USPTO all information known to that individual to be material to the patentability of any pending claim. *See* 37 C.F.R. § 1.56(a).

140. The foregoing obligations apply to all individuals associated with the filing or prosecution of a patent application, including: (1) inventors, (2) attorneys or agents who prepare or prosecute the application, and (3) every other person who is substantively involved in the preparation or prosecution of the application and who is associated with an inventor, an applicant, an assignee, or anyone to whom there is an obligation to assign the application. 37 C.F.R. § 1.56(a); Manual of Patent Examining Procedure § 2001.01. A person is considered to be substantively involved in the preparation or prosecution of the application if that person's "involvement relates to the content of the application or decisions related thereto, and that the involvement is not wholly administrative or secretarial in nature." *Avid Identification Sys., Inc. v. Crystal Import Corp.*, 603 F.3d 967, 974 (Fed. Cir. 2010).

141. The '247 patent issued on Application No. 18/325,225 (the "'225 Application"), which was filed May 30, 2023.

142. The '225 Application claimed the benefit of provisional application no. 63/374,941 ("Provisional Application"), which was filed September 8, 2022.

143. Mr. Glenn D. Bellamy is a patent attorney for ABC IP, LLC.

144. Mr. Bellamy is identified on an Electronic Acknowledgement Receipt as the person who authorized the filing of the Provisional Application and is also indicated on an Electronic Payment Receipt as the person who authorized the payment of the filing fee for the Provisional Application.

145. Mr. Bellamy is also indicated on an Electronic Acknowledgement Receipt as the person who authorized the filing of the '225 Application that resulted in the '247 patent.

146. Mr. Bellamy signed or submitted documents submitted during the prosecution of the ’247 patent, including at least (a) Transmittal for Power of Attorney to One or More Registered Practitioners, identifying himself as the “Attorney of Record”; (b) Application Data Sheet; (c) Patent Assignment; (d) Comments on Examiner’s Reasons for Allowance; and (e) Fee(s) Transmittal form for the issue fee.

147. On information and belief, Defendant Mr. DeMonico, President of RBT, was substantively involved with the development, commercialization, litigation enforcement, and prosecution strategy relating to the forced-reset technology claimed in the ’247 patent, including matters relating to prior art, accused products, and prosecution decisions concerning the ’225 Application that became the ’247 patent.

148. At least as early as September 8, 2022, Bellamy and DeMonico had a duty of candor to and a duty of good faith in dealing with the USPTO in connection with the prosecution of the ’225 Application.

149. At least as early as September 8, 2022, Bellamy and DeMonico had a duty to disclose to the USPTO all information known to them to be material to the patentability of any pending claim.

150. In the Notice of Allowance of the ’225 Application (attached hereto as Ex. E), the USPTO Examiner stated that (in his opinion) the closest prior art for all pending claims was U.S. Patent 7,398,723 (“Blakley ’723”). The Examiner also stated that Blakley ’723 discloses various claim limitations of the ‘225 Application, including the “hammer,” “trigger member,” “disconnector,” and “cam” limitations of claims 1, 4, 9, 14, 15 and 20.

151. The Examiner stated in the Notice of Allowance that (in his opinion), Blakley ’723 does not disclose the following elements of independent claims 1, 4, 9, 14, and 20:

[a] a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions;

[b] whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer and pivoting of said cam from said first position to said second position such that said cam lobe forces said trigger member towards said set position but prior to reaching said set position said disconnector hook catches said hammer hook, and thereafter forward movement of the bolt carrier causes said cam to pivot to said first position, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm; and

[c] whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer and pivoting of said cam from said first position to said second position such that said cam lobe forces said trigger member to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter forward movement of the bolt carrier causes said cam to pivot to said first position, at which time the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

152. The above-identified portion [a] corresponds to the "safety selector" limitation of claims 1, 4, 9, 14, and 20 of the '247 patent.

153. The above-identified portion [b] corresponds to the first "whereupon" limitation regarding the "standard semi-automatic position" of claims 1, 4, 9, 14, and 20 of the '247 patent.

154. The above-identified portion [c] corresponds to the second "whereupon" limitation regarding the "forced reset semi-automatic position" of claims 1, 4, 9, 14, and 20 of the '247 Patent.

155. The Examiner also stated in the Notice of Allowance that (in his opinion), Blakley '723 does not disclose the following elements of independent claim 15:

[b] a trigger mechanism whereupon in a standard semi-automatic mode, said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm; and

[c] whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said

disconnector hook is prevented from catching said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm.

156. The above-identified portion [b] corresponds to the first “whereupon” limitation regarding the “standard semi-automatic mode” of claim 15 of the ’247 Patent.

157. The above-identified portion [c] corresponds to the second “whereupon” limitation regarding the “forced reset semi-automatic mode” of claim 15 of the ‘247 Patent.

158. On information and belief, Bellamy and DeMonico were aware of prior art that disclosed each of these above-identified limitations that the Examiner believed were missing from Blakley ’723, including the prior art identified below. Bellamy and DeMonico, therefore, knew that such prior art was directly material to the patentability analysis being performed by the Examiner.

159. On information and belief, Bellamy, together with DeMonico, knowingly failed to disclose at least the material prior-art references identified below during prosecution of the ’225 Application despite understanding that those references were directly relevant to limitations the Examiner considered absent from Blakley ’723. The facts alleged herein support a reasonable inference that Bellamy and DeMonico withheld those references with the specific intent to prevent the USPTO from considering their impact on patentability.

160. Bellamy also caused the ’225 Application to include an affirmative representation regarding common ownership that had the effect of excluding a known prior-art reference from consideration under 35 U.S.C. § 102(b)(2)(C), as explained below. On information and belief, that representation was made with knowledge of the prior-art significance of the underlying FRT-15-3MD product and with the intent to avoid substantive examination of that prior art.

161. The facts alleged herein support a reasonable inference that Bellamy and DeMonico acted with a specific intent to deceive the USPTO. Those facts include, among other things:

(a) their knowledge of prior art that disclosed limitations the Examiner expressly identified as missing from Blakley '723; (b) Bellamy's direct involvement in litigation accusing the FRT-15-3MD based on overlapping forced-reset functionality; (c) the failure to disclose the FRT-15-3MD or related litigation materials to the USPTO; and (d) the affirmative representation of common ownership that had the effect of excluding Strbac '003 from consideration as prior art. The single most reasonable inference from these facts is that Bellamy and DeMonico intended to prevent the USPTO from substantively considering the prior-art significance of the FRT-15-3MD and related Strbac disclosures during prosecution of the '225 Application.

162. The conduct of Bellamy, together with DeMonico, constitutes inequitable conduct that renders all claims of the '247 patent unenforceable.

**Tommy Triggers FRT-15-3MD Prior Art**

163. Material prior art known to, and withheld by, Bellamy and DeMonico includes a trigger assembly sold by Mr. Mladen Thomas Strbac (d/b/a Tommy Triggers) called the FRT-15-3MD.

164. The FRT-15-3MD was in public use, on sale, or otherwise available to the public before the Provisional Application was filed.

165. The FRT-15-3MD was in public use, on sale, or otherwise available to the public before the '225 Application was filed.

166. The FRT-15-3MD qualifies as prior art to the '247 patent under 35 U.S.C. §102(a)(1).

167. Bellamy was aware of the FRT-15-3MD because he signed and filed a patent infringement complaint against Strbac/Tommy Triggers on behalf of ABC and RBT on February 21, 2022. *See Rare Breed Triggers, LLC v. Strbac*, No. 1:22-cv-280 (N.D. Ohio), ECF No. 1

("Strbac Complaint," attached hereto as Ex. F). That complaint describes and includes several photos of the FRT-15-3MD. That complaint includes, as an exhibit, a cease-and-desist letter dated January 17, 2022, signed by Bellamy and sent to Tommy Triggers regarding that trigger assembly.

168. On information and belief, DeMonico was aware of the FRT-15-3MD because the suit against Tommy Triggers was brought on behalf of ABC and RBT. In addition, the case was ultimately settled, and DeMonico would likely have signed, approved, and/or negotiated the agreement on behalf of RBT. This knowledge is independently confirmed by RBT's own infringement complaint. By no later than the filing of that complaint, RBT had investigated the FRT-15-3MD, understood its accused operation, and considered it sufficiently relevant to the claimed forced-reset technology to accuse it of infringement in federal court. A product that RBT understood well enough to investigate and accuse of infringement was, at minimum, sufficiently relevant and material to disclose to the USPTO during prosecution of overlapping claims directed to forced-reset firearm technology.

169. Some of the photos of the FRT-15-3MD from the Strbac Complaint are shown below:




170. The photos included in the Strbac Complaint show that at least Bellamy was in possession of the FRT-15-3MD.

171. Strbac filed a provisional patent application (No. 63/297,884) on January 10, 2022, which discloses limited information about the FRT-15-3MD.

172. The FRT-15-3MD was material to the patentability of at least claims 1, 4, 9, 14, 15, and 20 of the ’225 Application and should have been disclosed to the USPTO. Despite Bellamy’s and DeMonico’s knowledge of the FRT-15-3MD and its operation, neither disclosed the product, the allegations regarding its functionality, nor the related Strbac litigation materials to the USPTO during prosecution.

173. The FRT-15-3MD discloses all the claim limitations identified by the Examiner as missing from the prior art of record.

174. As evidenced by the Strbac Complaint (¶¶ 44-47), a firearm with the FRT-15-3MD has a safety selector (that would be mounted in the fire control mechanism pocket) that can be

rotated to switch between safe, standard semiautomatic, and forced-reset semiautomatic modes. This disclosure of a three-position safety selector used with a forced-reset trigger discloses portion [a] of what the Examiner found missing from the cited prior art.

175. As shown in the Strbac Complaint (¶¶ 27, 29, 45), a firearm with the FRT-15-3MD can operate in a "disconnector mode," which is much like that of a standard AR-15 trigger. In that standard semiautomatic mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. This disclosure of a standard semiautomatic mode discloses portion [b] of what the Examiner found missing from the cited prior art.

176. The Strbac Complaint (¶¶ 44-45, 47, 50, 76) also evidences that a firearm with the FRT-15-3MD can operate in forced-reset mode. In that mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer, but the FRT-15-3MD prevents the disconnector hook from catching the hammer hook. Thereafter, the bolt carrier moves forward into battery, at which time the user can pull the trigger member to fire the firearm without manually releasing the trigger member. This disclosure of a forced-reset semiautomatic mode meets portion [c] of what the Examiner found missing from the cited prior art.

177. A person of ordinary skill in the relevant art would have been motivated to modify the Blakley '723 trigger mechanism to include a three-position safety selector as taught by the FRT-15-3MD to allow the firearm to operate in each of three modes (safe, standard semiautomatic,

and forced-reset semiautomatic), wherein the disconnector is prevented from catching the hammer hook in forced-reset semiautomatic mode.

178. Had the Examiner been aware of the FRT-15-3MD, he would have rejected at least pending claims 1, 4, 9, 14, 15, and 20 of the ‘225 Application under 35 U.S.C. §103 in light of Blakley ’723 and the FRT-15-3MD.

179. Neither Bellamy nor DeMonico, nor anyone else involved with prosecuting the ’225 Application, disclosed the FRT-15-3MD to the USPTO during prosecution of the ’225 Application. Nor did they disclose that RBT had already accused the FRT-15-3MD in federal litigation based on allegedly overlapping forced-reset functionality.

180. On information and belief, Bellamy and/or DeMonico intentionally used the later-filed ’572 Strbac Application and the common-ownership representation described below to prevent the USPTO from substantively considering the prior-art significance of the earlier FRT-15-3MD product.

181. During prosecution of the ’247 patent, ABC disclosed U.S. Patent No. 11,724,003 to Thomas Strbac (“Strbac ’003”) in an Information Disclosure Statement (“IDS”) filed August 31, 2023. That IDS additionally identified 114 issued patents, 25 published patent applications, 7 foreign patent documents, and 1 non-patent literature document. On information and belief, the extensive IDS, identifying approximately 150 items, served to obscure the disclosure and relevance of Strbac ’003.

182. Strbac ’003 issued on application no. 18/048,572 (“the ’572 Strbac Application”), which was authorized by Bellamy and filed on October 21, 2022—*after* Bellamy filed the Provisional Application to which the ’247 patent claims priority. The ’572 Strbac Application

discloses aspects of a modified version of the FRT-15-3MD, and its disclosure adds substantial new matter relative to Strbac provisional application No. 63/297,884.

183. The new matter added to the ’572 Strbac Application is not entitled to priority as of the filing date of Strbac provisional application No. 63/297,884 (January 10, 2022). Instead, all new matter added to the ’572 Strbac Application relative to the provisional application has an effective filing date of the ’572 Strbac Application (October 21, 2022).

184. The ’225 Application incorporates by reference the ’572 Strbac Application and identifies it as “assignee’s” pending patent application (i.e., owned by Defendant ABC)—thus representing to the USPTO that the ’572 Strbac Application was commonly owned with the ’225 Application. Under the Manual of Patent Examining Procedure (e.g., MPEP § 717.02(a)), this affirmative statement had the effect of excluding Strbac ’003 as prior art under 35 U.S.C. § 102(b)(2)(C) based on common ownership by Defendant ABC of Strbac ’003 and the ’225 Application, even though Bellamy and DeMonico knew the FRT-15-3MD product was prior art to the claims of the ’225 Application. On information and belief, Bellamy and DeMonico understood that characterizing the later-filed ’572 Strbac Application as commonly owned would help prevent the USPTO from substantively evaluating the prior-art significance of the earlier FRT-15-3MD product itself.

185. Bellamy and DeMonico thus deceptively removed Strbac ’003 from consideration as prior art during prosecution. Indeed, the Examiner did not discuss Strbac ’003, the ’572 Strbac Application, or the underlying FRT-15-3MD product during prosecution or use any of them in a rejection, despite their obvious similarities to the claimed subject matter. As a result, the USPTO never substantively evaluated whether Blakley ’723 in view of the FRT-15-3MD rendered the asserted claims unpatentable.




FIG. 3




FIG. 3

**Blakley ’247, Fig. 3 vs. Strbac ’003, Fig. 3**

186. While direct evidence of Bellamy’s and DeMonico’s state of mind is solely within their control, the information available to Atrius confirms that the single most reasonable inference is that Bellamy and DeMonico intentionally withheld the FRT-15-3MD from the USPTO to obtain allowance of the ’225 Application and issuance of the ’247 patent. That inference is supported by Bellamy’s and DeMonico’s undeniable knowledge of the structure, operation, and materiality of the FRT-15-3MD (based at least on the Strbac Complaint) and their inexplicable failure to disclose the FRT-15-3MD during prosecution. That inference is further strengthened by the fact that Bellamy had already signed and filed the Strbac Complaint accusing the FRT-15-3MD of infringing forced-reset technology before the relevant prosecution events occurred. This inference is further supported by the statement in the ’247 patent that the ’572 Strbac Application was commonly owned by ABC IP, thereby intending to remove it (and the resulting Strbac ’003 patent)

from consideration as prior art to the ’247 patent. By filing the Provisional Application on September 8, 2022, then filing the ’572 Strbac Application on October 21, 2022, then identifying the ’572 Strbac Application as commonly owned in the specification of the ’225 Application—without disclosing the prior art FRT-15-3MD or the existence of the Strbac litigation accusing that same product—Bellamy and DeMonico successfully and intentionally concealed the FRT-15-3MD from the USPTO with the intent to deceive. RBT cannot plausibly contend that the FRT-15-3MD was unknown, insignificant, or poorly understood, where RBT had already deemed the same product important enough to investigate and accuse in federal litigation.

187. On information and belief, Bellamy and DeMonico were aware that the FRT-15-3MD discloses one or more limitations that the Examiner believed were missing from Blakley ’723 and the other prior art of record.

188. Atrius filed a petition for *inter partes* review of the ’247 patent on August 29, 2025, alleging claims of the ’247 patent are unpatentable based on Blakley ’723 in combination with one or more videos depicting certain aspects of the FRT-15-3MD. The petition relied on videos of the FRT-15-3MD—rather than the product itself—because *inter partes* review petitions are limited to unpatentability grounds based on prior art consisting of patents or printed publications (*i.e.*, excluding products in public use, on sale, or otherwise available to the public). *See* 35 U.S.C. § 311(b).

189. In response to Atrius’s petition for *inter partes* review, Defendants argued (among other things) that Atrius was improperly attempting to rely on the FRT-15-3MD product itself; that the videos identified in the petition do not qualify as printed publications for use in an *inter partes* review and were not publicly accessible; and that the videos on which Atrius relied failed to disclose how the product operates. Those positions are inconsistent with Defendants’ earlier

allegations in the Strbac Complaint, where Defendants described the operation and functionality of the FRT-15-3MD in detail for purposes of asserting infringement.

190. Atrius's petition was denied without opinion on February 18, 2026. Neither the Examiner (during examination of the '247 patent) nor the Patent Trial and Appeal Board (in reviewing the petition for *inter partes* review) ever discussed or distinguished the FRT-15-3MD product (or the combination of Blakley '723 and FRT-15-3MD) from the claims of the '247 patent or Strbac '003.

191. To date, Defendants have successfully prevented the USPTO from considering or passing judgment on patentability of the '247 claims based on Blakley '723 in view of the FRT-15-3MD. Neither the Examiner nor the Patent Trial and Appeal Board has ever substantively addressed whether the known prior-art FRT-15-3MD—despite being sufficiently relevant for RBT to accuse in litigation—renders the asserted claims unpatentable.

**Rare Breed FRT-15E3 Prior Art**

192. The Strbac Complaint (¶38) also states that on January 15, 2022—two days before sending a cease-and-desist letter to Tommy Triggers regarding the FRT-15-3MD—DeMonico publicly disclosed and demonstrated the operation of a three-position forced-reset trigger in which a safety selector switch can change the mode of operation between safe, standard semiautomatic with disconnector, and forced reset semiautomatic modes. That public disclosure occurred before filing of both the Provisional Application and the '225 Application and involved subject matter materially similar to limitations the Examiner later identified as missing from Blakley '723. The Strbac Complaint refers to this three-position trigger as the FRT-15E3 and shows a photo of it:




193. A video of DeMonico demonstrating a firearm with the FRT-15E3 installed and operational was uploaded to YouTube on January 15, 2022, at https://www.youtube.com/watch?v=ZJ0lWi2kfC0. The video publicly depicts the structure, operation, and selector functionality of the FRT-15E3 and confirms that Bellamy and DeMonico were aware of the device and its operation well before prosecution of the ’225 Application.

194. The FRT-15E3 was disclosed to the public before the Provisional Application to which the ’225 Application claims priority was filed.

195. The FRT-15E3 was disclosed to the public before the ‘225 Application was filed.

196. On information and belief, the FRT-15E3 publicly disclosed by DeMonico on January 15, 2022 was developed, tested, and publicly demonstrated before any alleged contribution by Blakley to the specific three-position selector functionality later claimed in the ’247 patent.

197. On information and belief, Bellamy and DeMonico therefore knew, before filing the Provisional Application and the ’225 Application, that a three-position selector capable of

switching between safe, standard semiautomatic, and forced-reset semiautomatic modes had already been publicly disclosed.

198. The FRT-15E3 qualifies as prior art to the ‘247 patent under 35 U.S.C. §102(a)(1) and, on information and belief, is not subject to either exception of 35 U.S.C. §102(b)(1).

199. The FRT-15E3 was material to the patentability of at least claims 1, 4, 9, 14, 15, and 20 of the ‘225 Application because it disclosed limitations the Examiner expressly identified as absent from Blakley ’723, including the three-position selector functionality and forced-reset operational modes identified in the Notice of Allowance. The FRT-15E3, therefore, should have been disclosed to the USPTO.

200. As evidenced by the Strbac Complaint (¶ 38) and the YouTube video, a firearm with the FRT-15E3 has a safety selector (that would be mounted in the fire control mechanism pocket) that can switch between safe, standard semiautomatic, and forced reset semiautomatic modes. This disclosure of a three-position safety selector used with a forced reset trigger discloses portion [a] of what the Examiner found missing from the cited prior art.

201. The Strbac Complaint (¶¶ 27, 29, 38, 45) evidences that a firearm with the FRT-15E3 can operate in a standard semiautomatic with disconnector mode, which is much like that of a standard AR-15 trigger. In that standard semiautomatic mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. This disclosure of a standard semiautomatic mode discloses portion [b] of what the Examiner found missing from the cited prior art.

202. The Strbac Complaint (¶¶ 35-36, 38, 45) also evidences that a firearm with the FRT-15E3 can operate in forced-reset semiautomatic mode, like the FRT-15 model also described in that complaint. In that mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer, but the FRT-15E3 prevents the disconnector hook from catching the hammer hook. Thereafter, the bolt carrier moves forward into battery, at which time the user can pull the trigger member to fire the firearm without manually releasing the trigger member. This disclosure of this forced-reset semiautomatic mode meets portion [c] of what the Examiner found missing from the cited prior art.

203. A person of ordinary skill in the art would have been motivated to modify the trigger mechanism of Blakley ’723 to include a three-position safety selector as taught by the FRT-15E3 to allow the firearm to operate in each of three modes (safe, standard semiautomatic with disconnector, and forced-reset semiautomatic), wherein the disconnector is prevented from catching the hammer hook in forced-reset semiautomatic mode.

204. Had the Examiner been aware of the FRT-15E3, he would have rejected at least pending claims 1, 4, 9, 14, 15, and 20 of the ‘225 Application under 35 U.S.C. §103 in light of Blakley ’723 and the FRT-15E3.

205. Neither Bellamy nor DeMonico, nor anyone else involved with prosecution of the ’225 Application, disclosed the FRT-15E3, the January 15, 2022 public demonstration, or the related video and litigation materials to the USPTO during prosecution of the ’225 Application.

206. The facts alleged herein support a reasonable inference that Bellamy and DeMonico intentionally withheld the FRT-15E3 from the USPTO during prosecution of the ’225 Application. That inference is supported by, among other things: (a) Defendants’ direct involvement in publicly disclosing and demonstrating the FRT-15E3 before filing the Provisional Application;

(b) Bellamy's discussion of the FRT-15E3 in the Strbac Complaint; (c) Bellamy's and DeMonico's knowledge that the FRT-15E3 disclosed limitations the Examiner later identified as missing from Blakley '723; and (d) their failure to disclose the FRT-15E3 or related materials to the USPTO despite that knowledge. The single most reasonable inference from these facts is that Bellamy and DeMonico intended to prevent the Examiner from substantively considering the prior-art significance of the FRT-15E3.

207. Bellamy was aware of the FRT-15E3 because he discussed and showed it in the Strbac Complaint in early 2022, after the FRT-15E3 was publicly disclosed but before the Provisional Application or the '225 Application were filed.

208. DeMonico was aware of the FRT-15E3 because he publicly disclosed and used it in a video posted to YouTube before the Provisional Application or the '225 Application were filed.

209. On information and belief, Bellamy and DeMonico were aware that the FRT-15E3 disclosed one or more limitations the Examiner expressly identified as missing from Blakley '723 and nevertheless knowingly failed to disclose the FRT-15E3 to the USPTO. The facts alleged herein support a reasonable inference that Bellamy and DeMonico withheld the FRT-15E3 with the specific intent to deceive the USPTO.

**Super Safety**

210. In early 2022, ABC and RBT discovered that Timothy Hoffman d/b/a Hoffman Tactical LLC was offering and distributing a downloadable 3D-printable modification to a standard AR-pattern trigger that effectively converted such trigger to a forced reset trigger. *See* ¶ 23 of Original Complaint in *ABC IP, LLC v. Timothy Hoffman et al.*, Case 1:25-cv-00389 (E.D. Tenn.), ECF No. 1 ("Hoffman Complaint," attached hereto as Ex. G).

211. Bellamy sent a cease-and-desist letter dated February 9, 2022, to Timothy Hoffman, alleging infringement of ABC's U.S. Patent No. 10,514,223. *See* Ex. G at ¶ 24.

212. ABC entered into a settlement agreement to resolve the dispute with Hoffman on February 24, 2022. *See* Ex. G at ¶ 24.

213. On information and belief, Defendants monitored Hoffman's public activities relating to FRTs beginning on or before early 2022, at least because Hoffman indicated to Defendants in early 2022 that he planned to design a non-infringing device. On information and belief, Defendants therefore closely monitored Hoffman's efforts to develop a non-infringing or alternative forced-reset design.

214. Hoffman publicly disclosed the Super Safety product in a video posted on YouTube on May 7, 2023: https://www.youtube.com/watch?v=auAqg-FiHv4 (see 15:07 of video). The Super Safety is disclosed as being slidably mounted in the firearm, i.e., a push-button safety selector.

215. The Super Safety disclosed in the YouTube video identified was mounted in the fire control mechanism pocket and could switch between safe, standard semiautomatic, and forced reset semiautomatic modes. This disclosure of a three-position safety selector used with a forced reset trigger discloses portion [a] of what the Examiner found missing from the cited prior art.

216. On May 30, 2023—approximately three weeks after Hoffman publicly disclosed the Super Safety—ABC filed the '225 Application that resulted in the '247 patent. The '225 Application added disclosure that was not included in the Provisional Application (i.e., new matter). New matter introduced in a non-provisional patent application claiming priority to a provisional application is entitled to priority as of the filing date of the non-provisional application and is not entitled to priority based on the filing date of the provisional application. The timing of

the ’225 Application—filed approximately three weeks after the public disclosure of the Super Safety—is consistent with Bellamy and DeMonico attempting to draft claims broad enough to encompass or read on the newly disclosed Super Safety functionality.

217. For example, the Provisional Application discloses the claimed cam and safety selector only as being “pivotable,” and the claims of the Provisional Application required both the cam and safety selector to be pivotable.

218. The Provisional Application does not disclose the claimed cam or safety selector being slidably mounted, nor does the Provisional Application include the word “slidable” or “slidably.”

219. The Provisional Application does not contain the word “movable” or “movably.”

220. The ’225 Application added new matter disclosing that, in the alternative to being mounted to pivot, “the cam 72 can be slidably mounted to the housing.” The ’225 Application also included one claim—i.e., claim 14—that was not included in the Provisional Application and captured the new matter by allowing the claimed cam to be “movably mounted,” which broadened the scope of the claim to cover a cam that is mounted to pivot (as disclosed in the Provisional Application) or a cam that is slidably mounted (as first disclosed in the ’225 Application).

221. All claims of the Provisional Application, and all original claims filed with the ’225 Application, require the presence of a safety selector mounted to pivot.

222. On April 4, 2024, ABC added new claims 15-23 to the pending ’225 Application, which eventually became claims 15-23 of the ’247 Patent. Like original claim 14, new claims 15-23 allow the claimed cam to be “movably mounted” and “moveable” between a first position and a second position rather than being limited to the cam being mounted to pivot as disclosed in the Provisional Application and required by claims 1-13 of the ’247 patent. Claims 15-23 thus

capture the new matter added by the ’225 Application that is not entitled to the priority date of the Provisional Application. The doctrine of claim differentiation emphasizes ABC’s intent to capture the new matter by changing “pivotable” to “movable.” Like claim 15, claim 16 includes a safety selector which is “movably mounted,” and dependent claim 22, states “wherein said safety selector moves . . . by rotation,” making clear that movable would encompass more (i.e., slidable).

223. All original claims 1-14 filed with the ’225 Application require a safety selector adapted to be mounted to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. Claims 20-23, added on April 4, 2024, broaden the scope of that requirement by allowing the safety selector to be “movably mounted,” i.e., mounted to pivot or slidably mounted.

224. Neither the Provisional Application nor the ’225 Application discloses that the safety selector can be mounted in any way other than to pivot. On information and belief, Applicant nevertheless introduced the broadening “movably mounted” safety selector language into claims 20-23 nearly a year after filing the ’225 Application to cover a safety selector that is slidably mounted (as disclosed by Super Safety) rather than being pivotally mounted.

225. On information and belief, Bellamy, together with DeMonico’s knowledge and support, introduced the above-described broadened “movably mounted” claim language into the ’225 Application after learning of the publicly disclosed Super Safety and its slidably mounted selector functionality.

226. Neither Bellamy nor DeMonico nor anyone else involved in prosecuting the ’225 Application disclosed the Super Safety to the USPTO.

227. The Super Safety is prior art to at least claims 14-23 of the ’247 patent.

228. On December 23, 2025, Bellamy filed a patent infringement complaint against Hoffman and Hoffman Tactical on behalf of ABC and RBT based on the Super Safety. *See* Ex. G.

229. The Hoffman Complaint accuses the Super Safety of infringing Claim 15 of the ’247 Patent, thereby admitting that Defendants (including Bellamy and DeMonico) believe the Super Safety, when installed and used as intended, includes all elements of at least that claim.

230. In the Hoffman Complaint, Defendants allege that the Super Safety includes all claim limitations the Examiner found missing from the cited prior art.

231. Defendants’ allegations in the Hoffman Complaint confirm that Defendants themselves contend the Super Safety satisfies every limitation of at least claim 15 of the ’247 patent. If the Super Safety qualifies as prior art to claim 15, Defendants’ own infringement allegations strongly support invalidity of that claim.

232. On information and belief, Bellamy and DeMonico were aware during prosecution of the ’247 patent that the Super Safety is prior art that discloses one or more limitations that the Examiner found missing from the cited prior art.

233. On information and belief, Bellamy and DeMonico were aware during prosecution of the ’247 patent that the Super Safety includes a slidably mounted safety selector—i.e., new matter captured by claims 15-23 submitted on April 4, 2024.

234. On information and belief, Bellamy and DeMonico were aware during prosecution of the ’247 patent that the Super Safety is a three-position push-button safety selector.

235. Had the Examiner been aware of the Super Safety, he would have rejected at least pending claims 15-23 of the ‘225 Application under 35 U.S.C. §102 and/or §103 in light of the Super Safety.

236. Had the Examiner been aware of the Super Safety, he would have rejected or materially limited Defendants' attempt to broaden claims 14-23, based on new matter added with or after the filing of the '225 Application, to cover slidably mounted cams and safety selectors in addition to pivotally mounted cams and safety selectors.

237. Had the Examiner been aware of the Super Safety, FRT-15-3MD, and/or FRT-15E3, he would have rejected at least pending claims 1, 4, 9, 14, 15, and 20 of the '225 Application under 35 U.S.C. §103 in light of Blakley '723 in combination with one or more of these prior-art systems.

238. On information and belief, Bellamy and DeMonico knowingly failed to disclose the Super Safety to the USPTO despite understanding that it was materially relevant to the patentability of at least claims 14-23 of the '247 patent.

239. The facts alleged herein—including Bellamy's and DeMonico's repeated failure to disclose prior-art systems that disclosed limitations the Examiner identified as missing from Blakley '723, their knowledge of those systems through public disclosures and litigation activity, and their later infringement allegations concerning those same systems—support a reasonable inference that Bellamy and DeMonico acted with a specific intent to deceive the USPTO during prosecution of the '225 Application.

## COUNT SIX: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '159 PATENT

240. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

241. U.S. Patent No. 12,578,159 (the "'159 patent"), entitled "Firearm Trigger Mechanism," issued from U.S. Application No. 18/761,606 (the "'606 Application") on March 17, 2026. The '606 Application asserts that it is a continuation of the '225 Application, which ultimately issued as the '247 Patent.

242. ABC has asserted that it is the current owner by assignment of all right, title, and interest in and to the ’159 patent.

243. RBT has asserted that it is the exclusive licensee of the ’159 patent.

244. Defendants have asserted in ongoing litigation against resellers of the Atrius FRS that the product embodies the technology claimed in the ’159 patent and that the standalone FRS product infringes the ’159 patent.

245. As a result of Defendants’ assertion of the ’159 patent against Atrius’s resellers and customers based on the FRS, there exists a controversy of sufficient immediacy and reality regarding infringement of the ’159 patent to warrant the issuance of a declaratory judgment of non-infringement under 28 U.S.C. §§ 2201 and 2202.

246. The FRS and uses thereof do not infringe and have not infringed, directly or indirectly, literally or under the doctrine of equivalents, any claim of the ’159 patent, and Atrius has not contributed to or induced infringement of any claim of the ’159 patent, at least because the FRS, whether sold as a standalone part or installed and used as intended, does not embody or practice each limitation of any claim of the ’159 patent.

247. By way of example, and without limitation, the ’159 patent claims require, among other things, structures and operational characteristics—including whereupon in a second mode the disconnector hook is prevented from holding the hammer—that the FRS does not have. As detailed above with respect to the ’247 patent, the FRS does not include a cam as disclosed in the Strbac patent family, does not require installation of a non-mil-spec trigger, hammer, or disconnector, and does not prevent the firearm’s disconnector hook from catching the hammer hook during operation.

248. For at least these reasons, the FRS, whether sold alone or installed and used as intended, does not infringe, and has not infringed, any claim of the ’159 patent.

249. Atrius is entitled to a declaratory judgment that Atrius and the FRS and uses thereof do not infringe, and have not infringed, either directly or indirectly, literally or under the doctrine of equivalents, any claim of the ’159 patent.

## COUNT SEVEN: DECLARATORY JUDGMENT OF INVALIDITY OF THE ’159 PATENT

250. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

251. As a result of Defendants’ assertion of the ’159 patent against Atrius’s resellers and customers based on the FRS, there exists a controversy of sufficient immediacy and reality regarding the validity of the claims of the ’159 patent to warrant the issuance of a declaratory judgment of invalidity.

252. The claims of the ’159 patent fail to meet one or more requirements of the patent laws of the United States, including without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

253. By way of example and without limitation, the claims of the ’159 patent are invalid because the subject matter of those claims was in public use, on sale, or otherwise available to the public before their effective filing date, including by virtue of the public disclosure, demonstration, sale, and use of the Tommy Triggers FRT-15-3MD and the Rare Breed FRT-15E3, as detailed above. The asserted claims are also invalid because, on information and belief, the claimed three-position selector and forced-reset operating modes were disclosed, taught, or rendered obvious by prior-art systems known to Defendants before and during prosecution of the application that issued as the ’159 patent.

254. A judicial declaration of invalidity is necessary and appropriate so that Atrius may ascertain its rights regarding the ’159 patent.

## COUNT EIGHT: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE ’159 PATENT DUE TO INEQUITABLE CONDUCT

255. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

256. On information and belief, Bellamy authorized and was substantively involved in the filing and prosecution of the ’606 Application that issued as the ’159 patent, and accordingly owed a duty of candor and good faith to the USPTO under 37 C.F.R. § 1.56 in connection with that prosecution.

257. As detailed above, Bellamy and DeMonico had actual knowledge, no later than January 17, 2022, of the structure, operation, public use, and on-sale activities of the Tommy Triggers FRT-15-3MD product, and had actual knowledge, no later than January 15, 2022, of the structure, operation, and public disclosure of the Rare Breed FRT-15E3. That knowledge predated the filing and prosecution of the ’606 Application that issued as the ’159 patent.

258. The FRT-15-3MD and the FRT-15E3 are material to the patentability of one or more claims of the ’159 patent because they disclose limitations of the claimed three-position safety selector and forced-reset trigger mechanism that, on information and belief, were not otherwise disclosed in the prior art of record before the Examiner during prosecution of the ’606 Application. Had the Examiner been aware of the FRT-15-3MD and/or FRT-15E3, the Examiner would not have allowed at least one claim of the ’159 patent in its issued form.

259. Neither Bellamy nor DeMonico, nor any other individual associated with the prosecution of the ’606 Application, disclosed the FRT-15-3MD or the FRT-15E3 to the USPTO during prosecution of the application that issued as the ’159 patent. Nor did they disclose the

related litigation materials, public demonstrations, videos, or allegations describing the operation and functionality of those prior-art systems.

260. On information and belief, the facts alleged herein support a reasonable inference—and the single most reasonable inference is—that Bellamy and DeMonico intentionally withheld the FRT-15-3MD and FRT-15E3 from the USPTO with the specific intent to deceive the USPTO into issuing the ’159 patent. That inference is supported by Bellamy’s and DeMonico’s knowledge of those products, the materiality of those products to claimed three-position forced-reset functionality, their failure to disclose those products or related materials, and the close relationship between the ’606 Application and the ’225 Application that issued as the ’247 patent.

261. As a result of Defendants’ assertion of the ’159 patent against Atrius’s resellers and customers based on the FRS, there exists a controversy of sufficient immediacy and reality regarding the enforceability of the ’159 patent to warrant the issuance of a declaratory judgment of unenforceability.

262. In the alternative, because the ’606 Application is a continuation of the ’225 Application and the ’159 patent shares a common specification, priority chain, claimed subject matter, and prosecution lineage with the ’247 patent, the ’159 patent is unenforceable under the doctrine of “infectious unenforceability.” *E.g.*, *Consolidated Aluminum Corp. v. Foseco Int’l Ltd.*, 910 F.2d 804 (Fed. Cir. 1990) (holding inequitable conduct in procuring one patent rendered related patents unenforceable); *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366 (Fed. Cir. 2006) (extending reasoning to continuation patents); *Freshub, Inc. v. Amazon.com Inc.*, No. 6:21-cv-00511-ADA, 2021 WL 8945738, at *5 (W.D. Tex. July 30, 2021) (defining the “Doctrine of Infectious Unenforceability” as “[i]nequitable conduct in the prosecution of a patent [that] may render unenforceable other related patents”).

263. Atrius is entitled to a declaratory judgment that the ’159 patent is unenforceable due to inequitable conduct.

**COUNT NINE:**
**WALKER PROCESS VIOLATION OF SECTION 2 OF THE SHERMAN ACT**

264. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

265. As detailed above, Defendants, through their patent attorney Bellamy and through Defendant DeMonico, obtained the ’247 patent—and through continuation practice, the ’159 patent—through knowing and intentional fraud on the USPTO, including through the intentional withholding of material prior art (the FRT-15-3MD, the FRT-15E3, and the Super Safety) and through an affirmative misrepresentation that the ’572 Strbac Application was commonly owned in order to deceptively remove Strbac ’003 from consideration as prior art. During the prosecution of these patents, Defendants (including Bellamy and DeMonico) had a duty of candor and good faith in dealing with the USPTO, including a duty to disclose to the USPTO all information known to be material to patentability under 37 C.F.R. § 1.56. The fraudulent omissions and misrepresentations described herein were material to issuance of the ’247 and ’159 patents. Had the USPTO been aware of the FRT-15-3MD, the FRT-15E3, the Super Safety, the related public disclosures and litigation materials, and the true prior-art significance of the Strbac disclosures, the USPTO would not have allowed at least one asserted claim of the ’247 patent and/or the ’159 patent in their issued form. The withheld prior art disclosed limitations the Examiner expressly identified as missing from Blakley ’723 and was directly material to patentability.

266. Defendants knew that the ’247 and ’159 patents were procured through the fraudulent conduct described herein and nevertheless maintained, asserted, and enforced those patents against Atrius’s resellers and customers through the Customer Lawsuits, cease-and-desist demands, threats of litigation, and related enforcement activities. Defendants’ enforcement of the

fraudulently-procured ’247 and ’159 patents constitutes exclusionary and anticompetitive conduct undertaken to obtain, maintain, and/or dangerously threaten monopoly power in the Relevant Market (defined below) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

267. On information and belief, Defendants’ enforcement campaign against Atrius’s customers, resellers, and related market participants was objectively baseless because Defendants knew, or reasonably should have known, that the ’247 and ’159 patents were procured through material omissions and misrepresentations to the USPTO and were therefore invalid and/or unenforceable. Despite that knowledge, Defendants nevertheless pursued serial enforcement actions, cease-and-desist demands, and litigation threats against downstream market participants to suppress competing FRT-type products, interfere with distribution channels, and impose litigation costs and commercial pressure on competitors and their customers.

268. The relevant antitrust market is the United States market for AR-15 pattern firearms forced reset triggers and forced reset safety selector systems that simulate fully-automatic fire while forcibly resetting the trigger with the bolt (the “Relevant Market”). Products in the Relevant Market are not reasonably interchangeable with non-FRT trigger products from the perspective of consumers seeking forced-reset functionality. FRTs and FRSs offer an entirely different user experience—namely, the ability to shoot a firearm that appears to be more in a “fully-automatic” fashion than a firearm equipped with a standard or OEM trigger could.

269. Through their assertion and enforcement of the ’247 patent, ’159 patent, and related FRT patents, Defendants possess monopoly power, or at a minimum a dangerous probability of acquiring monopoly power, in the Relevant Market. Defendants have used the asserted patents and related enforcement campaign to exclude competitors, suppress competing FRT-type products,

disrupt reseller and distribution relationships, and deter market participation by competing manufacturers and sellers.

270. Defendants have engaged in predatory and anticompetitive conduct with the specific intent to continue to monopolize the Relevant Market by, among other things, asserting the fraudulently-procured ’247 and ’159 patents in serial lawsuits against downstream customers, distributors, resellers, and other market participants, knowing that such enforcement would coerce these parties into ceasing distribution and/or use of the FRS. Defendants understood that targeting downstream resellers and customers would impose substantial litigation costs and commercial pressure throughout the distribution chain, thereby suppressing competition in the Relevant Market.

271. As a direct competitor and supplier whose customers have been targeted by enforcement of the fraudulently-procured ’247 and ’159 patents, Atrius has suffered antitrust injury of the type the antitrust laws were designed to prevent because Defendants’ conduct has impaired Atrius’s ability to compete in the Relevant Market, including lost sales, lost profits, exclusion from market opportunities, damage to customer relationships and goodwill, disruption of reseller and customer relationships, diminished market access, reputational harm, and attorneys’ fees and costs incurred in responding to Defendants’ enforcement campaign. Atrius is entitled to treble damages, attorneys’ fees, and costs under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, together with an injunction permanently restraining Defendants from further enforcement of the ’247 and ’159 patents against Atrius and its customers, manufacturers, distributors, importers, users, and resellers. Defendants’ conduct threatens continuing and irreparable harm to competition and to Atrius unless enjoined by this Court.

## COUNT TEN: SHAM LITIGATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

272. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

273. Defendants' Customer Lawsuits asserting infringement of the Asserted Patents are objectively baseless, at least as asserted against the FRS product, because no reasonable litigant could realistically expect success on the merits in light of, among other things: (a) the FRS does not satisfy one or more limitations of the asserted claims, as detailed in Counts One, Three, and Six; (b) all claims of the Asserted Patents are invalid, as detailed in Counts Two, Four, and Seven; and (c) the '247 and '159 patents are unenforceable for inequitable conduct, as detailed in Counts Five and Eight. Defendants nevertheless continued asserting those patents despite knowledge of the material prior art and prosecution misconduct described herein.

274. Defendants' Customer Lawsuits were not genuinely aimed at obtaining valid and lawful judicial relief on the merits. Rather, on information and belief, Defendants used the litigation process itself to impose costs, disrupt distribution channels, deter resellers and customers from carrying competing FRT-type products, and interfere with competition in the Relevant Market.

275. Defendants' conduct falls outside the protections of the *Noerr-Pennington* doctrine because the Customer Lawsuits were objectively baseless and pursued in subjective bad faith as part of an anticompetitive campaign directed at suppressing competition in the Relevant Market rather than obtaining legitimate judicial relief on the merits.

276. Defendants brought and maintain the Customer Lawsuits with the subjective intent to interfere directly with Atrius's existing and prospective business relationships, and to use the litigation process itself—rather than the legitimate adjudication of patent claims—as a means to

impose competitive pressure and suppress competition, e.g., coercing Atrius's resellers and customers into ceasing distribution and use of the FRS.

277. Prior to filing its series of Customer Lawsuits, Defendants did not provide Atrius with pre-suit notice concerning their allegations concerning the FRS before initiating serial infringement actions against downstream resellers and customers in a manner calculated to maximize commercial disruption, impose litigation costs throughout the distribution chain, and deter continued distribution of competing FRT-type products.

278. Defendants' pattern of serial infringement lawsuits asserted against downstream market participants—at least twenty-one filed since May 16, 2025—further demonstrates that the Customer Lawsuits constitute a pattern of baseless, repetitive claims undertaken without regard to the merits and intended to inflict collateral, anticompetitive injury on Atrius and its supply chain, including, but not limited to: (a) intimidating and coercing Atrius's resellers and customers into ceasing sales of Atrius's FRS product; (b) disrupting and destroying Atrius's distribution channels and customer relationships; (c) imposing burdensome litigation costs on Atrius's resellers and customers, thereby deterring them from continuing to carry Atrius's FRS product; and (d) excluding Atrius from competing in the Relevant Market. On information and belief, Defendants pursued this enforcement strategy without regard to the objective merits of the asserted infringement claims and with knowledge of substantial invalidity and unenforceability issues affecting the asserted patents.

279. Defendants' decision to sue Atrius's downstream customers and resellers—rather than Atrius directly—is itself evidence of Defendants' improper purpose, as it was calculated to inflict maximum damage to Atrius's business relationships and distribution networks while avoiding a direct adjudication on the merits of Defendants' patent claims against the manufacturer

of the accused product. Defendants have followed a similar tactic against other allegedly infringing products—suing resellers in preferred venues while avoiding taking on manufacturers head-on. Defendants' reseller-focused enforcement strategy was reasonably calculated to disrupt relationships between manufacturers, distributors, retailers, and consumers of competing FRT-type products and thereby suppress competition within the Relevant Market.

280. Defendants' conduct constitutes exclusionary conduct supporting monopolization, or attempted monopolization, of the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

281. Atrius has been injured in its business and property as a direct and proximate result of Defendants' objectively baseless and anticompetitive enforcement conduct, including through lost sales, lost profits, damage to customer relationships and goodwill, and the attorneys' fees and costs incurred in defending against Defendants' baseless infringement claims. Atrius is entitled to treble damages, attorneys' fees, and costs under 15 U.S.C. § 15, and to permanent injunctive relief under 15 U.S.C. § 26.

## COUNT ELEVEN: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

282. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

283. This Court has supplemental jurisdiction over this Texas state-law claim pursuant to 28 U.S.C. § 1367(a), as it arises from the same case or controversy and shares a common nucleus of operative fact with Atrius's federal patent and antitrust claims set forth in Counts One through Ten.

284. Atrius has existing and prospective business relationships with numerous manufacturers, distributors, importers, retailers, resellers, and end users of the FRS throughout the

United States, including in Texas. There was a reasonable probability that Atrius would have entered into and continued such business relationships absent Defendants' wrongful conduct.

285. Defendants have actual knowledge of Atrius's existing and prospective business relationships with its resellers and customers, as evidenced by Defendants' filing of the Customer Lawsuits expressly naming Atrius's resellers as defendants and accusing the Atrius FRS of infringement. Defendants also knew that Atrius relied on those reseller, distributor, and customer relationships to distribute and support the FRS in the Relevant Market.

286. Defendants have intentionally interfered with those relationships by filing and threatening to file the Customer Lawsuits and by communicating threats of patent infringement to Atrius's resellers and customers, all based on patent infringement allegations that Defendants knew, or reasonably should have known, lacked merit in view of the substantial noninfringement, invalidity, and unenforceability issues associated with the FRS and the asserted patents.

287. Defendants' conduct is independently tortious and unlawful because, among other reasons, it involved the bad-faith assertion of patent rights Defendants knew, or reasonably should have known, were invalid, unenforceable due to inequitable conduct, fraudulently procured, and/or not infringed by the FRS. Defendants' conduct was independently tortious and unlawful because, among other reasons, it involved the bad-faith assertion and enforcement of patent rights that Defendants knew, or reasonably should have known, were invalid, unenforceable, fraudulently procured, and/or not infringed by the FRS. Defendants' conduct further constitutes sham litigation, attempted monopolization, and/or monopolization in violation of Section 2 of the Sherman Act, as alleged above. Because Defendants' enforcement activities were undertaken in bad faith and were not objectively reasonable, such conduct is not protected by federal patent law or the *Noerr-Pennington* doctrine.

288. Defendants' interference was a substantial factor in causing third parties to refrain from entering into, continuing, and/or expanding business relationships with Atrius concerning the FRS product.

289. Defendants acted with the intent to interfere with Atrius's existing and prospective business relationships with manufacturers, distributors, importers, retailers, resellers, and end users or, alternatively, Defendants knew that their conduct was certain or substantially certain to result in the disruption of Atrius's existing and prospective business relationships. Defendants' strategy of targeting Atrius's downstream resellers—rather than suing Atrius, or the manufacturers of other accused products, directly—was specifically designed to disrupt and destroy Atrius's distribution channels and to deter resellers from carrying Atrius's product.

290. As a direct and proximate result of Defendants' wrongful conduct, Atrius has suffered, and will continue to suffer, actual and consequential damages, including lost sales, lost customers, lost profits, lost business opportunities, damage to goodwill and reputation, and the costs incurred in supporting and defending Atrius's resellers and customers against Defendants' enforcement activities.

291. Defendants acted with malice, fraud, and/or gross negligence, including by knowingly and intentionally targeting Atrius's downstream resellers and customers to disrupt Atrius's distribution channels and business relationships despite substantial noninfringement, invalidity, and unenforceability issues concerning the asserted patents. Defendants' conduct justifies an award of exemplary damages under Chapter 41 of the Texas Civil Practice and Remedies Code.

## <u>JURY DEMAND</u>

292. Atrius hereby demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Atrius respectfully requests that the Court enter judgment in favor of Atrius and against Defendants and award the following relief:

(a) Declaring that Atrius does not infringe and has not infringed, and the manufacture, use, sale, offer for sale, importation, distribution, marketing, and support of the FRS does not infringe and have not infringed, directly or indirectly, literally or under the doctrine of equivalents, contributorily, or by inducement, any valid and enforceable claim of the Asserted Patents in violation of 35 U.S.C. § 271.

(b) Declaring that all claims of the Asserted Patents are invalid under one or more provisions of 35 U.S.C. §§ 101, 102, 103, and/or 112;

(c) Declaring that the ’247 and ’159 patents, and any related continuation or derivative patents infected by the inequitable conduct alleged herein, are unenforceable due to inequitable conduct and/or infectious unenforceability;

(d) Ordering Defendants to take any necessary and legally available corrective action before the USPTO, including any disclaimer, terminal disclaimer, corrective filing, or other action permitted under 35 U.S.C. § 253 or other applicable law consistent with the Court’s judgment concerning the Asserted Patents;

(e) Granting an injunction permanently restraining Defendants and each of their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all persons in active concert or participation with any of them, from alleging, representing, threatening, or otherwise stating that Atrius or the FRS or the activities of manufacturers, distributors, users, importers, or sellers in relation to the FRS infringe any valid and enforceable claim of the Asserted Patents and from instituting, continuing, or initiating any action or proceeding alleging

infringement of any claim of the Asserted Patents against Atrius or any customers, manufacturers, users, importers, or sellers in relation to the FRS;

(f) Awarding Atrius its actual, compensatory, consequential, treble, and exemplary damages caused by Defendants' violations of Section 2 of the Sherman Act and tortious interference with business relations, in amounts to be proven at trial, together with pre- and post-judgment interest as permitted by law;

(g) Granting an injunction permanently restraining Defendants from further enforcement of the '247 and '159 patents against Atrius and its customers, manufacturers, distributors, importers, users, and resellers, pursuant to 15 U.S.C. § 26;

(h) Declaring Atrius to be the prevailing party, finding this case exceptional, and awarding Atrius its reasonable attorneys' fee, costs, and expenses pursuant to 35 U.S.C. § 285, 28 U.S.C. § 1920, 28 U.S.C. § 1927, and other applicable law;

(i) Holding Defendants jointly and severally liable for all damages, costs, fees, and other monetary relief awarded on Atrius's antitrust, tortious-interference, alter-ego, agency, vicarious-liability, and other claims for which joint and several liability is available under applicable law; and

(j) Awarding such other and further legal or equitable relief as this Court deems just and proper.

Dated: July 14, 2026

Respectfully submitted,

*/s/ Edward K. Chin*

Robert Manley
Texas Bar No. 787955
Christian Hurt

Texas Bar No. 24059987
Edward K. Chin
Texas State Bar No. 50511688
Alex Chern
Texas Bar No. 24109718
Brandon Merrill
Texas Bar No. 24144769
RManley@McKoolSmith.com
CHurt@McKoolSmith.com
EChin@McKoolSmith.com
AChern@McKoolSmith.com
BMerrill@McKoolSmith.com

**McKool Smith, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Adam V. Floyd (Texas Bar No. 00790699)
AFloyd@FloydIP.com

**Floyd IP**
3203 Bluffs Lane
Parker, Texas 75002
Tel: (512) 497-7500

**Counsel for Plaintiff Atrius Development Group Corporation, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2026, a true and correct copy of the foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's system.

/s/ *Edward K. Chin*
Edward K. Chin