**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **MDL No. 4:26-md-03176-ALM** |
| **ATRIUS DEVELOPMENT GROUP CORPORATION, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ABC IP, LLC, RARE BREED TRIGGERS, INC., RARE BREED FIREARMS LLC, LAWRENCE DEMONICO, KEVIN MAXWELL, and COLE LELEUX,**<br><br>**Defendants.** | Civil Action No. 4:26-cv-00448-ALM<br>Civil Action No. 4:26-cv-00984-ALM<br><br>**JURY TRIAL DEMANDED** |
| **ABC IP, LLC, and RARE BREED TRIGGERS, INC.,**<br><br>**Counterclaim-Plaintiffs,**<br><br>**v.**<br><br>**ATRIUS DEVELOPMENT GROUP CORPORATION, INC.,**<br><br>**MALCOLM BROWN, an individual residing in California,**<br><br>**GRANT SHAW, an individual residing in Texas, and**<br><br>**RYAN SPADAFORE, an individual residing in Texas,**<br><br>**Counterclaim-Defendants.** | |

**DEFENDANTS' ANSWER TO ATRIUS'S SECOND AMENDED COMPLAINT**
**FOR DECLARATORY JUDGMENT AND AMENDED COUNTERCLAIMS**

Answering Defendants ABC IP, LLC and Rare Breed Triggers, Inc. (collectively, "Answering Defendants" or "Counterclaim Plaintiffs"), through undersigned counsel, answer the Second Amended Complaint for Declaratory Judgment by Atrius Development Group Corporation, Inc. ("Atrius") dated July 14, 2026 (Dkt. 45), as follows. Except as expressly admitted, all allegations are denied. This Answer is submitted on behalf of Answering Defendants ABC IP, LLC and Rare Breed Triggers, Inc. only. Defendants Rare Breed Firearms LLC ("RBF"), Lawrence DeMonico, Kevin Maxwell, and Cole Leleux are separately represented and have moved to dismiss under Rule 12. Where allegations are directed at RBF or those individual Defendants, no response is required of the Answering Defendants, and any response herein is made solely on behalf of the Answering Defendants and is not a response by, or an admission attributable to, any other Defendant.

## NATURE OF THE ACTION

1. This action arises from Defendants' ongoing efforts to unlawfully disrupt Atrius' relationships with its valued customers by aggressively and repeatedly asserting unfounded claims of patent infringement through lawsuits against Atrius's resellers (but not Atrius) targeting an Atrius product known as the "Atrius Forced Reset Selector" ("FRS"). Defendants are currently engaged in a campaign of intimidation directed at manufacturers, distributors, and resellers of firearm components known as forced reset triggers ("FRTs") and forced reset safety mechanisms for AR-15 pattern firearms.

**ANSWER:** Answering Defendants admit that they have asserted claims of patent infringement through lawsuits against Atrius resellers of a product known as the "Atrius Forced Reset Selector." Answering Defendants deny the remaining allegations in Paragraph 1.

2. This action seeks: (i) declaratory judgment of non-infringement of United States Patent Nos. 12,031,784 ("the '784 patent"), 12,038,247 ("the '247 patent"), and 12,578,159 ("the

’159 patent”) (collectively, “the Asserted Patents”), pursuant to 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, including Title 35, United States Code; (ii) declaratory judgment that the Asserted Patents are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112; (iii) declaratory judgment that the ’247 and ’159 patents are unenforceable due to inequitable conduct; (iv) antitrust and unfair competition relief arising, among other reasons, from Defendants’ Walker Process fraud and sham patent enforcement tactics; and (v) relief from Defendants’ tortious interference with Atrius’s existing and potential business relationships.

**ANSWER:** Answering Defendants admit that Atrius’s Second Amended Complaint purports to assert claims for declaratory judgment of non-infringement of the ’784, ’247, and ’159 patents; declaratory judgment of invalidity of the ’784, ’247, and ’159 patents; declaratory judgment of unenforceability of the ’247 and ’159 patents; “Walker Process Violation of Section 2 of the Sherman Act”’; “Sham Litigation in Violation of Section 2 of the Sherman Act”; and “Tortious Interference with Business Relations.” Answering Defendants deny the remaining allegations in Paragraph 2.

3. On September 5, 2023, a district court in the Eastern District of New York granted the Department of Justice’s motion for a preliminary injunction, enjoining Defendants and their principals from making and selling FRT triggers, which the court found were likely illegal “machineguns” under 26 U.S.C. § 5845(b). United States of America v. Rare Breed Triggers, LLC, 1:23-cv-369 (E.D.N.Y.), ECF No. 139.

**ANSWER:** Answering Defendants admit that the Eastern District of New York issued an order at Dkt. 139 in *United States of America v. Rare Breed Triggers, LLC, et al.*, No. 1:23-cv-00369-NRM-RML granting the United States of America’s motion for a preliminary injunction. Answering Defendants deny the remaining allegations in Paragraph 3.

4. Prior to this injunction, on information and belief, Defendants amassed significant revenues (nearing $40 million) during a two-year stretch while the litigation was underway. But during that time, Defendants were the only participant in the marketplace; all lawful FRT manufacturers and sellers complied with the then-enforced and lawful classification of FRTs as "machineguns." Defendants profited from this defiance, often flaunting their "fight" while other manufacturers rightly complied with the then-enacted law.

**ANSWER:** Denied.

5. On July 24, 2024, however, in a different lawsuit brought by a non-profit gun rights organization challenging the Bureau of Alcohol, Tobacco, Firearms and Explosive's ("ATF") classification of FRTs as "machineguns," a district court in the Northern District of Texas (Fort Worth Division) entered a final judgment declaring that classification unlawful. National Association for Gun Rights, Inc. v. Garland, 4:23-cv-830 (N.D. Tex.), ECF No. 101.

**ANSWER:** Answering Defendants state that the judgment in National Association for Gun Rights, Inc. v. Garland, No. 4:23-cv-830 (N.D. Tex.), ECF 101, speaks for itself, and deny any characterization of that judgment inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 5 are denied.

6. On February 7, 2025, President Trump signed Executive Order 14206, which ordered the Attorney General ("AG") to, within 30 days, examine all actions of executive departments and agencies and the ATF's rules promulgated in the prior four years to determine whether any actions or rules are impinging upon the Second Amendment rights of citizens. The Executive Order also instructed the AG and the Domestic Policy Advisor to formulate a plan of action.

**ANSWER:** Answering Defendants state that Executive Order 14206 speaks for itself and deny any characterization of that Executive Order inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 6 are denied.

7. On May 13, 2025, while the judgment of the Northern District of Texas was on appeal, the Department of Justice settled the case along with the case against RBT, thereby rendering FRTs legal under federal (and Texas) law, though FRTs remain illegal under state law in approximately 15 states.

**ANSWER:** Answering Defendants state that the settlement agreements and any related orders referenced in Paragraph 7 speak for themselves and deny any characterization of those agreements or orders inconsistent with their terms. The remaining allegations of Paragraph 7 state legal conclusions to which no response is required; to the extent a response is required, Answering Defendants deny those allegations. Except as expressly admitted, the allegations of Paragraph 7 are denied.

8. Defendants responded by immediately filing a wave of predatory patent infringement lawsuits targeting retail outlets that carry FRT-type products, including stores that carry Atrius's FRS product. To date, Defendants have never filed suit against these products' manufacturers.

**ANSWER:** Answering Defendants admit that ABC and RBT have filed patent infringement actions against sellers of FRT-type products, including sellers of Atrius's FRS product. Answering Defendants deny the remaining allegations of Paragraph 8.

9. Since May 16, 2025, Defendants have filed at least twenty-one patent infringement lawsuits alleging infringement of the Asserted Patents and at least seven additional lawsuits alleging infringement of other FRT-related patents.

**ANSWER:** Answering Defendants admit that, since on or about May 16, 2025, they have filed patent infringement actions alleging infringement of the Asserted Patents and patent infringement actions alleging infringement of other patents covering forced-reset trigger technology. Answering Defendants further state that each such action was filed in good faith to enforce valid and enforceable patent rights. Except as expressly admitted, the allegations of Paragraph 9 are denied.

10. Since January 7, 2026, Defendants ABC and RBT have filed at least nine lawsuits against resellers of the Atrius FRS alleging infringement of the Asserted Patents (collectively, "Customer Lawsuits"), including the following cases spread across the United States:

*ABC IP, et al. v. Hawkphin Sales, LLC., et al*., 4:26-cv-00015 (S.D. Iowa).

*ABC IP, et al. v. Webcorp., Inc., et al*., 4:26-cv-00018 (E.D. Mo.).

*ABC IP, et al. v. PistolCap Limited Company, d/b/a Frisco Guns et al.,* 2:26-cv-00053 (E.D. Tex.)

*ABC IP, et al. v. ProSource Firearms, LLC,* 2:26-cv-00055 (E.D. Tex.)

*ABC IP, et al. v. Mister Guns, LLC et al.,* 2:26-cv-00056 (E.D. Tex.)

*ABC IP, et al. v. Superior Firearms of Texas, LLC,* 2:26-cv-00058 (E.D. Tex.)

*ABC IP, et al. v. Optics Planet, Inc. d/b/a OpticsPlanet*, 1:26-cv-01072 (N.D. Ill.)

*ABC IP, et al. v. HK Parts Inc*., 2:26-cv-90 (D. Utah)

*ABC IP, et al. v. Orion Arms Corp. d/b/a Orion Wholesale*, 4:26-cv-00032 (S.D. Ind.)

**ANSWER:** Answering Defendants admit that, since on or about January 7, 2026, ABC and RBT have filed the patent infringement actions identified by case name and docket number in Paragraph 10, and Answering Defendants respectfully refer the Court to the complaints in those actions for their complete and accurate terms. Answering Defendants further state that each such action was filed in good faith to enforce valid and enforceable patent rights in a forum where

jurisdiction and venue are proper. Except as expressly admitted, the allegations of Paragraph 10 are denied.

11. Defendants themselves have acknowledged that the Atrius-related reseller actions involve overlapping factual, technical, infringement, validity, claim-construction, customer-suit, and discovery issues concerning the Atrius FRS product and the Asserted Patents. In submissions to the Judicial Panel on Multidistrict Litigation, Defendants grouped the Atrius-related reseller cases together as involving the same accused Atrius FRS product and represented that coordinated treatment was necessary to avoid inconsistent rulings regarding infringement, validity, claim construction, customer-suit issues, and overlapping discovery. See MDL No. 3176, Dkt. 41-1 at 3, 8–10.

**ANSWER:** Answering Defendants state that their submissions to the Judicial Panel on Multidistrict Litigation speak for themselves, and deny any characterization of those submissions inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 11 are denied.

12. Defendants have never alleged or communicated that the Atrius FRS infringes any of the Asserted Patents before filing the Customer Lawsuits. Instead of bringing suit directly against Atrius—the actual designer and manufacturer of the FRS product accused of infringing the Asserted Patents—Defendants filed a series of unfounded lawsuits against customers and resellers. While Defendants have not named Atrius as a defendant in any of the Customer Lawsuits, the complaints identify the Atrius FRS (among, in some cases, other FRT-related products).

**ANSWER:** Denied.

13. Each existing (and potential future) Customer Lawsuit has caused, and will continue to cause, harm to Atrius, including through financial loss, litigation burden, business disruption, reputational damage, and strain on customer relationships.

**ANSWER:** Denied.

14. It is not in the substantial interest of justice or an efficient use of judicial resources for Atrius to be forced to defend itself and its customers from Defendants' unjustified patent infringement claims serially and/or in multiple lawsuits in various district courts across the United States. The core technical, operational, prior-art, inequitable-conduct, and infringement issues relating to the FRS are common across the Customer Lawsuits and centrally concern the design and operation of the FRS itself, making Atrius the proper party to litigate those issues.

**ANSWER:** Paragraph 14 states legal conclusions and argumentative characterizations to which no response is required. To the extent a response is required, denied.

15. Atrius seeks relief to resolve the controversy between the real parties in interest, Atrius and Defendants, to protect Atrius's existing and prospective customer relationships, to protect Atrius's lawful, independent innovation, and to remove the uncertainty and false accusations of patent infringement targeting the FRS in district courts across the country. Atrius asks this Court to eliminate the harm and risk Atrius has faced, and continues to face, from Defendants' ongoing campaign of intimidation and bad-faith and anticompetitive litigation by declaring that: (i) the FRS product has not and does not infringe any claim of the Asserted Patents; (ii) the reselling and use of the FRS have not and do not infringe any valid claim of the Asserted Patents; (iii) all claims of the Asserted Patents are invalid; (iv) the '247 and '159 patents are unenforceable due to inequitable conduct; (v) Defendants have attempted to acquire monopoly

power through its anticompetitive conduct in violation of the Sherman Act; and (vi) Defendants have tortiously interfered with Atrius's current (and prospective) business relations.

**ANSWER:** Answering Defendants admit that Atrius purports to seek the declaratory relief enumerated in Paragraph 15. Answering Defendants deny that Atrius is entitled to any of the relief it seeks and deny the remaining allegations, characterizations, and legal conclusions set forth in Paragraph 15.

## PARTIES

16. Plaintiff Atrius is a corporation organized and existing under the laws of the State of Texas and with an address of 200 Congress Ave., Unit 31W, Austin, TX 78701.

**ANSWER:** Answering Defendants admit that Atrius purports to be a corporation organized and existing under the laws of the State of Texas. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 16 and on that basis deny them.

17. Atrius's FRS product (pictured below) is a drop-in replacement safety selector compatible with standard AR-15 fire control groups, with no modifications required. The FRS enables a user to have three positions: SAFE, SEMI-AUTOMATIC (traditional), and FULL-SEMI.

**ANSWER:** Answering Defendants admit on information and belief that Atrius markets a product it calls the "Atrius Selector" that is offered as a three-position safety selector as a part of the AR-15 pattern fire control groups. Except as expressly admitted, the allegations of Paragraph 17 are denied.

18. On information and belief, Defendant ABC is a limited liability company organized and existing under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, DE 19901.

**ANSWER:** Admitted.

19. On information and belief, Defendant ABC does not make, use, sell, or offer for sale any products in the United States.

**ANSWER:** Answering Defendants admit that ABC does not itself directly make, use, sell, or offer for sale products in the United States. Answering Defendants further state that ABC is the owner of the Asserted Patents and that its exclusive licensee, RBT, makes, uses, sells, and offers for sale products in the United States covered by, or related to the technology of, the Asserted Patents.

20. On information and belief, Defendant Rare Breed Triggers is a corporation organized and existing under the laws of the State of Texas with addresses of 2710 Central Freeway, Suite 150-151, Wichita Falls, TX 76306 and 15511 Highway 71 West, Ste. 110444, Austin, TX 78738. Based on records available from the Texas Secretary of State, Defendant Rare Breed Triggers' registered agent for service of process is Samuel Eastman with an address of 2110 S. Lamar Blvd., Suite G, Austin, TX 78704.

**ANSWER:** Answering Defendants admit that Defendant RBT is a corporation organized and existing under the laws of the State of Texas with addresses of 2710 Central Freeway, Suite 150-151, Wichita Falls, TX 76306. Answering Defendants otherwise deny the remaining allegations of Paragraph 20.

21. On information and belief, Defendant Rare Breed Firearms is a limited liability company organized and existing under the laws of the State of Texas with an address at PO Box 341194, Austin, TX 78734. Based on records available from the Texas Secretary of State, Defendant Rare Breed Firearms' registered agent for service of process is Eastman Meyler PC with an address of 2301 E Riverside Dr., Suite A-50, Austin, TX 78741.

**ANSWER:** The allegations of Paragraph 21 are directed at Defendant Rare Breed Firearms LLC who is not a party to this Answer and on whose behalf the Answering Defendants do not respond.

22. On information and belief, Defendant RBT makes, uses, sells, and offers for sale products in the United States, including a trigger mechanism called the FRT-15L3 (pictured below).

**ANSWER:** Admitted.

23. On information and belief, Defendants do not contend that any claim of the Asserted Patents covers the FRT-15L3.

**ANSWER:** Paragraph 23 purports to characterize Answering Defendants' contentions regarding the scope of the Asserted Patents, which is a matter that will be developed through claim construction and discovery in the appropriate forum. To the extent a response is required, Answering Defendants state that the scope and coverage of the Asserted Patents will be determined by the Court through claim construction in accordance with applicable law, and on that basis deny the allegations of Paragraph 23.

24. On information and belief, Defendant Lawrence DeMonico is an individual residing at 6124 Osceola Trail, Austin, TX 78738. On information and belief, Mr. DeMonico is the President of RBT and a Manager of ABC. On information and belief, Mr. DeMonico owns LAD, LLC, which is a Member and affiliate of ABC.

**ANSWER:** Answering Defendants admit that Mr. DeMonico is the President of RBT and owns LAD, LLC. The allegation regarding Mr. DeMonico's residence is directed at an individual Defendant who is not a party to this Answer, and no response is required of the Answering Defendants. Except as expressly admitted, the allegations of Paragraph 24 are denied.

25. On information and belief, Defendant Kevin Maxwell is an individual residing at 1095 Torren Pt., Geneva, FL 32732. On information and belief, Mr. Maxwell is the general counsel of RBT and a Manager of ABC. On information and belief, Mr. Maxwell owns An 1861 LLC, which is a Member and affiliate of ABC.

**ANSWER:** The allegation regarding Mr. Maxwell's residence is directed at an individual Defendant who is not a party to this Answer, and no response is required of the Answering Defendants. Answering Defendants otherwise deny the remaining allegations of Paragraph 25.

26. On information and belief, Defendant Cole LeLeux [sic] is an individual residing at 2118 White Jasmine Ct., Apopka, FL 32712. On information and belief, Mr. LeLeux is a Manager of ABC. On information and belief, Mr. LeLeux previously held an ownership interest in RBT. On information and belief, Mr. LeLeux owns LeLeux LLC, which is a Member and affiliate of ABC.

**ANSWER:** Answering Defendants admit that Mr. Leleux previously held an ownership interest in RBT and owns Leleux LLC and that Mr. Leleux is a Manager of ABC. The allegation regarding Mr. Leleux's residence is directed at an individual Defendant who is not a party to this Answer, and no response is required of the Answering Defendants. Except as expressly admitted, the allegations of Paragraph 26 are denied.

## Organizational Structure and Alter Ego

27. As part of the DOJ's case against RBT, United States of America v. Rare Breed Triggers, LLC, 1:23-cv-369 (E.D.N.Y.), ATF agents examined the corporate and financial records of RBT and its closely associated companies: ABC IP, LLC; XYZ Distribution LLC (f/k/a "XYZ Distrubution [sic]" or "RB Trig LLC"); and DEF Consulting LLC. The agents also had information

from a confidential source with knowledge of RBT's inner workings, who provided the ATF with sales records. The allegations in this subsection are largely based upon those reports. 1:23-cv-369, ECF Nos. 7, 24, 26 (including exhibits).

**ANSWER:** Answering Defendants state that the referenced court filings and records in United States of America v. Rare Breed Triggers, LLC, No. 1:23-cv-369 (E.D.N.Y.), speak for themselves, and deny any characterization of those materials inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 27 are denied.

28. On information and belief, Defendant RBT was incorporated as a Florida LLC in April 2020. On information and belief, four individuals held ownership interests in RBT at the time of its formation or incorporation: Defendants DeMonico, Maxwell, LeLeux [sic], and a fourth individual, Michael Register.

**ANSWER:** Answering Defendants admit that RBT was formed in April 2020 and that DeMonico, Maxwell, Leleux, and Register held ownership interests at the time of its formation. Except as expressly admitted, the allegations of Paragraph 28 are denied.

29. On information and belief, later that year, DeMonico, LeLeux [sic], and Register divested their ownership interest in RBT, thus leaving Maxwell as the company's sole owner. Over the intervening years, Defendants reorganized the company from a single corporate structure to a complex web of interlocking companies, including the original Florida LLC, at least one North Dakota LLC, at least one Texas LLC, at least one Texas corporation, and at least one Delaware LLC.

**ANSWER:** Answering Defendants admit that DeMonico, Leleux, and Register divested their ownership interest in RBT, leaving Maxwell as the company's sole owner. Except as expressly admitted, the allegations of Paragraph 29 are denied.

30. On information and belief, the proceeds from RBT's sales of its FRT products are distributed to a holding company, XYZ Distrubution [sic]. On information and belief, after paying its suppliers and manufacturers, RBT's proceeds flow through XYZ to either ABC or DEF Consulting, another entity owned solely by the individual Defendants, or both.

**ANSWER:** Answering Defendants state that the court filings and records in *United States of America v. Rare Breed Triggers*, LLC, No. 1:23-cv-369 (E.D.N.Y.), speak for themselves, and deny any characterization of those materials inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 30, including the footnote thereto, are denied.

31. On information and belief, as recent as September 18, 2024, ABC was owned by the following Members with the following Percentage Interest:

- LAD, LLC [27.5%]
- An 1861, LLC [17.5%]
- LeLeux [sic], LLC [17.5%]
- Spider Hole, LLC [27.5%]

**ANSWER:** Denied.

32. ABC has three Managers: Defendants DeMonico, Maxwell, and LeLeux [sic]. On information and belief, Michael Register was or has, at one time, been a Manager of ABC, but has recently been embroiled in his own litigation against ABC and DeMonico. ABC IP, LLC et al. v. Spider Hole, LLC et al., No. 1:25-cv-00864-ADA (W.D. Tex.).

**ANSWER:** The allegations that DeMonico, Maxwell, Leleux, and/or Register are or were "Managers of ABC" state legal conclusions to which no response is required. Except as expressly admitted, the allegations of Paragraph 32 are denied.

33. Records from the Florida Division of Corporations reveal that DEF Consulting was dissolved in 2024, but that its managers included the same LLCs that owned ABC and were owned by the individual Defendants, including LAD, AN 1861, and LeLeux [sic].

**ANSWER:** Answering Defendants state that the records of the Florida Division of Corporations speak for themselves, and deny any characterization of those records inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 33 are denied.

34. On information and belief, Defendants ABC and RBT—in addition to their former iterations, DEF Consulting, and, presumably, XYZ Distrubution—all share owners, officers, business addresses, and counsel.

**ANSWER:** Denied.

35. On information and belief, payments made between these companies for "consulting services," are not. Rather, they are created to obscure the fact that DeMonico, Maxwell, and LeLeux [sic] own and control RBT.

**ANSWER:** Denied.

36. On information and belief, the money received by RBT for sales was immediately sent to various bank accounts ostensibly held in the names of other companies. Those funds were sent on to various other bank accounts. Ultimately, the profits from the sales were divided among DeMonico, Maxwell, and LeLeux [sic].

**ANSWER:** Denied.

37. On information and belief, as of early 2023, RBT sales generated between $30,000,000 and $40,000,000 in revenue. All or most of the profits from sales were distributed to DeMonico, Maxwell, and LeLeux [sic].

**ANSWER:** Denied.

38. On information and belief, ABC, which does not make, use, sell, or offer for sale any products, and exists solely to enforce patents, is inadequately capitalized to satisfy potential judgments. ABC was formed and is maintained as a judgment-proof vehicle to prosecute Defendants' abusive litigation campaign while shielding the individual Defendants and RBT from counterclaims and liability.

**ANSWER:** Denied.

39. A civil complaint filed by Defendants ABC and DeMonico against Register and Spider Hole confirms that ABC lacks adequate operating capital. See *ABC IP, et al., v. Spider Hole, LLC, et al*., No. 1:25-cv-864-ADA (W.D. Tex.), ECF No. 1:

- "Defendant Register made promises to be the 'Money Guy' and finance the operations of ABC. … Spider Hole, an entity owned solely by Register, would be the only party to provide capital to ABC." (¶ 13)
- "Mr. Register knew well before signing the Operating Agreement … that he would not be able to provide capital to ABC." (¶ 14)
- "Spider Hole was solely responsible for providing the capital contributions necessary to fund the Company's endeavors." (¶ 18)
- "On March 20, 2025, the managers of ABC met and voted on making a capital call to Spider Hole in the amount of $4,000,000 to be paid on or before March 31, 2025." (¶ 19)
- "Spider Hole failed to meet the required capital contribution timely." (¶ 20)
- "Because of Spider Hole's failure to contribute capital to ABC, ABC was unable to fund the enforcement of its patents …" (¶ 22)
- "Spider Hole [] failed to remit payment to ABC from the improper sales resulting in damages to the Company and its members of more than $280,000 …" (¶ 33)

**ANSWER:** Answering Defendants state that the complaint in *ABC IP, LLC et al. v. Spider Hole, LLC et al.*, No. 1:25-cv-00864-ADA (W.D. Tex.), speaks for itself, and deny any characterization of that document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 39 are denied.

40. On information and belief, RBT is similarly inadequately capitalized to satisfy potential judgments, as its revenues have been siphoned through a complex web of affiliate companies to pay the individual Defendants' personal LLCs.

**ANSWER:** Denied.

41. Furthermore, Defendants' convoluted, multi-layered corporate structure was designed to insulate the individual Defendants from personal liability for their inequitable, anticompetitive, and tortious conduct—both related to, and separate from, their abusive patent enforcement campaigns.

**ANSWER:** Denied.

**Agency Relationships and Vicarious Liability**

42. On information and belief, ABC and RBT operate as interrelated and coordinated entities with overlapping ownership, management, finances, litigation control, and business operations, including coordinated assertion and enforcement of the Asserted Patents.

**ANSWER:** Denied.

43. ABC is an agent of RBT.

**ANSWER:** The allegation that "ABC is an agent of RBT" states a legal conclusion to which no response is required. To the extent a response is required, denied.

44. ABC directs and controls the actions, operations, and performance of RBT, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 44 state legal conclusions to which no response is required. To the extent a response is required, denied.

45. ABC conditions the benefits derived by RBT on the performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 45 state legal conclusions to which no response is required. To the extent a response is required, denied.

46. ABC specifies the timing and manner of the RBT's performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 46 state legal conclusions to which no response is required. To the extent a response is required, denied.

47. ABC profits from RBT's activities.

**ANSWER:** The allegations of Paragraph 47 state legal conclusions to which no response is required. To the extent a response is required, denied.

48. ABC is vicariously liable for RBT's conduct, actions, and operations, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 48 state legal conclusions to which no response is required. To the extent a response is required, denied.

49. RBT is an agent of ABC.

**ANSWER:** The allegation that "RBT is an agent of ABC" states a legal conclusion to which no response is required. To the extent a response is required, denied.

50. RBT directs and controls the actions, operations, and performance of ABC, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 50 state legal conclusions to which no response is required. To the extent a response is required, denied.

51. RBT conditions the benefits derived by ABC on the performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 51 state legal conclusions to which no response is required. To the extent a response is required, denied.

52. RBT specifies the timing and manner of ABC's performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 52 state legal conclusions to which no response is required. To the extent a response is required, denied.

53. RBT profits from the activities of ABC.

**ANSWER:** The allegations of Paragraph 53 state legal conclusions to which no response is required. To the extent a response is required, denied.

54. RBT is vicariously liable for ABC's conduct, actions, and operations, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 54 state legal conclusions to which no response is required. To the extent a response is required, denied.

55. The individual Defendants (i.e., DeMonico, Maxwell, and LeLeux [sic]), by and through their personal LLCs, are agents of ABC and/or RBT.

**ANSWER:** The allegations of Paragraph 55 state legal conclusions to which no response is required. To the extent a response is required, denied.

56. The individual Defendants, by and through their personal LLCs, direct and control the actions, operations, and performance of ABC and/or RBT, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 56 state legal conclusions to which no response is required. To the extent a response is required, denied.

57. The individual Defendants, by and through their personal LLCs, condition benefits derived by ABC and/or RBT on the performance of activities, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 57 state legal conclusions to which no response is required. To the extent a response is required, denied.

58. The individual Defendants, by and through their personal LLCs, specify the timing and manner of the performance of activities by ABC and/or RBT, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 58 state legal conclusions to which no response is required. To the extent a response is required, denied.

59. The individual Defendants, by and through their personal LLCs, profit from the activities of ABC and/or RBT.

**ANSWER:** The allegations of Paragraph 59 state legal conclusions to which no response is required. To the extent a response is required, denied.

60. The individual Defendants, by and through their personal LLCs, are vicariously liable for ABC's and/or RBT's conduct, actions, and operations, including those related to Defendants' litigation efforts, antitrust violations, and tortious interference with Atrius's (and other competitors') business.

**ANSWER:** The allegations of Paragraph 60 state legal conclusions to which no response is required. To the extent a response is required, denied.

## ASSERTED PATENTS

61. The '784 patent is entitled "Adapted Forced Reset Trigger" and was issued by the United States Patent and Trademark Office on July 9, 2024. Ex. A is a true and correct copy of the '784 patent.

**ANSWER:** Answering Defendants admit that U.S. Patent No. 12,031,784, titled "Adapted Forced Reset Trigger," was issued by the United States Patent and Trademark Office on July 9, 2024, and that a document purporting to be a copy of the '784 Patent is attached to the Complaint as Exhibit A. Except as expressly admitted, the allegations of Paragraph 61 are denied.

62. The '247 patent is entitled "Firearm Trigger Mechanism" and was issued by the United States Patent and Trademark Office on July 16, 2024. Ex. B is a true and correct copy of the '247 patent.

**ANSWER:** Answering Defendants admit that U.S. Patent No. 12,038,247, titled "Firearm Trigger Mechanism," was issued by the United States Patent and Trademark Office on

July 16, 2024, and that a document purporting to be a copy of the ’247 Patent is attached to the Complaint as Exhibit B. Except as expressly admitted, the allegations of Paragraph 62 are denied.

63. The ’159 patent is entitled “Firearm Trigger Mechanism” and was issued by the United States Patent and Trademark Office on March 17, 2026. Ex. C is a true and correct copy of the ’159 patent.

**ANSWER:** Answering Defendants admit that United States Patent No. 12,578,159, entitled “Firearm Trigger Mechanism,” issued on March 17, 2026. Answering Defendants state that the ’159 Patent speaks for itself, and respectfully refer the Court to Exhibit C for its complete and accurate terms. Except as expressly admitted, the allegations of Paragraph 63 are denied.

64. Defendant ABC asserts in ongoing litigation that it is the current owner by assignment of all right, title, and interest in and to the Asserted Patents. On information and belief, Defendant ABC’s business is limited to owning and enforcing patents through repeated lawsuits in this District and elsewhere.

**ANSWER:** Answering Defendants admit that ABC asserts in ongoing litigation that it is the current owner by assignment of all right, title, and interest in and to the Asserted Patents. Except as expressly admitted, the allegations of Paragraph 64 are denied.

65. Defendant RBT asserts in ongoing litigation that it is the exclusive licensee of the Asserted Patents.

**ANSWER:** Answering Defendants admit that RBT asserts in ongoing patent infringement actions that it is the exclusive licensee of the Asserted Patents.

66. Defendants, together with their attorney Glenn Bellamy, fraudulently obtained the ’247 patent through a pattern of deceit during patent prosecution, including intentionally withholding at least three material prior art references with the intent to deceive the United States

Patent and Trademark Office ("USPTO"), as detailed below. Similarly, because the '159 patent issued from an application that was a continuation of the application that issued as the '247 patent, the '159 patent was also fraudulently obtained and suffers from infectious unenforceability.

**ANSWER:** Denied.

## JURISDICTION AND VENUE

67. This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the patent laws of the United States, including Title 35, United States Code, and the Sherman Antitrust Act, 15 U.S.C. §§ 1-7.

**ANSWER:** Paragraph 67 states legal conclusions to which no response is required. To the extent a response is required, Answering Defendants admit that Atrius purports to bring this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of Title 35, United States Code.

68. The Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1338(a), and/or 2201, and 2202.

**ANSWER:** Admitted that this Court has subject matter jurisdiction over the claims set forth in the Complaint pursuant to 28 U.S.C. §§ 1331, 1337, 1338(a), 2201, and 2202.

69. This action was originally filed in the United States District Court for the Western District of Texas, Midland/Odessa Division, as *Atrius Development Group Corporation, Inc. v. ABC IP, LLC et al.*, No. 7:26-cv-00057-DC-DTG. The Judicial Panel on Multidistrict Litigation conditionally transferred this action to the Eastern District of Texas for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Atrius maintains that the Western District of Texas is the proper transferor forum for purposes of trial and any remand following completion of MDL pretrial proceedings.

**ANSWER:** Answering Defendants admit that this action was originally filed in the United States District Court for the Western District of Texas, Midland/Odessa Division, and that the Judicial Panel on Multidistrict Litigation conditionally transferred this action to the Eastern District of Texas for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Answering Defendants state that the JPML's transfer order speaks for itself. The remaining allegations of Paragraph 69 state Atrius's legal positions and contentions, to which no response is required; to the extent a response is required, denied.

70. On April 28, 2026, Atrius filed a Motion to Remand this action to its original forum in the Western District of Texas. *See* MDL No. 3176, Dkt. 74. As of the date of filing of this Amended Complaint, that motion remains pending.

**ANSWER:** Answering Defendants admit that Atrius filed a motion to remand and that the motion remains pending. Answering Defendants state that the motion speaks for itself. Except as expressly admitted, the allegations of Paragraph 70 are denied.

71. Personal jurisdiction over Defendant Rare Breed Triggers, Inc. is proper in Texas because, on information and belief, Rare Breed Triggers, Inc. is organized under Texas law and maintains Texas business addresses, including addresses in Wichita Falls and Austin, Texas.

**ANSWER:** Admitted that RBT is a corporation organized under the laws of the State of Texas and that the Court has general personal jurisdiction over RBT.

72. Personal jurisdiction over Defendant Rare Breed Firearms LLC is proper in Texas because, on information and belief, Rare Breed Firearms LLC is organized under Texas law and maintains a Texas business address.

**ANSWER:** The allegations of Paragraph 72 are directed at Defendant Rare Breed Firearms LLC who is not a party to this Answer and on whose behalf the Answering Defendants do not respond.

73. Specific personal jurisdiction over Defendants is proper because they have purposefully directed activities or transactions to the State of Texas and have performed acts purposefully availing themselves of the privilege of conducting activities in Texas, and have engaged in conduct directed at Atrius and its Texas-based business relationships, including by filing and maintaining patent infringement lawsuits in Texas federal courts accusing resellers of the Atrius FRS of infringing the Asserted Patents. For example, Defendant RBT conducts business on an ongoing basis in Texas and elsewhere in the United States, and Defendants ABC and RBT have together filed at least one patent infringement lawsuit in the Western District of Texas alleging infringement of the ’247 patent. See, e.g., *ABC IP, et al. v. Hanes Tactical LLC et al.*, 3:25-cv-00201-DCG (W.D. Tex.). Defendants ABC and RBT have filed at least nine patent infringement lawsuits in judicial districts in the State of Texas, including at least one lawsuit in the Western District of Texas, one in the Southern District of Texas, and seven in the Eastern District of Texas. Certain of those cases are identified above. Additionally, ABC IP has brought two suits in the Western District of Texas pertaining to sales of FRTs. See *ABC IP, et al. v. Spider Hole, et al.*, 1:25-cv-864-ADA (W.D. Tex.); *ABC IP, et al. v. Spider Hole, et al.*, 1:25-cv-1626-ADA (W.D. Tex.).

**ANSWER:** Admitted for purposes of this action only that the Court has specific personal jurisdiction over the Answering Defendants who are answering. Answering Defendants further admit that ABC and RBT have filed the patent infringement actions identified by case name and docket number in Paragraph 73, and Answering Defendants respectfully refer the Court

to the complaints in those actions for their complete and accurate terms. Except as expressly admitted, the allegations of Paragraph 73 are denied.

74. Specific personal jurisdiction over Defendants DeMonico, Maxwell, and LeLeux [sic] is also proper because, on information and belief, each personally participated in, directed, authorized, controlled, ratified, and/or benefited from the conduct giving rise to Atrius's claims, including Defendants' acquisition, ownership, licensing, assertion, enforcement, and monetization of the Asserted Patents; the filing and maintenance of patent infringement lawsuits in Texas federal courts, including lawsuits in the Eastern District of Texas accusing resellers of the Atrius FRS of infringement; and the anticompetitive and tortious conduct alleged herein directed at Atrius and its Texas-based business relationships. These contacts are not based merely on the individual Defendants' corporate titles or statuses, but on their own purposeful acts and participation in the challenged conduct.

**ANSWER:** The allegations of Paragraph 74 are directed at Defendants DeMonico, Maxwell, and Leleux, who are not parties to this Answer and on whose behalf the Answering Defendants do not respond. To the extent a response is required of the Answering Defendants, the allegations state legal conclusions to which no response is required, and the Answering Defendants deny that Paragraph 74 establishes personal jurisdiction over any Defendant. Except as expressly admitted, the allegations of Paragraph 74 are denied.

75. Personal jurisdiction over Defendants is also proper under principles of agency, alter ego, conspiracy, concerted action, and/or purposeful direction because, on information and belief, Defendants acted jointly and in concert through ABC, RBT, Rare Breed Firearms LLC, and affiliated entities to obtain, assert, enforce, license, and monetize the Asserted Patents and to direct the challenged conduct toward Atrius and its Texas-based business relationships.

**ANSWER:** The allegations of Paragraph 75 state legal conclusions to which no response is required. To the extent a response is required, denied.

76. Defendants are subject to this Court's specific personal jurisdiction consistent with constitutional due process and the Texas Long-Arm Statute because, among other things, Defendants purposefully directed the challenged conduct toward Texas, Atrius, and Atrius's Texas-based business relationships through their business operations, patent-enforcement activities, litigation conduct, and other actions alleged herein, and should reasonably anticipate being haled into court in Texas in connection with such conduct.

**ANSWER:** Admitted for purposes of this action only that the Court has specific personal jurisdiction over Answering Defendants. Except as expressly admitted, the allegations of Paragraph 76 are denied.

77. Defendants Rare Breed Triggers, Inc. and Rare Breed Firearms LLC are also subject to general personal jurisdiction in Texas because, on information and belief, they are organized under Texas law, maintain principal places of business and/or continuous and systematic operations in Texas and are therefore "at home" in Texas for purposes of general jurisdiction.

**ANSWER:** Defendant Rare Breed Firearms LLC is not a party to this Answer and the Answering Defendants do not answer on behalf of Rare Breed Firearms. The remaining allegations of Paragraph 77 are admitted for purposes of this action only and on behalf of the Answering Defendants only that the Court has general personal jurisdiction over RBT. Except as expressly admitted, the allegations of Paragraph 77 are denied.

78. Venue was proper when this action was filed in the Western District of Texas under at least 28 U.S.C. §§ 1391(b), (c) and/or 1400(b) because Atrius resides in Texas, Defendant Rare Breed Triggers, Inc. resides in Texas, personal jurisdiction is proper over Defendants in Texas,

and a substantial part of the events, omissions, and injuries giving rise to Atrius's claims occurred in Texas, including in the Western District of Texas. Venue for coordinated or consolidated pretrial proceedings in this Court is proper pursuant to 28 U.S.C. § 1407 and the transfer orders entered by the Judicial Panel on Multidistrict Litigation in MDL No. 3176.

**ANSWER:** Answering Defendants deny that RBT resides in the Eastern District of Texas or the Western District of Texas and deny that RBT maintains a regular and established place of business in the Eastern District of Texas or the Western District of Texas. Solely for purposes of this action, however, Answering Defendants consent to venue in the Eastern District of Texas and the Western District of Texas. Except as expressly admitted, the allegations of Paragraph 78 are denied.

79. This Court also has supplemental jurisdiction over Atrius's related state-law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Atrius's federal patent and antitrust claims.

**ANSWER:** The allegations of Paragraph 79 state legal conclusions to which no response is required. To the extent a response is required, Answering Defendants admit that Atrius purports to invoke the Court's supplemental jurisdiction under 28 U.S.C. § 1367, and deny that Atrius is entitled to any relief.

## COUNT ONE: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '784 PATENT

80. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

81. ABC has asserted that it is the current owner by assignment of all right, title, and interest in and to the '784 patent.

**ANSWER:** Admitted.

82. RBT has asserted that it is the exclusive licensee of the ’784 patent.

**ANSWER:** Admitted.

83. Defendants have asserted in ongoing litigation that the FRS embodies the technology claimed in the ’784 patent and that the standalone FRS product infringes the ’784 patent.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing patent infringement actions that the Atrius Selector infringes at least one claim of the ’784 Patent. Except as expressly admitted, the allegations of Paragraph 83 are denied.

84. Defendants have also asserted in ongoing litigation that the FRS infringes the ’784 patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing patent infringement actions that the Atrius Selector infringes at least one claim of the ’784 Patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm. Except as expressly admitted, the allegations of Paragraph 84 are denied.

85. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding infringement to warrant the issuance of a declaratory judgment of non-infringement.

**ANSWER:** Answering Defendants admit that an actual controversy exists between the parties regarding whether the Atrius Selector infringes the ’784 Patent. Answering Defendants

deny that the Atrius Selector does not infringe the ’784 Patent. Except as expressly admitted, the allegations of Paragraph 85 are denied.

86. A judicial declaration is necessary and appropriate so that Atrius may ascertain its rights regarding the FRS and the ’784 patent.

**ANSWER:** Denied.

87. The FRS and uses thereof do not infringe and have not infringed the ’784 patent, and Atrius has not contributed to or induced infringement of any claim of the ’784 patent, at least because the FRS, whether as a standalone part or installed and used as intended, does not embody the limitations of any claim of the ’784 patent.

**ANSWER:** Denied.

88. The ’784 patent is directed to solving a problem relating to applying the invention of United States Patent No. 10,514,223 (“the ’223 patent”) to an AR-10 pattern firearm.

**ANSWER:** Answering Defendants admit that solving a problem relating to applying the invention of United States Patent No. 10,514,223 (the “’223 Patent”) to AR-10 pattern firearms is one aspect of the invention disclosed and claimed in the ’784 Patent. Answering Defendants further state that the ’784 Patent speaks for itself, and deny any characterization of the ’784 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 88 are denied.

89. As Defendants know, the FRS is compatible with mil-spec AR-15 pattern firearms.

**ANSWER:** Answering Defendants admit on information and belief that the Atrius Selector is compatible with and a part of certain AR-15 pattern fire control groups. Except as expressly admitted, the allegations of Paragraph 89 are denied.

90. As Defendants know, the FRS is not compatible with AR-10 pattern firearms.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 90 and on that basis deny them.

91. The ’784 patent discloses two embodiments of the claimed “locking member.”

**ANSWER:** Answering Defendants admit the ’784 Patent illustrates at least two exemplary embodiments of the disclosed and claimed “locking member.” Answering Defendants further state that the ’784 Patent speaks for itself, and deny any characterization of the ’784 Patent inconsistent with its terms, including any implication that the claims of the ’784 Patent are limited to the embodiments illustrated therein. Except as expressly admitted, the allegations of Paragraph 91 are denied.

92. Two disclosed embodiments of the claimed “locking member” in the ’784 patent are locking member (bar) 12 and locking member (bar) 48.

**ANSWER:** Answering Defendants admit that exemplary embodiments of the disclosed and claimed “locking member” in the ’784 Patent include locking member 12 and locking member 48. Answering Defendants further state that the ’784 Patent speaks for itself, and deny any characterization of the ’784 Patent inconsistent with its terms, including any implication that the claims of the ’784 Patent are limited to the embodiments illustrated therein. Except as expressly admitted, the allegations of Paragraph 92 are denied.

93. When locking member (bar) 12 of the ’784 patent is in a first position in which it locks trigger member 14 against pulling movement, locking member body 26 directly contacts trigger member 14.

**ANSWER:** Answering Defendants state that the ’784 Patent speaks for itself, and deny any characterization of the ’784 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 93 are denied.

94. Locking member 12 of the ’784 patent, including locking member body 26 and foldable extension 22, pivots as a unit when actuated by bolt carrier assembly 16 traveling forward.

**ANSWER:** Answering Defendants state that the ’784 Patent speaks for itself, and deny any characterization of the ’784 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 94 are denied.

95. Locking member 12 of the ’784 patent is supported by trigger housing 18 and pivot pin 20.

**ANSWER:** Answering Defendants state that the ’784 Patent speaks for itself, and deny any characterization of the ’784 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 95 are denied.

96. Locking member 12 of the ’784 patent, including locking member body 26 and foldable extension 22, pivots on pivot pin 20 when actuated by bolt carrier assembly 16 traveling forward.

**ANSWER:** Answering Defendants state that the ’784 Patent speaks for itself, and deny any characterization of the ’784 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 96 are denied.

97. The ’784 patent does not disclose an embodiment of the claimed “locking member” that is or includes a firearm’s safety selector.

**ANSWER:** Answering Defendants state that the ’784 Patent speaks for itself, and deny any characterization of the ’784 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 97 are denied.

98. The ’784 patent does not disclose an embodiment in which the claimed “locking member” is supported by a safety selector.

**ANSWER:** Answering Defendants state that the '784 Patent speaks for itself, and deny any characterization of the '784 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 98 are denied.

99. The FRS is not and does not contain a locking member with a body portion and an upwardly extending deflectable portion as disclosed and described in the '784 patent.

**ANSWER:** Denied.

100. By way of example, and without limitation, the FRS does not infringe, has not infringed, and cannot be and has not been used to infringe at least one or more of the following limitations as recited in claim 1 of the '784 patent, whether sold as a standalone product or installed and used as intended:

- "extended trigger member locking device"
- "a locking member"
- "the locking member configured to be movably supported by a frame and including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier"
- "such actuating contact causing the locking member to move from the first position to the second position"
- "the locking member having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position."

**ANSWER:** Denied.

101. For at least these reasons, the FRS, whether sold alone or installed and used as intended, does not infringe, and has not infringed, any claim of the '784 patent.

**ANSWER:** Denied.

102. Atrius is entitled to a declaratory judgment that Atrius and the FRS and uses thereof do not infringe, and have not infringed, either directly or indirectly, literally or under the doctrine of equivalents, any claim of the ’784 patent.

**ANSWER:** Denied.

**COUNT TWO:**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE ’784 PATENT**

103. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

104. Defendants have asserted in ongoing litigation that the FRS embodies the technology claimed in the ’784 patent and that the standalone FRS product infringes claims of the ’784 patent.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing patent infringement actions that the Atrius Selector infringes at least one claim of the ’784 Patent. Except as expressly admitted, the allegations of Paragraph 104 are denied.

105. Defendants have also asserted in ongoing litigation that the FRS infringes the ’784 patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold as part of a complete firearm.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing patent infringement actions that the Atrius Selector infringes at least one claim of the ’784 Patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold as part of a complete firearm. Except as expressly admitted, the allegations of Paragraph 105 are denied.

106. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding the validity of the claims of the '784 patent to warrant the issuance of a declaratory judgment of invalidity. Accordingly, there exists an actual and justiciable controversy between the parties regarding the validity of the claims of the '784 patent.

**ANSWER:** Answering Defendants admit that an actual controversy exists between the parties regarding the validity of at least one claim of the '784 Patent. Answering Defendants deny that any claim of the '784 Patent is invalid. Except as expressly admitted, the allegations of Paragraph 106 are denied.

107. The claims of the '784 patent fail to meet one or more requirements of the patent laws of the United States, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

**ANSWER:** Denied.

108. A judicial declaration of invalidity is necessary and appropriate so that Atrius may ascertain its rights regarding the '784 patent.

**ANSWER:** Denied.

**COUNT THREE:**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '247 PATENT**

109. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

110. ABC has asserted that it is the current owner by assignment of all right, title, and interest in and to the '247 patent.

**ANSWER:** Admitted.

111. RBT has asserted that it is the exclusive licensee of the ’247 patent.

**ANSWER:** Admitted.

112. Defendants have asserted in ongoing litigation that the FRS embodies the technology claimed in the ’247 patent and that the standalone FRS product infringes at least claim 15 of the ’247 patent.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing patent infringement actions that the standalone Atrius Selector product indirectly infringes at least claim 15 of the ’247 Patent. Except as expressly admitted, the allegations of Paragraph 112 are denied.

113. Defendants have also asserted in ongoing litigation that the FRS infringes at least claim 15 of the ’247 patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing patent infringement actions that the Atrius Selector directly infringes at least claim 15 of the ’247 Patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm. Except as expressly admitted, the allegations of Paragraph 113 are denied.

114. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding infringement to warrant the issuance of a declaratory judgment of non-infringement.

**ANSWER:** Answering Defendants admit that an actual controversy exists between the parties regarding whether the Atrius Selector infringes the ’247 Patent. Answering Defendants deny that the Atrius Selector does not infringe the ’247 Patent. Except as expressly admitted, the allegations of Paragraph 114 are denied.

115. A judicial declaration is necessary and appropriate so that Atrius may ascertain its rights regarding the FRS and the ’247 patent.

**ANSWER:** Denied.

116. The FRS and uses thereof do not infringe and have not infringed the ’247 patent, and Atrius has not contributed to or induced infringement of any claim of the ’247 patent at least because the FRS, whether as a standalone part or installed and used as intended, does not practice or embody the limitations of any claim of the ’247 patent.

**ANSWER:** Denied.

117. All claims of the ’247 patent include a requirement that, during operation in forced reset semi-automatic mode, the firearm’s disconnector hook is prevented from catching the firearm’s hammer hook during rearward movement of the bolt carrier.

**ANSWER:** Answering Defendants state that the ’247 Patent speaks for itself, and deny any characterization of the ’247 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 117 are denied.

118. During operation of an AR-15 pattern firearm with the FRS installed and set to “FULL-SEMI” mode, the firearm’s disconnector hook catches the hammer hook during rearward movement of the bolt carrier.

**ANSWER:** Denied.

119. During the operation of an AR-15 pattern firearm with the FRS installed and set to “FULL-SEMI” mode, the firearm’s disconnector hook is not prevented from catching the hammer hook.

**ANSWER:** Denied.

120. The ’247 patent discloses cam 72 as a component that is separate from safety selector 110.

**ANSWER:** Answering Defendants state that the ’247 Patent speaks for itself, and deny any characterization of the ’247 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 120 are denied.

121. The ’247 patent discloses cam lobe 78 interacting with cam follower 58 of trigger member 38.

**ANSWER:** Answering Defendants state that the ’247 Patent speaks for itself, and deny any characterization of the ’247 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 121 are denied.

122. Trigger member 38, hammer 36, and disconnector 60 of the ’247 patent are not standard (i.e., mil-spec) AR-15 trigger, hammer, and disconnector.

**ANSWER:** Answering Defendants state that the ’247 Patent speaks for itself, and deny any characterization of the ’247 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 122 are denied.

123. The ’247 patent does not disclose cam 72 interacting with safety selector 110.

**ANSWER:** Answering Defendants state that the ’247 Patent speaks for itself, and deny any characterization of the ’247 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 123 are denied.

124. The ’247 patent does not disclose cam 72 contacting safety selector 110.

**ANSWER:** Answering Defendants state that the ’247 Patent speaks for itself, and deny any characterization of the ’247 Patent inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 124 are denied.

125. The FRS includes a safety selector.

**ANSWER:** Admitted.

126. The FRS does not include a cam as disclosed and described in the ’247 patent.

**ANSWER:** Denied.

127. The FRS does not require the installation of a non-mil-spec trigger, non-mil-spec hammer, or non-mil-spec disconnector.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 127 and on that basis deny them.

128. By way of example, and without limitation, the FRS does not infringe, has not infringed, and cannot be and has not been used to infringe at least one or more of the following limitations as recited in claim 15 of the ’247 patent, whether sold as a standalone product, installed in a receiver, or sold or used as part of a complete firearm:

- “a cam having a cam lobe . . . said cam being movable between a first position and a second position, in said second position said cam lobe forces said trigger member toward said set position”
- “whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catch said hammer hook.”

**ANSWER:** Denied.

129. For at least these reasons, the FRS and uses thereof do not infringe, and have not infringed, the ’247 patent.

**ANSWER:** Denied.

130. Atrius is entitled to a declaratory judgment that Atrius and the FRS and uses thereof do not infringe, and have not infringed, either directly or indirectly, literally or under the doctrine of equivalents, any claim of the ’247 patent.

**ANSWER:** Denied.

**COUNT FOUR:**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE ’247 PATENT**

131. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

132. Defendants have asserted in ongoing litigation that the FRS embodies the technology claimed in the ’247 patent and that the standalone FRS infringes claims of the ’247 patent.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing patent infringement actions that the standalone Atrius Selector product indirectly infringes at least one claim of the ’247 Patent. Except as expressly admitted, the allegations of Paragraph 132 are denied.

133. Defendants have also asserted in ongoing litigation that the FRS infringes the ’247 patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing patent infringement actions that the Atrius Selector directly infringes at least one claim of the ’247 Patent when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm. Except as expressly admitted, the allegations of Paragraph 133 are denied.

134. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding the validity of the claims of the ’247 patent to warrant the issuance of a declaratory judgment of invalidity. Accordingly, there exists an

actual and justiciable controversy between the parties regarding the validity of the claims of the ’247 patent.

**ANSWER:** Answering Defendants admit that an actual controversy exists between the parties regarding the validity of at least one claim of the ’247 Patent. Answering Defendants deny that any claim of the ’247 Patent is invalid. Except as expressly admitted, the allegations of Paragraph 134 are denied.

135. The claims of the ’247 patent fail to meet one or more requirements of the patent laws of the United States, including without limitation 35 U.S.C. §§ 101, 102, 103, and 112, and the rules, regulations, and laws pertaining thereto.

**ANSWER:** Denied.

136. A judicial declaration of invalidity is necessary and appropriate so that Atrius may ascertain its rights regarding the ’247 patent.

**ANSWER:** Denied.

**COUNT FIVE:**
**DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE ’247 PATENT DUE TO INEQUITABLE CONDUCT**

137. A patent is unenforceable due to inequitable conduct if: “(1) an individual associated with the filing and prosecution of the patent application made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false information; and (2) the individual did so with a specific intent to deceive the PTO.” In re BP Lubricants USA, Inc., 637 F.3d 1307, 1327 n.3 (Fed. Cir. 2011).

**ANSWER:** Paragraph 137 states legal conclusions to which no response is required. To the extent a response is required, denied.

138. A pleading of inequitable conduct “must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of

the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1328 (Fed. Cir. 2009).

**ANSWER:** Paragraph 138 states legal conclusions to which no response is required. To the extent a response is required, denied.

139. Each individual associated with the filing and prosecution of a patent application has a duty of candor to and a duty of good faith in dealing with the USPTO. This includes a duty to disclose to the USPTO all information known to that individual to be material to the patentability of any pending claim. See 37 C.F.R. § 1.56(a).

**ANSWER:** Paragraph 139 states legal conclusions to which no response is required. To the extent a response is required, denied.

140. The foregoing obligations apply to all individuals associated with the filing or prosecution of a patent application, including: (1) inventors, (2) attorneys or agents who prepare or prosecute the application, and (3) every other person who is substantively involved in the preparation or prosecution of the application and who is associated with an inventor, an applicant, an assignee, or anyone to whom there is an obligation to assign the application. 37 C.F.R. § 1.56(a); Manual of Patent Examining Procedure § 2001.01. A person is considered to be substantively involved in the preparation or prosecution of the application if that person's "involvement relates to the content of the application or decisions related thereto, and that the involvement is not wholly administrative or secretarial in nature." Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 974 (Fed. Cir. 2010).

**ANSWER:** Paragraph 140 states legal conclusions to which no response is required. To the extent a response is required, denied.

141. The ’247 patent issued on Application No. 18/325,225 (the “’225 Application”), which was filed May 30, 2023.

**ANSWER:** Admitted.

142. The ’225 Application claimed the benefit of provisional application no. 63/374,941 (“Provisional Application”), which was filed September 8, 2022.

**ANSWER:** Admitted.

143. Mr. Glenn D. Bellamy is a patent attorney for ABC IP, LLC.

**ANSWER:** Admitted.

144. Mr. Bellamy is identified on an Electronic Acknowledgement Receipt as the person who authorized the filing of the Provisional Application and is also indicated on an Electronic Payment Receipt as the person who authorized the payment of the filing fee for the Provisional Application.

**ANSWER:** Answering Defendants state that the Electronic Acknowledgement Receipt and Provisional Application speak for themselves, and deny any characterization of the documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 144 are denied.

145. Mr. Bellamy is also indicated on an Electronic Acknowledgement Receipt as the person who authorized the filing of the ’225 Application that resulted in the ’247 patent.

**ANSWER:** Answering Defendants state that the Electronic Acknowledgement Receipt speaks for itself, and deny any characterization of the document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 145 are denied.

146. Mr. Bellamy signed or submitted documents submitted during the prosecution of the ’247 patent, including at least (a) Transmittal for Power of Attorney to One or More Registered

Practitioners, identifying himself as the "Attorney of Record"; (b) Application Data Sheet; (c) Patent Assignment; (d) Comments on Examiner's Reasons for Allowance; and (e) Fee(s) Transmittal form for the issue fee.

**ANSWER:** Answering Defendants state that the documents speak for themselves, and deny any characterization of the documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 146 are denied.

147. On information and belief, Defendant Mr. DeMonico, President of RBT, was substantively involved with the development, commercialization, litigation enforcement, and prosecution strategy relating to the forced-reset technology claimed in the '247 patent, including matters relating to prior art, accused products, and prosecution decisions concerning the '225 Application that became the '247 patent.

**ANSWER:** Denied. The allegation that Mr. DeMonico was "substantively involved" within the meaning of 37 C.F.R. § 1.56 and *Avid Identification Systems, Inc. v. Crystal Import Corp.*, 603 F.3d 967 (Fed. Cir. 2010), states a legal conclusion to which no response is required. To the extent a response is required, the Answering Defendants deny that Mr. DeMonico was substantively involved in the prosecution of the '225 Application within the meaning of that standard. Except as expressly admitted, the allegations of Paragraph 147 are denied.

148. At least as early as September 8, 2022, Bellamy and DeMonico had a duty of candor to and a duty of good faith in dealing with the USPTO in connection with the prosecution of the '225 Application.

**ANSWER:** Paragraph 148 states legal conclusions to which no response is required. To the extent a response is required, denied.

149. At least as early as September 8, 2022, Bellamy and DeMonico had a duty to disclose to the USPTO all information known to them to be material to the patentability of any pending claim.

**ANSWER:** Paragraph 149 states legal conclusions to which no response is required. To the extent a response is required, denied.

150. In the Notice of Allowance of the ’225 Application (attached hereto as Ex. E), the USPTO Examiner stated that (in his opinion) the closest prior art for all pending claims was U.S. Patent 7,398,723 (“Blakley ’723”). The Examiner also stated that Blakley ’723 discloses various claim limitations of the ’225 Application, including the “hammer,” “trigger member,” “disconnector,” and “cam” limitations of claims 1, 4, 9, 14, 15 and 20.

**ANSWER:** Answering Defendants state that the Notice of Allowance of the ’225 Application speaks for itself, and deny any characterization of that document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 150 are denied.

151. The Examiner stated in the Notice of Allowance that (in his opinion), Blakley ’723 does not disclose the following elements of independent claims 1, 4, 9, 14, and 20:

[a] a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions;

[b] whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer and pivoting of said cam from said first position to said second position such that said cam lobe forces said trigger member towards said set position but prior to reaching said set position said disconnector hook catches said hammer hook, and thereafter forward movement of the bolt carrier causes said cam to pivot to said first position, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm; and

[c] whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer and pivoting of said cam from said first position to said second position such that said cam lobe forces said trigger

member to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter forward movement of the bolt carrier causes said cam to pivot to said first position, at which time the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**ANSWER:** Answering Defendants state that the Notice of Allowance of the ’225 Application speaks for itself, and deny any characterization of that document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 151 are denied.

152. The above-identified portion [a] corresponds to the “safety selector” limitation of claims 1, 4, 9, 14, and 20 of the ’247 patent.

**ANSWER:** Answering Defendants do not adopt Atrius’s characterization of how the Notice of Allowance corresponds to the claims of the ’247 Patent. The Notice of Allowance and the ’247 Patent speak for themselves, and Answering Defendants deny any characterization of those documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 152 are denied.

153. The above-identified portion [b] corresponds to the first “whereupon” limitation regarding the “standard semi-automatic position” of claims 1, 4, 9, 14, and 20 of the ’247 patent.

**ANSWER:** Answering Defendants do not adopt Atrius’s characterization of how the Notice of Allowance corresponds to the claims of the ’247 Patent. The Notice of Allowance and the ’247 Patent speak for themselves, and Answering Defendants deny any characterization of those documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 153 are denied.

154. The above-identified portion [c] corresponds to the second “whereupon” limitation regarding the “forced reset semi-automatic position” of claims 1, 4, 9, 14, and 20 of the ’247 Patent.

**ANSWER:** Answering Defendants do not adopt Atrius's characterization of how the Notice of Allowance corresponds to the claims of the '247 Patent. The Notice of Allowance and the '247 Patent speak for themselves, and Answering Defendants deny any characterization of those documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 154 are denied.

155. The Examiner also stated in the Notice of Allowance that (in his opinion), Blakley '723 does not disclose the following elements of independent claim 15:

> [b] a trigger mechanism whereupon in a standard semi-automatic mode, said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm; and
>
> [c] whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm.

**ANSWER:** Answering Defendants state that the Notice of Allowance of the '225 Application speaks for itself, and deny any characterization of that document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 155 are denied.

156. The above-identified portion [b] corresponds to the first "whereupon" limitation regarding the "standard semi-automatic mode" of claim 15 of the '247 Patent.

**ANSWER:** Answering Defendants do not adopt Atrius's characterization of how the Notice of Allowance corresponds to the claims of the '247 Patent. The Notice of Allowance and the '247 Patent speak for themselves, and Answering Defendants deny any characterization of those documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 156 are denied.

157. The above-identified portion [c] corresponds to the second "whereupon" limitation regarding the "forced reset semi-automatic mode" of claim 15 of the '247 Patent.

**ANSWER:** Answering Defendants do not adopt Atrius's characterization of how the Notice of Allowance corresponds to the claims of the '247 Patent. The Notice of Allowance and the '247 Patent speak for themselves, and Answering Defendants deny any characterization of those documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 157 are denied.

158. On information and belief, Bellamy and DeMonico were aware of prior art that disclosed each of these above-identified limitations that the Examiner believed were missing from Blakley '723, including the prior art identified below. Bellamy and DeMonico, therefore, knew that such prior art was directly material to the patentability analysis being performed by the Examiner.

**ANSWER:** Denied.

159. On information and belief, Bellamy, together with DeMonico, knowingly failed to disclose at least the material prior-art references identified below during prosecution of the '225 Application despite understanding that those references were directly relevant to limitations the Examiner considered absent from Blakley '723. The facts alleged herein support a reasonable inference that Bellamy and DeMonico withheld those references with the specific intent to prevent the USPTO from considering their impact on patentability.

**ANSWER:** Denied.

160. Bellamy also caused the '225 Application to include an affirmative representation regarding common ownership that had the effect of excluding a known prior-art reference from consideration under 35 U.S.C. § 102(b)(2)(C), as explained below. On information and belief, that

representation was made with knowledge of the prior-art significance of the underlying FRT-15-3MD product and with the intent to avoid substantive examination of that prior art.

**ANSWER:** Denied.

161. The facts alleged herein support a reasonable inference that Bellamy and DeMonico acted with a specific intent to deceive the USPTO. Those facts include, among other things: (a) their knowledge of prior art that disclosed limitations the Examiner expressly identified as missing from Blakley '723; (b) Bellamy's direct involvement in litigation accusing the FRT-15-3MD based on overlapping forced-reset functionality; (c) the failure to disclose the FRT-15-3MD or related litigation materials to the USPTO; and (d) the affirmative representation of common ownership that had the effect of excluding Strbac '003 from consideration as prior art. The single most reasonable inference from these facts is that Bellamy and DeMonico intended to prevent the USPTO from substantively considering the prior-art significance of the FRT-15-3MD and related Strbac disclosures during prosecution of the '225 Application.

**ANSWER:** Denied.

162. The conduct of Bellamy, together with DeMonico, constitutes inequitable conduct that renders all claims of the '247 patent unenforceable.

**ANSWER:** Denied.

**Tommy Triggers FRT-15-3MD Prior Art**

163. Material prior art known to, and withheld by, Bellamy and DeMonico includes a trigger assembly sold by Mr. Mladen Thomas Strbac (d/b/a Tommy Triggers) called the FRT-15-3MD.

**ANSWER:** Denied. The Tommy Triggers FRT-15-3MD was neither material to patentability nor withheld from the USPTO. The structure and operation of the Tommy Triggers

FRT-15-3MD was disclosed to the USPTO by way of U.S. Patent No. 12,036,336, which was considered by the Examiner as prior art.

164. The FRT-15-3MD was in public use, on sale, or otherwise available to the public before the Provisional Application was filed.

**ANSWER:** Admitted that the Tommy Triggers FRT-15-3MD was in public use, on sale, or otherwise available to the public before the Provisional Application was filed. Answering Defendants deny that the FRT-15-3MD was material to patentability or withheld from the USPTO. The structure and operation of the Tommy Triggers FRT-15-3MD was disclosed to the USPTO by way of U.S. Patent No. 12,036,336, which was considered by the Examiner as prior art.

165. The FRT-15-3MD was in public use, on sale, or otherwise available to the public before the ’225 Application was filed.

**ANSWER:** Admitted that the Tommy Triggers FRT-15-3MD was in public use, on sale, or otherwise available to the public before the ’225 Application was filed. Answering Defendants deny that the Tommy Triggers FRT-15-3MD was material to patentability or withheld from the USPTO. The structure and operation of the Tommy Triggers FRT-15-3MD was disclosed to the USPTO by way of U.S. Patent No. 12,036,336, which was considered by the Examiner as prior art.

166. The FRT-15-3MD qualifies as prior art to the ’247 patent under 35 U.S.C. §102(a)(1).

**ANSWER:** Paragraph 166 states a legal conclusion to which no response is required. To the extent a response is required, denied.

167. Bellamy was aware of the FRT-15-3MD because he signed and filed a patent infringement complaint against Strbac/Tommy Triggers on behalf of ABC and RBT on February 21, 2022. See Rare Breed Triggers, LLC v. Strbac, No. 1:22-cv-280 (N.D. Ohio), ECF No. 1 ("Strbac Complaint," attached hereto as Ex. F). That complaint describes and includes several photos of the FRT-15-3MD. That complaint includes, as an exhibit, a cease-and-desist letter dated January 17, 2022, signed by Bellamy and sent to Tommy Triggers regarding that trigger assembly.

**ANSWER:** Answering Defendants state that the Strbac Complaint and the cease-and-desist letter referenced in Paragraph 167 speak for themselves, and deny any characterization of those documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 167 are denied.

168. On information and belief, DeMonico was aware of the FRT-15-3MD because the suit against Tommy Triggers was brought on behalf of ABC and RBT. In addition, the case was ultimately settled, and DeMonico would likely have signed, approved, and/or negotiated the agreement on behalf of RBT. This knowledge is independently confirmed by RBT's own infringement complaint. By no later than the filing of that complaint, RBT had investigated the FRT-15-3MD, understood its accused operation, and considered it sufficiently relevant to the claimed forced-reset technology to accuse it of infringement in federal court. A product that RBT understood well enough to investigate and accuse of infringement was, at minimum, sufficiently relevant and material to disclose to the USPTO during prosecution of overlapping claims directed to forced-reset firearm technology.

**ANSWER:** Answering Defendants admit that the Strbac action was brought on behalf of ABC and RBT and was ultimately settled. Answering Defendants state that the Strbac action and any settlement agreement related thereto speak for themselves, and deny any characterization

of those documents inconsistent with their terms. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 168, and on that basis deny them.

169. Some of the photos of the FRT-15-3MD from the Strbac Complaint are shown below:

**ANSWER:** Answering Defendants state that the Strbac Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 169 are denied.

170. The photos included in the Strbac Complaint show that at least Bellamy was in possession of the FRT-15-3MD.

**ANSWER:** Denied. The photos referenced in Paragraph 170 do not evidence possession of the Tommy Triggers FRT-15-3MD; they were taken from Tommy Triggers's website. Except as expressly admitted, the allegations of Paragraph 170 are denied.

171. Strbac filed a provisional patent application (No. 63/297,884) on January 10, 2022, which discloses limited information about the FRT-15-3MD.

**ANSWER:** Answering Defendants admit that Mr. Strbac filed a provisional patent application (no. 63/297,884) on January 10, 2022. Answering Defendants state that the Strbac provisional patent application speaks for itself, and deny any characterization of that document inconsistent with its terms, including the characterization that it discloses only "limited information" about the Tommy Triggers FRT-15-3MD. Except as expressly admitted, the allegations of Paragraph 171 are denied.

172. The FRT-15-3MD was material to the patentability of at least claims 1, 4, 9, 14, 15, and 20 of the '225 Application and should have been disclosed to the USPTO. Despite Bellamy's

and DeMonico's knowledge of the FRT-15-3MD and its operation, neither disclosed the product, the allegations regarding its functionality, nor the related Strbac litigation materials to the USPTO during prosecution.

**ANSWER:** Denied. The Tommy Triggers FRT-15-3MD was neither material to patentability nor required to be separately disclosed to the USPTO. The structure and operation of the Tommy Triggers FRT-15-3MD was disclosed to the USPTO by way of U.S. Patent No. 12,036,336, which was considered by the Examiner as prior art.

173. The FRT-15-3MD discloses all the claim limitations identified by the Examiner as missing from the prior art of record.

**ANSWER:** Denied.

174. As evidenced by the Strbac Complaint (¶¶ 44-47), a firearm with the FRT-15-3MD has a safety selector (that would be mounted in the fire control mechanism pocket) that can be rotated to switch between safe, standard semiautomatic, and forced-reset semiautomatic modes. This disclosure of a three-position safety selector used with a forced-reset trigger discloses portion [a] of what the Examiner found missing from the cited prior art.

**ANSWER:** Answering Defendants state that the Strbac Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Answering Defendants deny that the Tommy Triggers FRT-15-3MD was material to patentability or required to be separately disclosed to the USPTO. Except as expressly admitted, the allegations of Paragraph 174 are denied.

175. As shown in the Strbac Complaint (¶¶ 27, 29, 45), a firearm with the FRT-15-3MD can operate in a "disconnector mode," which is much like that of a standard AR-15 trigger. In that standard semiautomatic mode, rearward movement of the bolt carrier causes rearward pivoting of

the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. This disclosure of a standard semiautomatic mode discloses portion [b] of what the Examiner found missing from the cited prior art.

**ANSWER:** Answering Defendants state that the Strbac Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Answering Defendants deny that the Tommy Triggers FRT-15-3MD was material to patentability or required to be separately disclosed to the USPTO. Except as expressly admitted, the allegations of Paragraph 175 are denied.

176. The Strbac Complaint (¶¶ 44-45, 47, 50, 76) also evidences that a firearm with the FRT-15-3MD can operate in forced-reset mode. In that mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer, but the FRT-15-3MD prevents the disconnector hook from catching the hammer hook. Thereafter, the bolt carrier moves forward into battery, at which time the user can pull the trigger member to fire the firearm without manually releasing the trigger member. This disclosure of a forced-reset semiautomatic mode meets portion [c] of what the Examiner found missing from the cited prior art.

**ANSWER:** Answering Defendants state that the Strbac Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Answering Defendants deny that the Tommy Triggers FRT-15-3MD was material to patentability or required to be separately disclosed to the USPTO. Except as expressly admitted, the allegations of Paragraph 176 are denied.

177. A person of ordinary skill in the relevant art would have been motivated to modify the Blakley ’723 trigger mechanism to include a three-position safety selector as taught by the FRT-15-3MD to allow the firearm to operate in each of three modes (safe, standard semiautomatic, and forced-reset semiautomatic), wherein the disconnector is prevented from catching the hammer hook in forced-reset semiautomatic mode.

**ANSWER:** Denied.

178. Had the Examiner been aware of the FRT-15-3MD, he would have rejected at least pending claims 1, 4, 9, 14, 15, and 20 of the ‘225 Application under 35 U.S.C. §103 in light of Blakley ’723 and the FRT-15-3MD.

**ANSWER:** Denied.

179. Neither Bellamy nor DeMonico, nor anyone else involved with prosecuting the ’225 Application, disclosed the FRT-15-3MD to the USPTO during prosecution of the ’225 Application. Nor did they disclose that RBT had already accused the FRT-15-3MD in federal litigation based on allegedly overlapping forced-reset functionality.

**ANSWER:** Denied. The FRT-15-3MD was neither material to patentability nor required to be separately disclosed to the USPTO. The FRT-15-3MD was disclosed to the USPTO by way of U.S. Patent No. 12,036,336.

180. On information and belief, Bellamy and/or DeMonico intentionally used the later-filed ’572 Strbac Application and the common-ownership representation described below to prevent the USPTO from substantively considering the prior-art significance of the earlier FRT-15-3MD product.

**ANSWER:** Denied.

181. During prosecution of the ’247 patent, ABC disclosed U.S. Patent No. 11,724,003 to Thomas Strbac (“Strbac ’003”) in an Information Disclosure Statement (“IDS”) filed August 31, 2023. That IDS additionally identified 114 issued patents, 25 published patent applications, 7 foreign patent documents, and 1 non-patent literature document. On information and belief, the extensive IDS, identifying approximately 150 items, served to obscure the disclosure and relevance of Strbac ’003.

**ANSWER:** Answering Defendants admit that ABC disclosed U.S. Patent No. 11,724,003 to Thomas Strbac (“Strbac ’003”) in an Information Disclosure Statement filed during prosecution of the ’247 patent. Answering Defendants state that the Information Disclosure Statement identified all references known or believed to be material to patentability of the pending claims, as required by 37 C.F.R. § 1.56. Answering Defendants further state that the Information Disclosure Statement speaks for itself, and deny any characterization of that document inconsistent with its terms. Answering Defendants deny that the Information Disclosure Statement was filed for the purpose of obscuring the disclosure or relevance of Strbac ’003 or any other reference. Except as expressly admitted, the allegations of Paragraph 181 are denied.

182. Strbac ’003 issued on application no. 18/048,572 (“the ’572 Strbac Application”), which was authorized by Bellamy and filed on October 21, 2022—after Bellamy filed the Provisional Application to which the ’247 patent claims priority. The ’572 Strbac Application discloses aspects of a modified version of the FRT-15-3MD, and its disclosure adds substantial new matter relative to Strbac provisional application No. 63/297,884.

**ANSWER:** Answering Defendants admit that U.S. Patent No. 11,724,003 (Strbac ’003) issued on application no. 18/048,572 (the “’572 Strbac Application”) filed October 21, 2022. Answering Defendants deny that the ’572 Strbac Application adds substantial new matter relative

to Strbac provisional application no. 63/297,884. Except as expressly admitted, the allegations of Paragraph 182 are denied.

183. The new matter added to the ’572 Strbac Application is not entitled to priority as of the filing date of Strbac provisional application No. 63/297,884 (January 10, 2022). Instead, all new matter added to the ’572 Strbac Application relative to the provisional application has an effective filing date of the ’572 Strbac Application (October 21, 2022).

**ANSWER:** Denied.

184. The ’225 Application incorporates by reference the ’572 Strbac Application and identifies it as “assignee’s” pending patent application (i.e., owned by Defendant ABC)—thus representing to the USPTO that the ’572 Strbac Application was commonly owned with the ’225 Application. Under the Manual of Patent Examining Procedure (e.g., MPEP § 717.02(a)), this affirmative statement had the effect of excluding Strbac ’003 as prior art under 35 U.S.C. § 102(b)(2)(C) based on common ownership by Defendant ABC of Strbac ’003 and the ’225 Application, even though Bellamy and DeMonico knew the FRT-15-3MD product was prior art to the claims of the ’225 Application. On information and belief, Bellamy and DeMonico understood that characterizing the later-filed ’572 Strbac Application as commonly owned would help prevent the USPTO from substantively evaluating the prior-art significance of the earlier FRT-15-3MD product itself.

**ANSWER:** Answering Defendants state that the ’225 Application and the MPEP each speak for themselves, and deny any characterization of those documents inconsistent with their terms. Answering Defendants deny that the statement in the ’225 Application regarding the ’572 Strbac Application had the effect of excluding Strbac ’003 as prior art under 35 U.S.C. §

102(b)(2)(C); the USPTO Examiner treated Strbac '003 as prior art during prosecution. Except as expressly admitted, the allegations of Paragraph 184 are denied.

185. Bellamy and DeMonico thus deceptively removed Strbac '003 from consideration as prior art during prosecution. Indeed, the Examiner did not discuss Strbac '003, the '572 Strbac Application, or the underlying FRT-15-3MD product during prosecution or use any of them in a rejection, despite their obvious similarities to the claimed subject matter. As a result, the USPTO never substantively evaluated whether Blakley '723 in view of the FRT-15-3MD rendered the asserted claims unpatentable.

**ANSWER:** Denied.

186. While direct evidence of Bellamy's and DeMonico's state of mind is solely within their control, the information available to Atrius confirms that the single most reasonable inference is that Bellamy and DeMonico intentionally withheld the FRT-15-3MD from the USPTO to obtain allowance of the '225 Application and issuance of the '247 patent. That inference is supported by Bellamy's and DeMonico's undeniable knowledge of the structure, operation, and materiality of the FRT-15-3MD (based at least on the Strbac Complaint) and their inexplicable failure to disclose the FRT-15-3MD during prosecution. That inference is further strengthened by the fact that Bellamy had already signed and filed the Strbac Complaint accusing the FRT-15-3MD of infringing forced-reset technology before the relevant prosecution events occurred. This inference is further supported by the statement in the '247 patent that the '572 Strbac Application was commonly owned by ABC IP, thereby intending to remove it (and the resulting Strbac '003 patent) from consideration as prior art to the '247 patent. By filing the Provisional Application on September 8, 2022, then filing the '572 Strbac Application on October 21, 2022, then identifying the '572 Strbac Application as commonly owned in the specification of the '225 Application—

without disclosing the prior art FRT-15-3MD or the existence of the Strbac litigation accusing that same product—Bellamy and DeMonico successfully and intentionally concealed the FRT-15-3MD from the USPTO with the intent to deceive. RBT cannot plausibly contend that the FRT-15-3MD was unknown, insignificant, or poorly understood, where RBT had already deemed the same product important enough to investigate and accuse in federal litigation.

**ANSWER:** Denied.

187. On information and belief, Bellamy and DeMonico were aware that the FRT-15-3MD discloses one or more limitations that the Examiner believed were missing from Blakley '723 and the other prior art of record.

**ANSWER:** Denied.

188. Atrius filed a petition for inter partes review of the '247 patent on August 29, 2025, alleging claims of the '247 patent are unpatentable based on Blakley '723 in combination with one or more videos depicting certain aspects of the FRT-15-3MD. The petition relied on videos of the FRT-15-3MD—rather than the product itself—because inter partes review petitions are limited to unpatentability grounds based on prior art consisting of patents or printed publications (i.e., excluding products in public use, on sale, or otherwise available to the public). *See* 35 U.S.C. § 311(b).

**ANSWER:** Paragraph 188 states legal conclusions to which no response is required. Answering Defendants otherwise admit the allegations of Paragraph 188.

189. In response to Atrius's petition for *inter partes* review, Defendants argued (among other things) that Atrius was improperly attempting to rely on the FRT-15-3MD product itself; that the videos identified in the petition do not qualify as printed publications for use in an inter partes review and were not publicly accessible; and that the videos on which Atrius relied failed to

disclose how the product operates. Those positions are inconsistent with Defendants' earlier allegations in the Strbac Complaint, where Defendants described the operation and functionality of the FRT-15-3MD in detail for purposes of asserting infringement.

**ANSWER:** Answering Defendants admit that, in response to Atrius's petition for inter partes review, Answering Defendants argued (among other things) that Atrius was improperly attempting to rely on the FRT-15-3MD product itself; that the videos identified in the petition do not qualify as printed publications for use in an inter partes review and were not publicly accessible; and that the videos on which Atrius relied failed to disclose how the product operates. Answering Defendants deny that those positions are inconsistent with Answering Defendants' allegations in the Strbac Complaint. Except as expressly admitted, the allegations of Paragraph 189 are denied.

190. Atrius's petition was denied without opinion on February 18, 2026. Neither the Examiner (during examination of the '247 patent) nor the Patent Trial and Appeal Board (in reviewing the petition for inter partes review) ever discussed or distinguished the FRT-15-3MD product (or the combination of Blakley '723 and FRT-15-3MD) from the claims of the '247 patent or Strbac '003.

**ANSWER:** Answering Defendants admit that Atrius's petition for inter partes review of the '247 Patent was denied on the merits without opinion on February 18, 2026. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of Atrius's allegations regarding what the Patent Trial and Appeal Board discussed or considered in its deliberations, and on that basis deny those allegations. Answering Defendants further state that a detailed description of the Tommy Triggers FRT-15-3MD product was disclosed to the USPTO by way of U.S. Patent No. 12,036,336 and considered by the Examiner during prosecution of the

’225 Application. Answering Defendants further state that the USPTO Examiner considered all of the references Atrius alleges to be prior art and allowed even broader claims in U.S. Patent Application No. 18/761,606 (a continuation application of the ’225 Application). Except as expressly admitted, the allegations of Paragraph 190 are denied.

191. To date, Defendants have successfully prevented the USPTO from considering or passing judgment on patentability of the ’247 claims based on Blakley ’723 in view of the FRT-15-3MD. Neither the Examiner nor the Patent Trial and Appeal Board has ever substantively addressed whether the known prior-art FRT-15-3MD—despite being sufficiently relevant for RBT to accuse in litigation—renders the asserted claims unpatentable.

**ANSWER:** Denied. The USPTO Examiner considered all of the references Atrius alleges to be prior art and allowed even broader claims in U.S. Patent Application No. 18/761,606 (a continuation application of the ’225 Application). The Patent Trial and Appeal Board’s denial of Atrius’s petition for inter partes review of the ’247 Patent on February 18, 2026, further confirms the non-materiality of the alleged prior art.

**Rare Breed FRT-15E3 Prior Art**

192. The Strbac Complaint (¶38) also states that on January 15, 2022—two days before sending a cease-and-desist letter to Tommy Triggers regarding the FRT-15-3MD—DeMonico publicly disclosed and demonstrated the operation of a three-position forced-reset trigger in which a safety selector switch can change the mode of operation between safe, standard semiautomatic with disconnector, and forced reset semiautomatic modes. That public disclosure occurred before filing of both the Provisional Application and the ’225 Application and involved subject matter materially similar to limitations the Examiner later identified as missing from Blakley ’723. The Strbac Complaint refers to this three-position trigger as the FRT-15E3 and shows a photo of it:

**ANSWER:** Answering Defendants state that the Strbac Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 192 are denied.

193. A video of DeMonico demonstrating a firearm with the FRT-15E3 installed and operational was uploaded to YouTube on January 15, 2022, at https://www.youtube.com/watch?v=ZJ0lWi2kfC0. The video publicly depicts the structure, operation, and selector functionality of the FRT-15E3 and confirms that Bellamy and DeMonico were aware of the device and its operation well before prosecution of the '225 Application.

**ANSWER:** Answering Defendants admit that a video was uploaded to YouTube on January 15, 2022, at https://www.youtube.com/watch?v=ZJ0lWi2kfC0. Answering Defendants state that the YouTube video speaks for itself, and deny any characterization of the video inconsistent with its content. Answering Defendants deny that the video discloses enabling details about the FRT-15E3 or confirms Mr. Bellamy's or Mr. DeMonico's awareness relevance of materiality of the FRT-15E3 before prosecution of the '225 Application. Except as expressly admitted, the allegations of Paragraph 193 are denied.

194. The FRT-15E3 was disclosed to the public before the Provisional Application to which the '225 Application claims priority was filed.

**ANSWER:** Denied.

195. The FRT-15E3 was disclosed to the public before the '225 Application was filed.

**ANSWER:** Denied.

196. On information and belief, the FRT-15E3 publicly disclosed by DeMonico on January 15, 2022 was developed, tested, and publicly demonstrated before any alleged contribution by Blakley to the specific three-position selector functionality later claimed in the '247 patent.

**ANSWER:** Denied.

197. On information and belief, Bellamy and DeMonico therefore knew, before filing the Provisional Application and the ’225 Application, that a three-position selector capable of switching between safe, standard semiautomatic, and forced-reset semiautomatic modes had already been publicly disclosed.

**ANSWER:** Denied.

198. The FRT-15E3 qualifies as prior art to the ’247 patent under 35 U.S.C. §102(a)(1) and, on information and belief, is not subject to either exception of 35 U.S.C. §102(b)(1).

**ANSWER:** Denied.

199. The FRT-15E3 was material to the patentability of at least claims 1, 4, 9, 14, 15, and 20 of the ’225 Application because it disclosed limitations the Examiner expressly identified as absent from Blakley ’723, including the three-position selector functionality and forced-reset operational modes identified in the Notice of Allowance. The FRT-15E3, therefore, should have been disclosed to the USPTO.

**ANSWER:** Denied.

200. As evidenced by the Strbac Complaint (¶38) and the YouTube video, a firearm with the FRT-15E3 has a safety selector (that would be mounted in the fire control mechanism pocket) that can switch between safe, standard semiautomatic, and forced reset semiautomatic modes. This disclosure of a three-position safety selector used with a forced reset trigger discloses portion [a] of what the Examiner found missing from the cited prior art.

**ANSWER:** Denied.

201. The Strbac Complaint (¶¶ 27, 29, 38, 45) evidences that a firearm with the FRT-15E3 can operate in a standard semiautomatic with disconnector mode, which is much like that of

a standard AR-15 trigger. In that standard semiautomatic mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. This disclosure of a standard semiautomatic mode discloses portion [b] of what the Examiner found missing from the cited prior art.

**ANSWER:** Denied.

202. The Strbac Complaint (¶¶ 35-36, 38, 45) also evidences that a firearm with the FRT-15E3 can operate in forced-reset semiautomatic mode, like the FRT-15 model also described in that complaint. In that mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer, but the FRT-15E3 prevents the disconnector hook from catching the hammer hook. Thereafter, the bolt carrier moves forward into battery, at which time the user can pull the trigger member to fire the firearm without manually releasing the trigger member. This disclosure of this forced-reset semiautomatic mode meets portion [c] of what the Examiner found missing from the cited prior art.

**ANSWER:** Denied.

203. A person of ordinary skill in the art would have been motivated to modify the trigger mechanism of Blakley ’723 to include a three-position safety selector as taught by the FRT-15E3 to allow the firearm to operate in each of three modes (safe, standard semiautomatic with disconnector, and forced-reset semiautomatic), wherein the disconnector is prevented from catching the hammer hook in forced-reset semiautomatic mode.

**ANSWER:** Denied.

204. Had the Examiner been aware of the FRT-15E3, he would have rejected at least pending claims 1, 4, 9, 14, 15, and 20 of the ’225 Application under 35 U.S.C. §103 in light of Blakley ’723 and the FRT-15E3.

**ANSWER:** Denied.

205. Neither Bellamy nor DeMonico, nor anyone else involved with prosecution of the ’225 Application, disclosed the FRT-15E3, the January 15, 2022 public demonstration, or the related video and litigation materials to the USPTO during prosecution of the ’225 Application.

**ANSWER:** Denied. The FRT-15E3 was neither material to patentability nor required to be disclosed to the USPTO during prosecution of the ’225 Application.

206. The facts alleged herein support a reasonable inference that Bellamy and DeMonico intentionally withheld the FRT-15E3 from the USPTO during prosecution of the ’225 Application. That inference is supported by, among other things: (a) Defendants’ direct involvement in publicly disclosing and demonstrating the FRT-15E3 before filing the Provisional Application; (b) Bellamy’s discussion of the FRT-15E3 in the Strbac Complaint; (c) Bellamy’s and DeMonico’s knowledge that the FRT-15E3 disclosed limitations the Examiner later identified as missing from Blakley ’723; and (d) their failure to disclose the FRT-15E3 or related materials to the USPTO despite that knowledge. The single most reasonable inference from these facts is that Bellamy and DeMonico intended to prevent the Examiner from substantively considering the prior-art significance of the FRT-15E3.

**ANSWER:** Denied.

207. Bellamy was aware of the FRT-15E3 because he discussed and showed it in the Strbac Complaint in early 2022, after the FRT-15E3 was publicly disclosed but before the Provisional Application or the ’225 Application were filed.

**ANSWER:** Answering Defendants state that the Strbac Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Answering Defendants deny that the FRT-15E3 was publicly disclosed before the Provisional Application or the '225 Application were filed. Except as expressly admitted, the allegations of Paragraph 207 are denied.

208. DeMonico was aware of the FRT-15E3 because he publicly disclosed and used it in a video posted to YouTube before the Provisional Application or the '225 Application were filed.

**ANSWER:** Denied. The FRT-15E3 was not publicly disclosed before the Provisional Application or the '225 Application were filed, and was not material to patentability of the '225 Application.

209. On information and belief, Bellamy and DeMonico were aware that the FRT-15E3 disclosed one or more limitations the Examiner expressly identified as missing from Blakley '723 and nevertheless knowingly failed to disclose the FRT-15E3 to the USPTO. The facts alleged herein support a reasonable inference that Bellamy and DeMonico withheld the FRT-15E3 with the specific intent to deceive the USPTO.

**ANSWER:** Denied.

**Super Safety**

210. In early 2022, ABC and RBT discovered that Timothy Hoffman d/b/a Hoffman Tactical LLC was offering and distributing a downloadable 3D-printable modification to a standard AR-pattern trigger that effectively converted such trigger to a forced reset trigger. See ¶ 23 of Original Complaint in *ABC IP, LLC v. Timothy Hoffman et al.*, Case 1:25-cv-00389 (E.D. Tenn.), ECF No. 1 ("Hoffman Complaint," attached hereto as Ex. G).

**ANSWER:** Admitted.

211. Bellamy sent a cease-and-desist letter dated February 9, 2022, to Timothy Hoffman, alleging infringement of ABC's U.S. Patent No. 10,514,223. See Ex. G at ¶ 24.

**ANSWER:** Admitted.

212. ABC entered into a settlement agreement to resolve the dispute with Hoffman on February 24, 2022. See Ex. G at ¶ 24.

**ANSWER:** Answering Defendants admit that ABC entered into a settlement agreement with Mr. Hoffman on February 24, 2022. Except as expressly admitted, the allegations of Paragraph 212 are denied.

213. On information and belief, Defendants monitored Hoffman's public activities relating to FRTs beginning on or before early 2022, at least because Hoffman indicated to Defendants in early 2022 that he planned to design a non-infringing device. On information and belief, Defendants therefore closely monitored Hoffman's efforts to develop a non-infringing or alternative forced-reset design.

**ANSWER:** Denied.

214. Hoffman publicly disclosed the Super Safety product in a video posted on YouTube on May 7, 2023: https://www.youtube.com/watch?v=auAqg-FiHv4 (see 15:07 of video). The Super Safety is disclosed as being slidably mounted in the firearm, i.e., a push-button safety selector.

**ANSWER:** Answering Defendants admit that a video was uploaded to YouTube on May 7, 2023, at https://www.youtube.com/watch?v=auAqg-FiHv4. Answering Defendants state that the YouTube video speaks for itself, and deny any characterization of the video inconsistent with its content. The YouTube video does not constitute prior art to the '247 Patent. Except as expressly admitted, the allegations of Paragraph 214 are denied.

215. The Super Safety disclosed in the YouTube video identified was mounted in the fire control mechanism pocket and could switch between safe, standard semiautomatic, and forced reset semiautomatic modes. This disclosure of a three-position safety selector used with a forced reset trigger discloses portion [a] of what the Examiner found missing from the cited prior art.

**ANSWER:** Denied.

216. On May 30, 2023—approximately three weeks after Hoffman publicly disclosed the Super Safety—ABC filed the ’225 Application that resulted in the ’247 patent. The ’225 Application added disclosure that was not included in the Provisional Application (i.e., new matter). New matter introduced in a non-provisional patent application claiming priority to a provisional application is entitled to priority as of the filing date of the non-provisional application and is not entitled to priority based on the filing date of the provisional application. The timing of the ’225 Application—filed approximately three weeks after the public disclosure of the Super Safety—is consistent with Bellamy and DeMonico attempting to draft claims broad enough to encompass or read on the newly disclosed Super Safety functionality.

**ANSWER:** Answering Defendants admit that the ’225 Application resulted in the ’247 Patent. Answering Defendants state that the ’225 Application speaks for itself, and deny any characterization of that document inconsistent with its terms. Answering Defendants deny that the ’225 Application added new matter relative to the Provisional Application to which the ’247 Patent claims priority. The remaining allegations of Paragraph 216 state legal conclusions to which no response is required. Except as expressly admitted, the allegations of Paragraph 216 are denied.

217. For example, the Provisional Application discloses the claimed cam and safety selector only as being "pivotable," and the claims of the Provisional Application required both the cam and safety selector to be pivotable.

**ANSWER:** Denied.

218. The Provisional Application does not disclose the claimed cam or safety selector being slidably mounted, nor does the Provisional Application include the word "slidable" or "slidably."

**ANSWER:** Denied.

219. The Provisional Application does not contain the word "movable" or "movably."

**ANSWER:** Answering Defendants state that the Provisional Application speaks for itself, and deny any characterization of that document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 219 are denied.

220. The '225 Application added new matter disclosing that, in the alternative to being mounted to pivot, "the cam 72 can be slidably mounted to the housing." The '225 Application also included one claim—i.e., claim 14—that was not included in the Provisional Application and captured the new matter by allowing the claimed cam to be "movably mounted," which broadened the scope of the claim to cover a cam that is mounted to pivot (as disclosed in the Provisional Application) or a cam that is slidably mounted (as first disclosed in the '225 Application).

**ANSWER:** Answering Defendants state that the Provisional Application and the '225 Application each speak for themselves, and deny any characterization of those documents inconsistent with their terms. Answering Defendants deny that the '225 Application added new matter relative to the Provisional Application. Except as expressly admitted, the allegations of Paragraph 220 are denied.

221. All claims of the Provisional Application, and all original claims filed with the ’225 Application, require the presence of a safety selector mounted to pivot.

**ANSWER:** Answering Defendants state that the Provisional Application and the ’225 Application each speak for themselves, and deny any characterization of those documents inconsistent with their terms. Except as expressly admitted, the allegations of Paragraph 221 are denied.

222. On April 4, 2024, ABC added new claims 15-23 to the pending ’225 Application, which eventually became claims 15-23 of the ’247 Patent. Like original claim 14, new claims 15-23 allow the claimed cam to be “movably mounted” and “moveable” between a first position and a second position rather than being limited to the cam being mounted to pivot as disclosed in the Provisional Application and required by claims 1-13 of the ’247 patent. Claims 15-23 thus capture the new matter added by the ’225 Application that is not entitled to the priority date of the Provisional Application. The doctrine of claim differentiation emphasizes ABC’s intent to capture the new matter by changing “pivotable” to “movable.” Like claim 15, claim 16 includes a safety selector which is “movably mounted,” and dependent claim 22, states “wherein said safety selector moves . . . by rotation,” making clear that movable would encompass more (i.e., slidable).

**ANSWER:** Answering Defendants state that the Provisional Application, the ’225 Application, and the ’247 Patent each speak for themselves, and deny any characterization of those documents inconsistent with their terms. Answering Defendants deny that the ’225 Application added new matter relative to the Provisional Application. Except as expressly admitted, the allegations of Paragraph 222 are denied.

223. All original claims 1-14 filed with the ’225 Application require a safety selector adapted to be mounted to pivot between safe, standard semi-automatic, and forced reset semi-

automatic positions. Claims 20-23, added on April 4, 2024, broaden the scope of that requirement by allowing the safety selector to be "movably mounted," i.e., mounted to pivot or slidably mounted.

**ANSWER:** Answering Defendants state that the '225 Application and the '247 Patent each speak for themselves, and deny any characterization of those documents inconsistent with their terms. Answering Defendants deny that the '225 Application added new matter relative to the Provisional Application. Except as expressly admitted, the allegations of Paragraph 223 are denied.

224. Neither the Provisional Application nor the '225 Application discloses that the safety selector can be mounted in any way other than to pivot. On information and belief, Applicant nevertheless introduced the broadening "movably mounted" safety selector language into claims 20-23 nearly a year after filing the '225 Application to cover a safety selector that is slidably mounted (as disclosed by Super Safety) rather than being pivotally mounted.

**ANSWER:** Denied.

225. On information and belief, Bellamy, together with DeMonico's knowledge and support, introduced the above-described broadened "movably mounted" claim language into the '225 Application after learning of the publicly disclosed Super Safety and its slidably mounted selector functionality.

**ANSWER:** Denied. The '225 Application did not add new matter relative to the Provisional Application.

226. Neither Bellamy nor DeMonico nor anyone else involved in prosecuting the '225 Application disclosed the Super Safety to the USPTO.

**ANSWER:** Denied. The Super Safety was neither material to patentability nor required to be disclosed to the USPTO during prosecution of the ’225 Application.

227. The Super Safety is prior art to at least claims 14-23 of the ’247 patent.

**ANSWER:** Denied.

228. On December 23, 2025, Bellamy filed a patent infringement complaint against Hoffman and Hoffman Tactical on behalf of ABC and RBT based on the Super Safety. See Ex. G.

**ANSWER:** Answering Defendants state that the Hoffman Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Except as expressly admitted, the allegations of Paragraph 228 are denied.

229. The Hoffman Complaint accuses the Super Safety of infringing Claim 15 of the ’247 Patent, thereby admitting that Defendants (including Bellamy and DeMonico) believe the Super Safety, when installed and used as intended, includes all elements of at least that claim.

**ANSWER:** Answering Defendants state that the Hoffman Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Answering Defendants admit that the Super Safety, when installed and used as intended, includes all elements of at least claim 15 of the ’247 Patent. Except as expressly admitted, the allegations of Paragraph 229 are denied.

230. In the Hoffman Complaint, Defendants allege that the Super Safety includes all claim limitations the Examiner found missing from the cited prior art.

**ANSWER:** Answering Defendants state that the Hoffman Complaint speaks for itself, and deny any characterization of that document inconsistent with its terms. Answering Defendants admit that, in the Hoffman Complaint, Answering Defendants allege that the Super

Safety infringes claim 15 of the ’247 Patent. Except as expressly admitted, the allegations of Paragraph 230 are denied.

231. Defendants’ allegations in the Hoffman Complaint confirm that Defendants themselves contend the Super Safety satisfies every limitation of at least claim 15 of the ’247 patent. If the Super Safety qualifies as prior art to claim 15, Defendants’ own infringement allegations strongly support invalidity of that claim.

**ANSWER:** Denied.

232. On information and belief, Bellamy and DeMonico were aware during prosecution of the ’247 patent that the Super Safety is prior art that discloses one or more limitations that the Examiner found missing from the cited prior art.

**ANSWER:** Denied.

233. On information and belief, Bellamy and DeMonico were aware during prosecution of the ’247 patent that the Super Safety includes a slidably mounted safety selector—i.e., new matter captured by claims 15-23 submitted on April 4, 2024.

**ANSWER:** Denied.

234. On information and belief, Bellamy and DeMonico were aware during prosecution of the ’247 patent that the Super Safety is a three-position push-button safety selector.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 234 and on that basis deny them.

235. Had the Examiner been aware of the Super Safety, he would have rejected at least pending claims 15-23 of the ’225 Application under 35 U.S.C. §102 and/or §103 in light of the Super Safety.

**ANSWER:** Denied.

236. Had the Examiner been aware of the Super Safety, he would have rejected or materially limited Defendants' attempt to broaden claims 14-23, based on new matter added with or after the filing of the '225 Application, to cover slidably mounted cams and safety selectors in addition to pivotally mounted cams and safety selectors.

**ANSWER:** Denied.

237. Had the Examiner been aware of the Super Safety, FRT-15-3MD, and/or FRT-15E3, he would have rejected at least pending claims 1, 4, 9, 14, 15, and 20 of the '225 Application under 35 U.S.C. §103 in light of Blakley '723 in combination with one or more of these prior-art systems.

**ANSWER:** Denied.

238. On information and belief, Bellamy and DeMonico knowingly failed to disclose the Super Safety to the USPTO despite understanding that it was materially relevant to the patentability of at least claims 14-23 of the '247 patent.

**ANSWER:** Denied.

239. The facts alleged herein—including Bellamy's and DeMonico's repeated failure to disclose prior-art systems that disclosed limitations the Examiner identified as missing from Blakley '723, their knowledge of those systems through public disclosures and litigation activity, and their later infringement allegations concerning those same systems—support a reasonable inference that Bellamy and DeMonico acted with a specific intent to deceive the USPTO during prosecution of the '225 Application.

**ANSWER:** Denied.

## COUNT SIX:
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '159 PATENT

240. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

241. U.S. Patent No. 12,578,159 (the "'159 patent"), entitled "Firearm Trigger Mechanism," issued from U.S. Application No. 18/761,606 (the "'606 Application") on March 17, 2026. The '606 Application asserts that it is a continuation of the '225 Application, which ultimately issued as the '247 Patent.

**ANSWER:** Answering Defendants admit that United States Patent No. 12,578,159, entitled "Firearm Trigger Mechanism," issued from U.S. Application No. 18/761,606 on March 17, 2026, and that the '606 Application claims to be a continuation of the '225 Application, which issued as the '247 Patent. Answering Defendants state that the '159 Patent and its file history speak for themselves. Except as expressly admitted, the allegations of Paragraph 241 are denied.

242. ABC has asserted that it is the current owner by assignment of all right, title, and interest in and to the '159 patent.

**ANSWER:** Admitted.

243. RBT has asserted that it is the exclusive licensee of the '159 patent.

**ANSWER:** Admitted.

244. Defendants have asserted in ongoing litigation against resellers of the Atrius FRS that the product embodies the technology claimed in the '159 patent and that the standalone FRS product infringes the '159 patent.

**ANSWER:** Answering Defendants admit that they have asserted in ongoing litigation that the Atrius Selector infringes the '159 Patent. Answering Defendants state that the complaints in those actions speak for themselves, and respectfully refer the Court to those complaints for

their complete and accurate terms. Except as expressly admitted, the allegations of Paragraph 244 are denied.

245. As a result of Defendants' assertion of the '159 patent against Atrius's resellers and customers based on the FRS, there exists a controversy of sufficient immediacy and reality regarding infringement of the '159 patent to warrant the issuance of a declaratory judgment of non-infringement under 28 U.S.C. §§ 2201 and 2202.

**ANSWER:** Paragraph 245 states legal conclusions to which no response is required. To the extent a response is required, Answering Defendants admit that an actual case or controversy exists regarding infringement of the '159 Patent, and deny that Atrius is entitled to any relief.

246. The FRS and uses thereof do not infringe and have not infringed, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '159 patent, and Atrius has not contributed to or induced infringement of any claim of the '159 patent, at least because the FRS, whether sold as a standalone part or installed and used as intended, does not embody or practice each limitation of any claim of the '159 patent.

**ANSWER:** Denied.

247. By way of example, and without limitation, the '159 patent claims require, among other things, structures and operational characteristics—including whereupon in a second mode the disconnector hook is prevented from holding the hammer—that the FRS does not have. As detailed above with respect to the '247 patent, the FRS does not include a cam as disclosed in the Strbac patent family, does not require installation of a non-mil-spec trigger, hammer, or disconnector, and does not prevent the firearm's disconnector hook from catching the hammer hook during operation.

**ANSWER:** Denied.

248. For at least these reasons, the FRS, whether sold alone or installed and used as intended, does not infringe, and has not infringed, any claim of the '159 patent.

**ANSWER:** Denied.

249. Atrius is entitled to a declaratory judgment that Atrius and the FRS and uses thereof do not infringe, and have not infringed, either directly or indirectly, literally or under the doctrine of equivalents, any claim of the '159 patent.

**ANSWER:** Denied. Answering Defendants deny that Atrius is entitled to a declaratory judgment of non-infringement of the '159 Patent or to any other relief.

## COUNT SEVEN:
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '159 PATENT

250. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

251. As a result of Defendants' assertion of the '159 patent against Atrius's resellers and customers based on the FRS, there exists a controversy of sufficient immediacy and reality regarding the validity of the claims of the '159 patent to warrant the issuance of a declaratory judgment of invalidity.

**ANSWER:** Paragraph 251 states legal conclusions to which no response is required. To the extent a response is required, Answering Defendants admit that an actual case or controversy exists regarding the validity of the '159 Patent, and deny that Atrius is entitled to any relief.

252. The claims of the '159 patent fail to meet one or more requirements of the patent laws of the United States, including without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

**ANSWER:** Denied.

253. By way of example and without limitation, the claims of the ’159 patent are invalid because the subject matter of those claims was in public use, on sale, or otherwise available to the public before their effective filing date, including by virtue of the public disclosure, demonstration, sale, and use of the Tommy Triggers FRT-15-3MD and the Rare Breed FRT-15E3, as detailed above. The asserted claims are also invalid because, on information and belief, the claimed three-position selector and forced-reset operating modes were disclosed, taught, or rendered obvious by prior-art systems known to Defendants before and during prosecution of the application that issued as the ’159 patent.

**ANSWER:** Denied.

254. A judicial declaration of invalidity is necessary and appropriate so that Atrius may ascertain its rights regarding the ’159 patent.

**ANSWER:** Paragraph 254 states a legal conclusion to which no response is required. To the extent a response is required, denied.

## COUNT EIGHT: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE ’159 PATENT DUE TO INEQUITABLE CONDUCT

255. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

256. On information and belief, Bellamy authorized and was substantively involved in the filing and prosecution of the ’606 Application that issued as the ’159 patent, and accordingly owed a duty of candor and good faith to the USPTO under 37 C.F.R. § 1.56 in connection with that prosecution.

**ANSWER:** Answering Defendants admit that Mr. Bellamy participated in the prosecution of the ’606 Application. The allegation that Mr. Bellamy owed a duty of candor and

good faith under 37 C.F.R. § 1.56 states a legal conclusion to which no response is required. Except as expressly admitted, the allegations of Paragraph 256 are denied.

257. As detailed above, Bellamy and DeMonico had actual knowledge, no later than January 17, 2022, of the structure, operation, public use, and on-sale activities of the Tommy Triggers FRT-15-3MD product, and had actual knowledge, no later than January 15, 2022, of the structure, operation, and public disclosure of the Rare Breed FRT-15E3. That knowledge predated the filing and prosecution of the '606 Application that issued as the '159 patent.

**ANSWER:** Denied.

258. The FRT-15-3MD and the FRT-15E3 are material to the patentability of one or more claims of the '159 patent because they disclose limitations of the claimed three-position safety selector and forced-reset trigger mechanism that, on information and belief, were not otherwise disclosed in the prior art of record before the Examiner during prosecution of the '606 Application. Had the Examiner been aware of the FRT-15-3MD and/or FRT-15E3, the Examiner would not have allowed at least one claim of the '159 patent in its issued form.

**ANSWER:** Denied.

259. Neither Bellamy nor DeMonico, nor any other individual associated with the prosecution of the '606 Application, disclosed the FRT-15-3MD or the FRT-15E3 to the USPTO during prosecution of the application that issued as the '159 patent. Nor did they disclose the related litigation materials, public demonstrations, videos, or allegations describing the operation and functionality of those prior-art systems.

**ANSWER:** Denied.

260. On information and belief, the facts alleged herein support a reasonable inference—and the single most reasonable inference is—that Bellamy and DeMonico intentionally withheld

the FRT-15-3MD and FRT-15E3 from the USPTO with the specific intent to deceive the USPTO into issuing the ’159 patent. That inference is supported by Bellamy’s and DeMonico’s knowledge of those products, the materiality of those products to claimed three-position forced-reset functionality, their failure to disclose those products or related materials, and the close relationship between the ’606 Application and the ’225 Application that issued as the ’247 patent.

**ANSWER:** Denied.

261. As a result of Defendants’ assertion of the ’159 patent against Atrius’s resellers and customers based on the FRS, there exists a controversy of sufficient immediacy and reality regarding the enforceability of the ’159 patent to warrant the issuance of a declaratory judgment of unenforceability.

**ANSWER:** Paragraph 261 states legal conclusions to which no response is required. To the extent a response is required, Answering Defendants admit that an actual case or controversy exists regarding the enforceability of the ’159 Patent, and deny that Atrius is entitled to any relief.

262. In the alternative, because the ’606 Application is a continuation of the ’225 Application and the ’159 patent shares a common specification, priority chain, claimed subject matter, and prosecution lineage with the ’247 patent, the ’159 patent is unenforceable under the doctrine of “infectious unenforceability.” E.g., Consolidated Aluminum Corp. v. Foseco Int’l Ltd., 910 F.2d 804 (Fed. Cir. 1990) (holding inequitable conduct in procuring one patent rendered related patents unenforceable); Agfa Corp. v. Creo Prods. Inc., 451 F.3d 1366 (Fed. Cir. 2006) (extending reasoning to continuation patents); Freshub, Inc. v. Amazon.com Inc., No. 6:21-cv-00511-ADA, 2021 WL 8945738, at *5 (W.D. Tex. July 30, 2021) (defining the “Doctrine of Infectious Unenforceability” as “[i]nequitable conduct in the prosecution of a patent [that] may render unenforceable other related patents”).

**ANSWER:** Paragraph 262 states legal conclusions to which no response is required. Answering Defendants state that the cited authorities speak for themselves. To the extent a response is required, denied.

263. Atrius is entitled to a declaratory judgment that the ’159 patent is unenforceable due to inequitable conduct.

**ANSWER:** Denied. Answering Defendants deny that Atrius is entitled to a declaratory judgment that the ’159 Patent is unenforceable or to any other relief.

**COUNT NINE:**
**WALKER PROCESS VIOLATION OF SECTION 2 OF THE SHERMAN ACT**

264. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

265. As detailed above, Defendants, through their patent attorney Bellamy and through Defendant DeMonico, obtained the ’247 patent—and through continuation practice, the ’159 patent—through knowing and intentional fraud on the USPTO, including through the intentional withholding of material prior art (the FRT-15-3MD, the FRT-15E3, and the Super Safety) and through an affirmative misrepresentation that the ’572 Strbac Application was commonly owned in order to deceptively remove Strbac ’003 from consideration as prior art. During the prosecution of these patents, Defendants (including Bellamy and DeMonico) had a duty of candor and good faith in dealing with the USPTO, including a duty to disclose to the USPTO all information known to be material to patentability under 37 C.F.R. § 1.56. The fraudulent omissions and misrepresentations described herein were material to issuance of the ’247 and ’159 patents. Had the USPTO been aware of the FRT-15-3MD, the FRT-15E3, the Super Safety, the related public disclosures and litigation materials, and the true prior-art significance of the Strbac disclosures,

the USPTO would not have allowed at least one asserted claim of the ’247 patent and/or the ’159 patent in their issued form. The withheld prior art disclosed limitations the Examiner expressly identified as missing from Blakley ’723 and was directly material to patentability.

**ANSWER:** Denied.

266. Defendants knew that the ’247 and ’159 patents were procured through the fraudulent conduct described herein and nevertheless maintained, asserted, and enforced those patents against Atrius’s resellers and customers through the Customer Lawsuits, cease-and-desist demands, threats of litigation, and related enforcement activities. Defendants’ enforcement of the fraudulently-procured ’247 and ’159 patents constitutes exclusionary and anticompetitive conduct undertaken to obtain, maintain, and/or dangerously threaten monopoly power in the Relevant Market (defined below) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** Denied.

267. On information and belief, Defendants’ enforcement campaign against Atrius’s customers, resellers, and related market participants was objectively baseless because Defendants knew, or reasonably should have known, that the ’247 and ’159 patents were procured through material omissions and misrepresentations to the USPTO and were therefore invalid and/or unenforceable. Despite that knowledge, Defendants nevertheless pursued serial enforcement actions, cease-and-desist demands, and litigation threats against downstream market participants to suppress competing FRT-type products, interfere with distribution channels, and impose litigation costs and commercial pressure on competitors and their customers.

**ANSWER:** Denied.

268. The relevant antitrust market is the United States market for AR-15 pattern firearms forced reset triggers and forced reset safety selector systems that simulate fully-automatic fire

while forcibly resetting the trigger with the bolt (the "Relevant Market"). Products in the Relevant Market are not reasonably interchangeable with non-FRT trigger products from the perspective of consumers seeking forced-reset functionality. FRTs and FRSs offer an entirely different user experience—namely, the ability to shoot a firearm that appears to be more in a "fully-automatic" fashion than a firearm equipped with a standard or OEM trigger could.

**ANSWER:** Paragraph 268 states legal conclusions to which no response is required. To the extent a response is required, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the definition of the alleged "Relevant Market," and on that basis deny them. Except as expressly admitted, the allegations of Paragraph 268 are denied.

269. Through their assertion and enforcement of the '247 patent, '159 patent, and related FRT patents, Defendants possess monopoly power, or at a minimum a dangerous probability of acquiring monopoly power, in the Relevant Market. Defendants have used the asserted patents and related enforcement campaign to exclude competitors, suppress competing FRT-type products, disrupt reseller and distribution relationships, and deter market participation by competing manufacturers and sellers.

**ANSWER:** Denied.

270. Defendants have engaged in predatory and anticompetitive conduct with the specific intent to continue to monopolize the Relevant Market by, among other things, asserting the fraudulently-procured '247 and '159 patents in serial lawsuits against downstream customers, distributors, resellers, and other market participants, knowing that such enforcement would coerce these parties into ceasing distribution and/or use of the FRS. Defendants understood that targeting downstream resellers and customers would impose substantial litigation costs and commercial

pressure throughout the distribution chain, thereby suppressing competition in the Relevant Market.

**ANSWER:** Denied.

271. As a direct competitor and supplier whose customers have been targeted by enforcement of the fraudulently-procured '247 and '159 patents, Atrius has suffered antitrust injury of the type the antitrust laws were designed to prevent because Defendants' conduct has impaired Atrius's ability to compete in the Relevant Market, including lost sales, lost profits, exclusion from market opportunities, damage to customer relationships and goodwill, disruption of reseller and customer relationships, diminished market access, reputational harm, and attorneys' fees and costs incurred in responding to Defendants' enforcement campaign. Atrius is entitled to treble damages, attorneys' fees, and costs under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, together with an injunction permanently restraining Defendants from further enforcement of the '247 and '159 patents against Atrius and its customers, manufacturers, distributors, importers, users, and resellers. Defendants' conduct threatens continuing and irreparable harm to competition and to Atrius unless enjoined by this Court.

**ANSWER:** Denied. Answering Defendants deny that Atrius has suffered antitrust injury or is entitled to treble damages, attorneys' fees, costs, injunctive relief, or any other relief.

## COUNT TEN:
## SHAM LITIGATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

272. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

273. Defendants' Customer Lawsuits asserting infringement of the Asserted Patents are objectively baseless, at least as asserted against the FRS product, because no reasonable litigant

could realistically expect success on the merits in light of, among other things: (a) the FRS does not satisfy one or more limitations of the asserted claims, as detailed in Counts One, Three, and Six; (b) all claims of the Asserted Patents are invalid, as detailed in Counts Two, Four, and Seven; and (c) the ’247 and ’159 patents are unenforceable for inequitable conduct, as detailed in Counts Five and Eight. Defendants nevertheless continued asserting those patents despite knowledge of the material prior art and prosecution misconduct described herein.

**ANSWER:** Denied.

274. Defendants’ Customer Lawsuits were not genuinely aimed at obtaining valid and lawful judicial relief on the merits. Rather, on information and belief, Defendants used the litigation process itself to impose costs, disrupt distribution channels, deter resellers and customers from carrying competing FRT-type products, and interfere with competition in the Relevant Market.

**ANSWER:** Denied.

275. Defendants’ conduct falls outside the protections of the Noerr-Pennington doctrine because the Customer Lawsuits were objectively baseless and pursued in subjective bad faith as part of an anticompetitive campaign directed at suppressing competition in the Relevant Market rather than obtaining legitimate judicial relief on the merits.

**ANSWER:** Paragraph 275 states legal conclusions to which no response is required. To the extent a response is required, denied.

276. Defendants brought and maintain the Customer Lawsuits with the subjective intent to interfere directly with Atrius’s existing and prospective business relationships, and to use the litigation process itself—rather than the legitimate adjudication of patent claims—as a means to

impose competitive pressure and suppress competition, e.g., coercing Atrius's resellers and customers into ceasing distribution and use of the FRS.

**ANSWER:** Denied.

277. Prior to filing its series of Customer Lawsuits, Defendants did not provide Atrius with pre-suit notice concerning their allegations concerning the FRS before initiating serial infringement actions against downstream resellers and customers in a manner calculated to maximize commercial disruption, impose litigation costs throughout the distribution chain, and deter continued distribution of competing FRT-type products.

**ANSWER:** Denied.

278. Defendants' pattern of serial infringement lawsuits asserted against downstream market participants—at least twenty-one filed since May 16, 2025—further demonstrates that the Customer Lawsuits constitute a pattern of baseless, repetitive claims undertaken without regard to the merits and intended to inflict collateral, anticompetitive injury on Atrius and its supply chain, including, but not limited to: (a) intimidating and coercing Atrius's resellers and customers into ceasing sales of Atrius's FRS product; (b) disrupting and destroying Atrius's distribution channels and customer relationships; (c) imposing burdensome litigation costs on Atrius's resellers and customers, thereby deterring them from continuing to carry Atrius's FRS product; and (d) excluding Atrius from competing in the Relevant Market. On information and belief, Defendants pursued this enforcement strategy without regard to the objective merits of the asserted infringement claims and with knowledge of substantial invalidity and unenforceability issues affecting the asserted patents.

**ANSWER:** Denied.

279. Defendants' decision to sue Atrius's downstream customers and resellers—rather than Atrius directly—is itself evidence of Defendants' improper purpose, as it was calculated to inflict maximum damage to Atrius's business relationships and distribution networks while avoiding a direct adjudication on the merits of Defendants' patent claims against the manufacturer of the accused product. Defendants have followed a similar tactic against other allegedly infringing products—suing resellers in preferred venues while avoiding taking on manufacturers head-on. Defendants' reseller-focused enforcement strategy was reasonably calculated to disrupt relationships between manufacturers, distributors, retailers, and consumers of competing FRT-type products and thereby suppress competition within the Relevant Market.

**ANSWER:** Denied.

280. Defendants' conduct constitutes exclusionary conduct supporting monopolization, or attempted monopolization, of the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** Paragraph 280 states legal conclusions to which no response is required. To the extent a response is required, denied.

281. Atrius has been injured in its business and property as a direct and proximate result of Defendants' objectively baseless and anticompetitive enforcement conduct, including through lost sales, lost profits, damage to customer relationships and goodwill, and the attorneys' fees and costs incurred in defending against Defendants' baseless infringement claims. Atrius is entitled to treble damages, attorneys' fees, and costs under 15 U.S.C. § 15, and to permanent injunctive relief under 15 U.S.C. § 26.

**ANSWER:** Denied. Answering Defendants deny that Atrius has been injured in its business or property or is entitled to treble damages, attorneys' fees, costs, injunctive relief, or any other relief.

**COUNT ELEVEN:**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

282. Atrius repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Answering Defendants incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

283. This Court has supplemental jurisdiction over this Texas state-law claim pursuant to 28 U.S.C. § 1367(a), as it arises from the same case or controversy and shares a common nucleus of operative fact with Atrius's federal patent and antitrust claims set forth in Counts One through Ten.

**ANSWER:** Paragraph 283 states legal conclusions to which no response is required. To the extent a response is required, Answering Defendants admit that Atrius purports to invoke the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a), and deny that Atrius is entitled to any relief.

284. Atrius has existing and prospective business relationships with numerous manufacturers, distributors, importers, retailers, resellers, and end users of the FRS throughout the United States, including in Texas. There was a reasonable probability that Atrius would have entered into and continued such business relationships absent Defendants' wrongful conduct.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 284, and on that basis deny them.

285. Defendants have actual knowledge of Atrius's existing and prospective business relationships with its resellers and customers, as evidenced by Defendants' filing of the Customer

Lawsuits expressly naming Atrius's resellers as defendants and accusing the Atrius FRS of infringement. Defendants also knew that Atrius relied on those reseller, distributor, and customer relationships to distribute and support the FRS in the Relevant Market.

**ANSWER:** Answering Defendants admit that ABC and RBT have filed patent infringement actions naming certain resellers of the Atrius FRS as defendants and that those actions accuse the Atrius FRS of infringement. Except as expressly admitted, the allegations of Paragraph 285 are denied.

286. Defendants have intentionally interfered with those relationships by filing and threatening to file the Customer Lawsuits and by communicating threats of patent infringement to Atrius's resellers and customers, all based on patent infringement allegations that Defendants knew, or reasonably should have known, lacked merit in view of the substantial noninfringement, invalidity, and unenforceability issues associated with the FRS and the asserted patents.

**ANSWER:** Denied.

287. Defendants' conduct is independently tortious and unlawful because, among other reasons, it involved the bad-faith assertion of patent rights Defendants knew, or reasonably should have known, were invalid, unenforceable due to inequitable conduct, fraudulently procured, and/or not infringed by the FRS. Defendants' conduct was independently tortious and unlawful because, among other reasons, it involved the bad-faith assertion and enforcement of patent rights that Defendants knew, or reasonably should have known, were invalid, unenforceable, fraudulently procured, and/or not infringed by the FRS. Defendants' conduct further constitutes sham litigation, attempted monopolization, and/or monopolization in violation of Section 2 of the Sherman Act, as alleged above. Because Defendants' enforcement activities were undertaken in bad faith and were

not objectively reasonable, such conduct is not protected by federal patent law or the Noerr-Pennington doctrine.

**ANSWER:** Denied.

288. Defendants' interference was a substantial factor in causing third parties to refrain from entering into, continuing, and/or expanding business relationships with Atrius concerning the FRS product.

**ANSWER:** Denied.

289. Defendants acted with the intent to interfere with Atrius's existing and prospective business relationships with manufacturers, distributors, importers, retailers, resellers, and end users or, alternatively, Defendants knew that their conduct was certain or substantially certain to result in the disruption of Atrius's existing and prospective business relationships. Defendants' strategy of targeting Atrius's downstream resellers—rather than suing Atrius, or the manufacturers of other accused products, directly—was specifically designed to disrupt and destroy Atrius's distribution channels and to deter resellers from carrying Atrius's product.

**ANSWER:** Denied.

290. As a direct and proximate result of Defendants' wrongful conduct, Atrius has suffered, and will continue to suffer, actual and consequential damages, including lost sales, lost customers, lost profits, lost business opportunities, damage to goodwill and reputation, and the costs incurred in supporting and defending Atrius's resellers and customers against Defendants' enforcement activities.

**ANSWER:** Denied. Answering Defendants deny that Atrius has suffered any damages as a result of any conduct by Answering Defendants or is entitled to any relief.

291. Defendants acted with malice, fraud, and/or gross negligence, including by knowingly and intentionally targeting Atrius's downstream resellers and customers to disrupt Atrius's distribution channels and business relationships despite substantial noninfringement, invalidity, and unenforceability issues concerning the asserted patents. Defendants' conduct justifies an award of exemplary damages under Chapter 41 of the Texas Civil Practice and Remedies Code.

**ANSWER:** Denied. Answering Defendants deny that they acted with malice, fraud, or gross negligence, and deny that Atrius is entitled to exemplary damages or any other relief.

## RESPONSE TO PLAINTIFF'S PRAYER FOR RELIEF

Answering Defendants deny that Atrius is entitled to any of the relief requested in its Prayer for Relief or to any relief whatsoever. Answering Defendants deny each and every allegation contained in Atrius's Prayer for Relief, including subparagraphs (a) through (j), and respectfully request that the Court deny Atrius's Prayer for Relief in its entirety, enter judgment in favor of Answering Defendants and against Atrius on each Count of the Complaint, declare this case exceptional under 35 U.S.C. § 285, and award Answering Defendants their reasonable attorneys' fees, costs, and expenses, together with such other and further relief as the Court deems just and proper.

## GENERAL DENIAL

Except as expressly admitted herein, Answering Defendants deny each and every allegation set forth in the Complaint.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without admitting any allegation in the Complaint, and without assuming the burden of proof on any issue as to which the burden properly rests on Atrius, Answering Defendants, in addition to the denials and admissions set forth above, assert the following affirmative and

additional defenses. Answering Defendants reserve the right to amend, supplement, or modify these defenses as discovery and further investigation may warrant.

**FIRST AFFIRMATIVE DEFENSE (INFRINGEMENT OF THE '784 PATENT)**

The Atrius Selector—whether sold as a standalone product, sold pre-installed in a receiver, or sold or used as part of a complete firearm—infringes one or more claims of the '784 Patent under 35 U.S.C. § 271, directly and/or indirectly, literally and/or under the doctrine of equivalents. Atrius's making, using, selling, offering for sale, and/or importing of the Atrius Selector, and inducement of and contribution to such activities by others, constitute acts of infringement of the '784 Patent. Atrius is therefore not entitled to a declaratory judgment of non-infringement of the '784 Patent or to any other relief sought in Count I of the Complaint.

**SECOND AFFIRMATIVE DEFENSE (VALIDITY OF THE '784 PATENT)**

Each claim of the '784 Patent is valid and enforceable. The '784 Patent is presumed valid under 35 U.S.C. § 282, and Atrius bears the burden of overcoming that presumption by clear and convincing evidence on a claim-by-claim basis. Atrius has not met, and cannot meet, that burden. The claims of the '784 Patent satisfy each of the conditions for patentability set forth in Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and 112. Atrius is therefore not entitled to a declaratory judgment of invalidity of the '784 Patent or to any other relief sought in Count II of the Complaint.

**THIRD AFFIRMATIVE DEFENSE (INFRINGEMENT OF THE '247 PATENT)**

The Atrius Selector directly infringes at least claim 15 of the '247 Patent under 35 U.S.C. § 271(a) when sold or used in combination with separate trigger mechanism parts, when sold pre-installed in a receiver, and when sold or used as part of a complete firearm. The standalone Atrius Selector product further indirectly infringes at least claim 15 of the '247 Patent under 35 U.S.C. §§ 271(b) and (c), in that Atrius induces and contributes to infringement by others, including

customers and end users who install the Atrius Selector in AR-pattern firearms. Atrius is therefore not entitled to a declaratory judgment of non-infringement of the ’247 Patent or to any other relief sought in Count III of the Complaint.

**FOURTH AFFIRMATIVE DEFENSE (VALIDITY OF THE ’247 PATENT)**

Each claim of the ’247 Patent is valid and enforceable. The ’247 Patent is presumed valid under 35 U.S.C. § 282, and Atrius bears the burden of overcoming that presumption by clear and convincing evidence on a claim-by-claim basis. Atrius has not met, and cannot meet, that burden. The claims of the ’247 Patent satisfy each of the conditions for patentability set forth in Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and 112. Atrius is therefore not entitled to a declaratory judgment of invalidity of the ’247 Patent or to any other relief sought in Count IV of the Complaint.

**FIFTH AFFIRMATIVE DEFENSE (COMPLIANCE WITH THE DUTY OF CANDOR)**

The ’247 Patent was prosecuted in full compliance with the duty of candor and good faith owed to the USPTO under 37 C.F.R. § 1.56. Neither Mr. Bellamy nor Mr. DeMonico, nor any other person associated with the filing and prosecution of the ’225 Application, made any affirmative misrepresentation of material fact, failed to disclose material information, or submitted false information to the USPTO. Nor did Mr. Bellamy, Mr. DeMonico, or any other such person act with any intent to deceive the USPTO. All information believed to be material to patentability was disclosed in Information Disclosure Statements submitted during prosecution, and the Examiner considered each such reference before allowing the claims of the ’247 Patent.

**SIXTH AFFIRMATIVE DEFENSE (NON-MATERIALITY OF ALLEGED PRIOR ART — ’247 PATENT)**

None of the FRT-15-3MD, the FRT-15E3, or the Super Safety constitutes material prior art under the but-for materiality standard set forth in Therasense, Inc. v. Becton, Dickinson & Co.,

649 F.3d 1276 (Fed. Cir. 2011) (en banc). Had any of those references been before the Examiner during prosecution of the ’225 Application, the Examiner would not have refused to allow any claim of the ’247 Patent. To the contrary, a detailed description of the Tommy Triggers FRT-15-3MD was disclosed to the USPTO by way of U.S. Patent No. 12,036,336 and considered by the Examiner during prosecution of the ’225 Application, and the USPTO Examiner considered all of the references Atrius alleges to be prior art and allowed even broader claims in U.S. Patent No. 12,578,159 (a continuation of the ’225 Application). The Patent Trial and Appeal Board’s denial on the merits of Atrius’s petition for inter partes review of the ’247 Patent on February 18, 2026, further confirms the non-materiality of the alleged prior art.

**SEVENTH AFFIRMATIVE DEFENSE (FAILURE TO PLEAD INEQUITABLE CONDUCT WITH PARTICULARITY — ’247 PATENT)**

Count V of the Complaint fails to plead inequitable conduct with the particularity required by Federal Rule of Civil Procedure 9(b), as construed by the Federal Circuit in *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009). Count V fails to identify with the requisite specificity the “who, what, when, where, and how” of the alleged material misrepresentations or omissions, fails to plead facts from which a court may reasonably infer that any individual associated with the filing and prosecution of the ’225 Application knew of the alleged prior art, knew it to be material, and made a deliberate decision to withhold it, and fails to plead facts giving rise to the required strong inference of specific intent to deceive the USPTO. Atrius’s reliance on conclusory allegations made “on information and belief,” unsupported by underlying factual averments, is insufficient as a matter of law.

**EIGHTH AFFIRMATIVE DEFENSE (INFRINGEMENT OF THE ’159 PATENT)**

The Atrius Selector—whether sold as a standalone product, sold pre-installed in a receiver, or sold or used as part of a complete firearm—infringes one or more claims of the ’159 Patent

under 35 U.S.C. § 271, directly and/or indirectly, literally and/or under the doctrine of equivalents. Atrius's making, using, selling, offering for sale, and/or importing of the Atrius Selector, and inducement of and contribution to such activities by others, constitute acts of infringement of the '159 Patent. Atrius is therefore not entitled to a declaratory judgment of non-infringement of the '159 Patent or to any other relief sought in Count VI of the Complaint.

**NINTH AFFIRMATIVE DEFENSE (VALIDITY OF THE '159 PATENT)**

Each claim of the '159 Patent is valid and enforceable. The '159 Patent is presumed valid under 35 U.S.C. § 282, and Atrius bears the burden of overcoming that presumption by clear and convincing evidence on a claim-by-claim basis. Atrius has not met, and cannot meet, that burden. The claims of the '159 Patent satisfy each of the conditions for patentability set forth in Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and 112. Atrius is therefore not entitled to a declaratory judgment of invalidity of the '159 Patent or to any other relief sought in Count VII of the Complaint.

**TENTH AFFIRMATIVE DEFENSE (COMPLIANCE WITH THE DUTY OF CANDOR — '159 PATENT)**

The '159 Patent was prosecuted in full compliance with the duty of candor and good faith owed to the USPTO under 37 C.F.R. § 1.56. Neither Mr. Bellamy nor Mr. DeMonico, nor any other person associated with the filing and prosecution of the '606 Application, made any affirmative misrepresentation of material fact, failed to disclose material information, or submitted false information to the USPTO. Nor did Mr. Bellamy, Mr. DeMonico, or any other such person act with any intent to deceive the USPTO. All information believed to be material to patentability was disclosed to or otherwise considered by the USPTO during prosecution of the '606 Application before the Examiner allowed the claims of the '159 Patent.

## ELEVENTH AFFIRMATIVE DEFENSE (NON-MATERIALITY OF ALLEGED PRIOR ART — ’159 PATENT)

None of the FRT-15-3MD, the FRT-15E3, or the Super Safety constitutes material prior art under the but-for materiality standard set forth in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc), with respect to the claims of the ’159 Patent. Had any of those references been before the Examiner during prosecution of the ’606 Application, the Examiner would not have refused to allow any claim of the ’159 Patent. Atrius has not pleaded, and cannot establish, but-for materiality or a specific intent to deceive the USPTO with respect to the ’159 Patent.

## TWELFTH AFFIRMATIVE DEFENSE (FAILURE TO PLEAD INEQUITABLE CONDUCT WITH PARTICULARITY — ’159 PATENT)

Count VIII of the Complaint fails to plead inequitable conduct with the particularity required by Federal Rule of Civil Procedure 9(b), as construed by the Federal Circuit in *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009). Count VIII fails to identify with the requisite specificity the “who, what, when, where, and how” of the alleged material misrepresentations or omissions, fails to plead facts from which a court may reasonably infer that any individual associated with the filing and prosecution of the ’606 Application knew of the alleged prior art, knew it to be material, and made a deliberate decision to withhold it, and fails to plead facts giving rise to the required strong inference of specific intent to deceive the USPTO. Atrius’s reliance on conclusory allegations made “on information and belief,” unsupported by underlying factual averments, is insufficient as a matter of law.

## THIRTEENTH AFFIRMATIVE DEFENSE (FAILURE TO STATE A CLAIM)

Each of Atrius’s claims, in whole or in part, fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

**FOURTEENTH AFFIRMATIVE DEFENSE (LACK OF SUBJECT MATTER JURISDICTION (DECLARATORY JUDGMENT))**

To the extent Atrius cannot establish an actual case or controversy of sufficient immediacy and reality with respect to any particular claim of the ’784 Patent, the ’247 Patent, or the ’159 Patent, this Court lacks subject matter jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, and Article III of the United States Constitution. Atrius bears the burden of establishing, on a claim-by-claim basis, the existence of a justiciable controversy as to each claim of each Asserted Patent for which it seeks declaratory relief.

**FIFTEENTH AFFIRMATIVE DEFENSE (WAIVER, ESTOPPEL, ACQUIESCENCE, AND LACHES)**

Atrius’s claims are barred, in whole or in part, by the doctrines of waiver, estoppel, acquiescence, and/or laches.

**SIXTEENTH AFFIRMATIVE DEFENSE (UNCLEAN HANDS)**

Atrius’s claims are barred, in whole or in part, by the doctrine of unclean hands on behalf of Atrius and/or its counsel.

**SEVENTEENTH AFFIRMATIVE DEFENSE (FAILURE TO MITIGATE)**

To the extent Atrius alleges or claims any damages or harm, Atrius has failed to mitigate any such damages or harm.

**EIGHTEENTH AFFIRMATIVE DEFENSE (NO ENTITLEMENT TO ATTORNEYS’ FEES OR COSTS)**

This is not an exceptional case under 35 U.S.C. § 285, and Atrius is not entitled to attorneys’ fees. Nor is Atrius entitled to costs, expenses, or fees under 28 U.S.C. § 1920, 28 U.S.C. § 1927, or any other authority.

**NINETEENTH AFFIRMATIVE DEFENSE (NOERR-PENNINGTON IMMUNITY)**

Atrius's antitrust claims (Counts IX and X) are barred, in whole or in part, by the Noerr-Pennington doctrine.

**TWENTIETH AFFIRMATIVE DEFENSE (FAILURE TO PLEAD WALKER PROCESS FRAUD WITH PARTICULARITY)**

Atrius's Walker Process claim (Count IX) is barred, in whole or in part, for failure to plead fraud on the USPTO with the particularity required by Federal Rule of Civil Procedure 9(b).

**TWENTY-FIRST AFFIRMATIVE DEFENSE (NO ANTITRUST INJURY OR STANDING)**

Atrius's antitrust claims (Counts IX and X) are barred, in whole or in part, because Atrius has not suffered antitrust injury and lacks antitrust standing.

**TWENTY-SECOND AFFIRMATIVE DEFENSE (FAILURE TO DEFINE A COGNIZABLE RELEVANT MARKET)**

Atrius's antitrust claims (Counts IX and X) are barred, in whole or in part, because Atrius has failed to allege or establish a legally cognizable relevant market.

**TWENTY-THIRD AFFIRMATIVE DEFENSE (NO MONOPOLY POWER OR DANGEROUS PROBABILITY OF MONOPOLIZATION)**

Atrius's antitrust claims (Counts IX and X) are barred, in whole or in part, because Answering Defendants do not possess monopoly power in any properly defined relevant market, and there is no dangerous probability that Answering Defendants would achieve monopoly power.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE (NO PATTERN OF SHAM LITIGATION)**

Atrius's sham-litigation claim (Count X) is barred, in whole or in part, because Answering Defendants' enforcement of the Asserted Patents does not constitute a pattern of baseless, repetitive claims brought without regard to the merits.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE (STATUTE OF LIMITATIONS — ANTITRUST)**

Atrius's antitrust claims (Counts IX and X) are barred, in whole or in part, by the four-year statute of limitations applicable to private antitrust actions under Section 4B of the Clayton Act, 15 U.S.C. § 15b, to the extent any conduct on which those claims are based occurred more than four years before the commencement of this action.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE (JUSTIFICATION AND LEGAL RIGHT — TORTIOUS INTERFERENCE)**

Atrius's tortious interference claim (Count XI) is barred, in whole or in part, by the privilege of justification. Answering Defendants' assertion and good-faith enforcement of the Asserted Patents, including communications concerning alleged infringement, were undertaken in the exercise of Answering Defendants' own legal rights and a colorable legal interest in their patents, and therefore cannot give rise to liability for tortious interference under Texas law.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE (FAILURE TO PLEAD CAUSATION — TORTIOUS INTERFERENCE)**

Atrius's tortious interference claim (Count XI) is barred, in whole or in part, because Atrius has failed to identify any specific existing or prospective contract or business relationship with which Answering Defendants allegedly interfered, has failed to allege facts showing that any such relationship would have continued or been entered into but for Answering Defendants' conduct, and has failed to plead facts establishing that Answering Defendants' conduct proximately caused any cognizable injury to Atrius.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE (STATUTE OF LIMITATIONS — TORTIOUS INTERFERENCE)**

Atrius's tortious interference claim (Count XI) is barred, in whole or in part, by the statute of limitations applicable to tortious interference claims under Texas law.

**TWENTY-NINTH AFFIRMATIVE DEFENSE (RESERVATION OF DEFENSES)**

Answering Defendants reserve the right to assert additional affirmative and other defenses that may be revealed through discovery, further investigation, or otherwise, and Answering Defendants do not waive any such defenses by failing to plead them at this time.

## AMENDED COUNTERCLAIMS

For their counterclaims against Atrius Development Group Corporation, Inc., ("Atrius"), Malcolm Brown, Grant Shaw, and Ryan Spadafore (collectively, "Counterclaim Defendants"), Counterclaim-Plaintiffs ABC IP, LLC and Rare Breed Triggers, Inc. allege as follows:

### THE PLAINTIFFS

1. ABC is a limited liability company organized under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, Delaware 19901.

2. Rare Breed is a corporation organized under the laws of Texas with an address of 2710 Central Freeway, Suite 150-151, Wichita Falls, Texas 76306.

### ATRIUS AND THE INDIVIDUAL COUNTERCLAIM DEFENDANTS

3. Atrius was a Montana corporation until it converted to a Texas corporation on or about June 20, 2025, approximately one month after Atrius launched the Atrius Selector on May 16, 2025.

4. Based solely on Paragraph 16 of the Second Amended Complaint as pled by Atrius, Atrius is a corporation organized and existing under the laws of the State of Texas and with an address of 200 Congress Ave., Unit 31W, Austin, TX 78701.

5. As reflected in Travis County records, Atrius's identified address at 200 Congress Ave., Unit 31W, Austin, TX 78701 is a residential condominium owned by Grant Bickford Shaw. On information and belief, Mr. Shaw acquired this address on or about January 7, 2023—prior to Atrius becoming a Texas Corporation.

6. On information and belief, Atrius's corporate offices are located at 200 Congress Ave., Suite 901, Austin, TX 78701, in the same building as the condominium owned by Grant Shaw.

7. Upon information and belief, Atrius has three directors: Malcolm Brown, Grant Shaw, and Ryan Michael Spadafore.

8. Upon information and belief, Malcolm Brown is an individual residing at 25471 Alta Loma, Lake Forest, California 92630.

9. Upon information and belief, Mr. Brown serves as a director of Atrius who controls and directs the operations of Atrius.

10. Upon information and belief, Grant Bickford Shaw is an individual residing at 200 Congress Ave., Unit 31W, Austin, TX 78701.

11. Upon information and belief, Mr. Shaw is a director of Atrius who controls and directs the operations of Atrius.

12. Shaw personally served as Atrius's registered agent for service of process in Texas from June 20, 2025 through August 25, 2026, at 200 Congress Ave., Suite 901, Austin, Texas, and in that capacity personally consented in writing to accept service of process on Atrius's behalf.

13. Upon information and belief, Ryan Spadafore is an individual who previously resided in Aliso Viejo, California and who now resides in Coeur d'Alene, Idaho.

14. Upon information and belief, corporate records identify Mr. Spadafore as an officer of Atrius at Atrius's business address of 200 Congress Ave., Suite 901, Austin, Texas 78701.

15. Upon information and belief, Mr. Spadafore serves as Atrius's Chief Executive Officer and as a director of Atrius. In both capacities, Mr. Spadafore controls and directs the operations of Atrius.

16. On or about June 20, 2025, Brown, Shaw, and Spadafore caused the formation of three additional Texas entities bearing Atrius's initials, which are all related to Atrius Development Group: ADGC Three Amigos, LLC (Charter No. 0806094843); ADGC Starkiller, Inc. (Charter No. 0806094854); and ADGC Death Star, LLC (Charter No. 0806094860). On information and belief, and according to corporate records, each of these entities is located at 200 Congress Ave., Austin, Texas—the same building as Atrius's corporate offices and the condominium owned by Mr. Shaw. On information and belief, Spadafore is a manager or director of each of these entities.

**JURISDICTION**

17. Counterclaim Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

18. These counterclaims arise under the patent laws of the United States, Title 35, United States Code. The jurisdiction of this Court is proper under at least 35 U.S.C. § 271 *et seq.*, and 28 U.S.C. §§ 1331, 1338, 1367, and 2201–02.

19. Atrius commenced an action for declaratory judgment concerning the Counterclaim Patents in the Western District of Texas, which has been transferred to this Court for coordinated pretrial proceedings as part of MDL No. 3176.

20. Upon information and belief, Brown, Shaw, and Spadafore, as Atrius's directors, caused Atrius to commence that action in Texas.

21. Counterclaim Defendants have consented to the personal jurisdiction of this Court at least by commencing and directing Atrius to commence its declaratory-judgment action in Texas.

22. Based on Counterclaim Defendants' allegations above and filing of this action, venue is proper for purposes of these counterclaims in this District under 28 U.S.C. § 1391.

23. Based at least on their positions as directors of Atrius, their control and direction of Atrius, and their personal participation in the acts of infringement alleged herein, joinder of Malcolm Brown, Grant Shaw, and Ryan Spadafore is proper under Fed. R. Civ. P. 13, 19, and/or 20.

24. Brown, Shaw, and Spadafore have purposefully availed themselves of the privilege of conducting activities in Texas, including by causing Atrius to become a Texas corporation, by causing the formation of three additional Texas entities, by serving as Atrius's agent for service of process in Texas, by maintaining Atrius's business address in Texas, and by directing and participating in the offer for sale and sale of the Atrius Selector in Texas.

25. Counterclaim Plaintiffs' claims arise out of and relate to those activities.

26. The exercise of personal jurisdiction over Brown, Shaw, and Spadafore is reasonable and comports with due process.

## BACKGROUND

27. Counterclaim Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

28. These counterclaims assert direct, contributory, and induced infringement of U.S. Patent Nos. 12,038,247 ("the '247 Patent"), 12,031,784 ("the '784 Patent"), 12,578,159 ("the '159 Patent"), and 12,636,403 ("the '403 Patent") (together, "the Counterclaim Patents").

29. The '784 Patent was lawfully and properly issued by the United States Patent and Trademark Office on July 9, 2024. Each and every claim of the '784 Patent is valid and enforceable. A true and correct copy of the '784 Patent is attached as Exhibit A.

30. The '247 Patent was lawfully and properly issued by the United States Patent and Trademark Office on July 16, 2024. Each and every claim of the '247 Patent is valid and enforceable. A true and correct copy of the '247 Patent is attached as Exhibit B.

31. The ’159 Patent was lawfully and properly issued by the United States Patent and Trademark Office on March 17, 2026. Each and every claim of the ’159 Patent is valid and enforceable. A true and correct copy of the ’159 Patent is attached as Exhibit C.

32. The ’403 Patent was lawfully and properly issued by the United States Patent and Trademark Office on May 26, 2026. Each and every claim of the ’403 Patent is valid and enforceable. A true and correct copy of the ’403 Patent is attached as Exhibit D.

33. ABC is the current owner by assignment of all right, title and interest in and to the Counterclaim Patents. These assignments have been recorded at the United States Patent and Trademark Office (“USPTO”).

34. Rare Breed is the exclusive licensee of the Counterclaim Patents.

35. Counterclaim Plaintiffs have complied with the requirements of 35 U.S.C. § 287 either because the Counterclaim Patents are not practiced by ABC or any licensee and/or because any licensee has been required to mark its product.

36. Upon information and belief, Counterclaim Defendants have committed acts of direct, contributory, and induced patent infringement, which will be described in more detail below. These acts are in violation of 35 U.S.C. § 271 and should be considered willful, at least because of Counterclaim Defendants’ knowledge as described below.

## THE INVENTIONS

37. A typical AR15-pattern firearm, for example, is considered a semiautomatic firearm. The operation of a *standard disconnector* AR-pattern trigger mechanism is commenced by the trigger member being pulled by the user. The trigger member releases the hammer from the trigger sear and allows the hammer to strike the firing pin. A portion of the propellant gas is used to begin the process of sending the bolt carrier to the rear of the firearm. The rearward movement of the bolt carrier cocks the hammer on the disconnector and then the bolt is allowed to return

forward into battery with a new round inserted into the chamber. While this is happening, in the standard AR-pattern semiautomatic trigger, the user can either continue to hold the trigger member in a pulled (i.e., fired) state or allow the trigger to return to its reset state, in which the sear, rather than the disconnector, engages and holds the hammer in a cocked position. When the user reduces pressure on the trigger member to allow the trigger spring to reset the trigger member, the disconnector releases the hammer to engage the trigger sear.

38. In the standard AR-pattern trigger assembly, the purpose of the disconnector is to hold the hammer in a cocked position until the trigger member is reset by a trigger spring when the user lets the trigger reset. The disconnector allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to manually reset the trigger rapidly enough so that the sear engages before the bolt carrier or bolt returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer to simply "follow" the bolt carrier as it returns to battery without firing a second round, leaving the hammer uncocked.

39. In contrast, in what Counterclaim Plaintiffs have coined a "forced reset" trigger mechanism, cycling of the bolt carrier or bolt causes the trigger member to be mechanically moved to the reset position and hold the trigger member there until the bolt or bolt carrier is back in battery, when it is safe for the user to pull the trigger again, without the need for a disconnector.

40. The '247 and '159 Patents provide a novel device for accelerating the firing sequence of any semiautomatic firearm, in contrast to a standard semiautomatic trigger or other prior art devices that allow an accelerated rate of semiautomatic firing. The device can be selected to operate in either a standard semiautomatic mode or a "forced reset" semiautomatic mode and

uses a cam, rotated by cycling of the action, to cause the trigger member to reset and prevent the trigger member from being pulled again until the action has returned to the in-battery position.

41. The ’784 Patent provides a device that works in a trigger system as an extended trigger member locking mechanism for use with a semi-automatic firearm that employs, in some embodiments, a “deflectable extension of the locking member that is actuated by forward movement of the bolt carrier,” among other innovations as explicitly claimed. Certain inventions of the ’784 Patent overcome the geometric limitations of prior art designs for use in multiple and varied semi-automatic firearm designs by allowing a locking member to deflect or fold separately from the body portion of the locking member when contacted by the forward portion of the bolt carrier as it cycles to the rear.

42. The ’403 Patent describes and claims a device that can be selected to operate in either of two distinct modes: 1) standard disconnector semiautomatic mode and 2) “forced reset” semiautomatic mode.

43. The claims of the patents define the scope of the patented inventions.

**THE INFRINGING DEVICES**

44. Counterclaim Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

45. On information and belief, Counterclaim Defendants are making, using, selling, and/or offering for sale various forced-reset trigger or selector devices, including, for example, the Atrius Selector, via the website https://atrius.dev, in multiple variants:

a. As a standalone product;

b. In conjunction with separate trigger mechanism parts; and/or

c. Pre-installed in a receiver and/or complete firearm.

46. Exemplary photographs are shown below:


atrius.dev/products/
Products
Merch
Support
Contact
What can we help you find today?
Mil-Spec Atrius Forced Reset Selector
$199.00
Four Payments of $49.75 with
credova Learn More
Lever Blocker Standalone
$29.99
FRS Lever Standalone
$39.99
G-LEVER Standalone
$49.99
(G-LEVER) Ambidextrous Forced Reset Selector
$269.00
Ambidextrous Forced Reset Selector
$249.00


atrius.dev/products/
Products
Merch
Support
Contact
What can we help you find today?
Atrius Forced Reset Selector
$199.00
Four Payments of $49.75 with
credova Learn More
Follow Us
About Us
Contact Us
Blog
Terms & Conditions
Privacy Policy
Shipping Policy
Return Policy
Warranty Policy


atrius.dev/ambidextrous-forced-reset-selector/
Products
Merch
Support
Contact
What can we help you find today?
Ambidextrous Forced Reset Selector
$249.00
Four Payments of $62.25 with credova Learn More
(No reviews yet) Write a Review
Please note:
2 business days processing time
Check compatibility HERE before purchasing
Maximum Purchase: 10 units
Add to Cart
SSL Secure Payment


atrius.dev/mil-spec-atrius-forced-reset-selector/
Products
Merch
Support
Contact
What can we help you find today?
Mil-Spec Atrius Forced Reset Selector
$199.00
Four Payments of $49.75 with credova Learn More
(No reviews yet) Write a Review
Maximum Purchase:
10 units
Quantity:
Add to Cart


atrius.dev
Welcome to Atrius Development Group.
Shop
Support
Dealer Inquiry
News
What can we help you find today?
THE FIRST FRS READY RIFLE
MORE INFO
DEVELOPMENT GROUP
ONEHORSE
*Parts and accessories not included. Image represent a build example.




47. The Atrius Selector can operate in a "disconnector mode," which is much like that of a standard AR-15 trigger. The user can switch between safe, standard semiautomatic with disconnector, and forced reset semiautomatic with cam modes by rotating the safety selector between positions.

48. An exemplary image is shown below:


atrius.dev/mil-spec-atrius-forced-reset-selector/

Products Merch Support Contact ATRIUS What can we help you find today?

This is the Atrius Mil-Spec FRS (single side) featuring a mil-spec selector switch and a traditional design that looks great, especially if you're working on a retro build.

It's the most robust solution on the market that enables the user to have 3 positions; SAFE, SEMI (Traditional) and FULL-SEMI. This Forced Reset Selector (FRS) is compatible with mil-spec/full-profile AR15 (chambered in .223/5.56/.300 BLK) fire control groups with no modifications required.

## THE INDIVIDUAL COUNTERCLAIM DEFENDANTS' PERSONAL PARTICIPATION IN THE INFRINGING CONDUCT

49. Counterclaim Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

50. Malcolm Brown and Ryan Spadafore hold themselves out to be founders of Atrius. For example, Spadafore has publicly identified himself as a co-founder of Atrius and has identified Brown as Atrius's other founder. *See* https://www.youtube.com/watch?v=an-fYZZTMEI, and https://www.youtube.com/watch?v=g6_QuWHf_KE. Spadafore has also repeatedly and publicly

held himself out as Atrius's Founder and Chief Executive Officer, in statements attributed to him from July 2025 through July 2026.

51. Brown and Spadafore designed and developed the Atrius Selector, which Atrius markets as its "Forced Reset Selector" or "FRS." In an interview posted on YouTube at https://www.youtube.com/watch?v=g6_QuWHf_KE, Spadafore stated that he and Brown developed the forced-reset selector, and described the product as a drop-in, reverse-compatible selector for existing mil-spec AR-15s.

52. Spadafore has publicly described the development of the Atrius Selector as an iterative process in which he and Brown worked through successive designs and products before arriving at the selector device that Atrius now makes, uses, offers for sale, and sells. In an interview posted on YouTube at https://www.youtube.com/watch?v=u0wFi5ZqhOc, Spadafore stated that he and Brown went through different designs and different products and ultimately settled on a reverse-compatible, drop-in selector for mil-spec AR-15 systems.

53. Spadafore has also publicly described himself and Brown as jointly responsible for the design of Atrius's products, identifying Brown as Atrius's engineer and describing himself and Brown as sharing the role of architect, each addressing a different aspect of the work. *See* https://www.youtube.com/watch?v=g6_QuWHf_KE.

54. Atrius marketing materials depict both Brown and Spadafore each personally using the Atrius Selector installed in a firearm. *See* https://www.youtube.com/watch?v=an-fYZZTMEI. The video depicts Brown and Spadafore in Austin, Texas, handling and demonstrating the Atrius Selector.

55. On information and belief, portions of the video referenced in Paragraph 54 were filmed at The Austonian, 200 Congress Ave., Austin, Texas—the same building in which Atrius's

corporate offices are located and in which Mr. Shaw owns the condominium that Atrius has identified as its address. The video depicts interior spaces of that building, including the elevator lobby of its fifty-fifth floor and the adjoining club room. Also on information and belief, other portions of that video were filmed at "The Range at Austin," a gun range in Austin Texas owned by Mr. Shaw.

56. Brown and Spadafore thereby personally used the Atrius Selector in Texas, and personally participated in Texas in the marketing and promotion of the Atrius Selector.

57. In or about July 2025, after Atrius's merchant services were terminated, Spadafore publicly described his arrangement of replacement payment processing for Atrius and the resulting restoration of Atrius's online checkout. Spadafore thereby personally restored Atrius's ability to offer for sale and sell the Atrius Selector to customers in the United States.

58. On or about January 5, 2026, Spadafore publicly announced that Orion Wholesale had been appointed as Atrius's exclusive two-step distributor for the Atrius Selector. Orion Wholesale is a defendant in this litigation with respect to that same product.

59. In or about January 2026, Spadafore publicly announced, in his capacity as Atrius's chief executive officer, that Rare Breed's patent claims had been evaluated and would be addressed in the appropriate forum; that Atrius would support its distribution and retail partners faced with those claims; and that any dealer receiving such a claim should notify Atrius so that Atrius could coordinate a response. Spadafore thereby acknowledged Atrius's knowledge of Counterclaim Plaintiffs' patent rights and personally encouraged Atrius's distributors, dealers, and retail partners to continue offering for sale and selling the Atrius Selector notwithstanding those claims.

60. In or about March 2026, Spadafore appeared on a firearms podcast and explained to prospective purchasers how the Atrius Selector interacts with semi-automatic platforms,

including timing, gas configuration, and buffer selection, and encouraged listeners to purchase the product.

61. In another YouTube video, Brown provides troubleshooting guidance for installation and use of the Atrius FRS. *See* https://www.youtube.com/watch?v=JD6TJhXpwCg.

62. Brown thereby personally encouraged Atrius's customers to install and use the Atrius Selector in their firearms. On information and belief, Atrius's customers who install and use the Atrius Selector as Brown instructs infringe one or more claims of the Counterclaim Patents, and Brown's instruction and encouragement induces that infringement.

63. Spadafore also personally encourages and promotes the sale of firearms incorporating the Atrius Selector by third parties. On information and belief, non-party One Horse incorporates the Atrius Selector into rifles that it offers for sale and sells. In a June 2026 video update posted on YouTube at https://www.youtube.com/watch?v=GHj57I7uegc, Spadafore thanked those who had supported One Horse's sales of such rifles and encouraged continued support of those sales. On information and belief, rifles incorporating the Atrius Selector, when assembled and used as intended, infringe one or more claims of the Counterclaim Patents, and Spadafore's public encouragement of One Horse's sales of those rifles induces and contributes to that infringement.

64. From in or about June 2026 through July 2026, Spadafore directed a month-long sales promotion of the Atrius Selector, announced in a press release issued from Austin, Texas.

65. Shaw is a director of Atrius who controls and directs its operations. Shaw owns the condominium that Atrius has identified as its address, personally served as Atrius's agent for service of process in Texas, and participated in the formation of the three additional Texas entities located in that same building. On information and belief, Shaw participated in and approved

Atrius's decisions concerning the design, manufacture, pricing, marketing, and sale of the Atrius Selector.

66. Upon information and belief, Brown, Shaw, and Spadafore each personally participated in, directed, authorized, and approved the acts of infringement alleged herein, and each did so with knowledge of the Counterclaim Patents as alleged below. Each of Brown, Shaw, and Spadafore is therefore personally liable for infringement of the Counterclaim Patents.

**COUNTERCLAIM DEFENDANTS' RELATIONSHIP WITH BIG DADDY AND THE NOVEMBER 8, 2021 PATENT LICENSE AGREEMENT**

67. Counterclaim Defendants did not independently develop the forced-reset trigger products they now make and/or sell. Counterclaim Defendants' forced-reset trigger and forced-reset selector products originated in, and were funded and brought to market through, their years-long relationship with non-party Anthony "Tony" McKnight and his companies, including Big Daddy Unlimited, Inc. ("BDU") and Performance Triggers.

68. On or about November 8, 2021, Atrius, as licensor, and BDU, as licensee, entered into a written Patent License Agreement (the "License"). Malcolm Brown signed the License on behalf of Atrius, and McKnight signed on behalf of BDU. The License concerned forced reset triggers and associated technology developed by Atrius.

69. Under Section 1 of the License, Atrius granted BDU "all Patent Rights"; all technology, trade secrets, and know-how related to the design and manufacture of the invention, including all design plans, blueprints, documentation, and software; and the exclusive ability to license sub-distributors. Atrius further granted BDU a six-month exclusive license to manufacture and sell the invention upon 10,000 triggers becoming ready for shipping, and an additional six months of exclusivity if BDU sold those 10,000 units within six months.

70. In exchange, and among other consideration, BDU agreed to pay Atrius a royalty of $75 per unit for the first 10,000 units and $65 per unit thereafter, together with $60,000 up front payable in three $20,000 installments in December 2021, January 2022, and February 2022. BDU paid Atrius the full $60,000.

71. The License also granted BDU a right of first refusal to manufacture and distribute all firearm-industry products that Atrius developed in the year following closing; provided that BDU and McKnight personally would indemnify Atrius; prohibited assignment by the licensee without Atrius's written consent while permitting Atrius to assign its rights; and constituted the entire agreement between the parties, barring any oral modification.

72. The License automatically renewed on an annual basis unless a party provided written notice of non-renewal at least thirty days before the end of the term. No such notice was given, the License was never cancelled in writing, and no written agreement ever replaced it; the License renewed annually.

73. Through the License, Atrius licensed away to BDU the entirety of its claimed patent rights, technology, trade secrets, and know-how in the forced-reset trigger technology at issue, and did so to a licensee that Atrius knew to be engaged in the forced-reset trigger business.

74. BDU funded Atrius's development of forced-reset triggers. The $60,000 up-front payment covered both Atrius's research and design work and the grant of all patent rights, technology, trade secrets, and know-how. At Brown's direction, McKnight at times funded Atrius's projects by paying Atrius's manufacturers directly rather than routing payment through Atrius.

75. The parties' relationship did not end with the License. When Atrius's roller-style "A.R.T." trigger went forward, McKnight placed an order on or about October 26, 2023 for 1,000

A.R.T. triggers—identified as the "Atrius Select Fire Trigger"—at $375 per unit, and funded the project through installment payments totaling approximately $140,000. Without that funding, the A.R.T. product would not have come to market.

76. On information and belief, Atrius arranged the manufacturing of the A.R.T. trigger through a company Malcolm Brown identified as "Trilogy," which is a Chinese manufacturer, and the A.R.T. was smuggled into the United States from China concealed among other goods, including car parts or dishwasher parts. On information and belief, Grant Shaw personally helped arrange manufacturers for Atrius.

77. Atrius's later forced-reset selector product likewise originated with McKnight. In early 2025, after McKnight sent Brown a "super safety" device, Brown stated that he could make a version of it and designed the product in or about February 2025. McKnight funded its development and initial manufacturing through a series of payments between February and May 2025, including a payment to Atrius's manufacturer and a $30,000 wire to Brown on or about May 14, 2025.

78. McKnight, not Atrius, supplied the product's commercial identity: McKnight coined the name "Super Selektor," which Atrius later rebranded as the "Forced Reset Selector" or "FRS"; wrote the product's marketing copy; set its retail price; helped Brown obtain a merchant account; and produced Atrius's marketing materials, including a demonstration video of Brown. The parties' arrangement was that Atrius would supply McKnight's companies 500 units per week. Without McKnight's funding and support, Atrius's forced-reset trigger and forced-reset selector products would not have reached the market.

79. At all relevant times, Atrius and Brown were aware of Rare Breed's litigation against McKnight and his companies and of the resulting Confidential Settlement Agreement,

dated September 22, 2022 (the "Settlement Agreement"), by which McKnight and his companies agreed not to produce or sell forced-reset triggers or parts that could be used as part of forced-reset triggers.

80. Counterclaim Defendants' forced-reset trigger business is a continuation of, and is inextricably linked to, the forced-reset trigger business of McKnight and BDU: Atrius developed its products with McKnight's funding, licensed its claimed technology to BDU under a License that remains in force, and supplied product to McKnight's companies until that activity was enjoined. Whether Atrius is bound by the Settlement Agreement is the subject of a pending motion in an arbitration styled *Rare Breed Triggers, et al. v. Big Daddy Enterprises, et al*.

81. Counterclaim Defendants acquired knowledge of the Counterclaim Patents and their validity through Counterclaim Defendants' relationship with non-party Anthony "Tony" McKnight and his companies. Hence, Counterclaim Defendants' infringement was willful.

**COUNTERCLAIM COUNT I — INFRINGEMENT OF THE '247 PATENT**

82. Counterclaim Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

83. In violation of 35 U.S.C. § 271, Counterclaim Defendants have infringed, induced others to infringe, and/or contributed to the infringement of one or more claims of the '247 Patent, including but not limited to claim 15, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '247 Patent. Such unlicensed products include forced-reset selector and trigger devices, including the Atrius Selector.

84. On information and belief, Counterclaim Defendants have and continue to willfully infringe, induce others to infringe, and/or contribute to the infringement of one or more claims of

the ’247 Patent, including but not limited to claim 15, literally and/or under the doctrine of equivalents.

85. An exemplary comparison of the Atrius Selector, when assembled and used as intended, with claim 15 of the ’247 Patent, is illustrated in the chart below:

| ’247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| 15. A firearm trigger mechanism comprising: | When installed and used as directed, the Atrius Selector is part of a trigger mechanism and functions as a cam that in at least one mode, both causes the reset of the trigger and locks the trigger during the cycle of operation.  **Atrius Selector** |

| '247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver | The Atrius Selector (yellow) is installed in a fire control mechanism pocket of a receiver along with a hammer (red) that has a sear catch and a hook for engaging a disconnector (orange).<br><br>(Plaintiff-generated renderings of Atrius Selector here and below) |

<table>
<tr><th>’247 Patent, Claim 15</th><th>The Atrius Selector</th></tr>
<tr><td>to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,</td><td>The hammer (red) pivots on a transverse hammer pivot axis between set and released positions, depicted below. The hammer is adapted to be pivoted rearward by rearward movement of a bolt carrier.<br><br>Hammer Set Position<br><br>Hammer Released Position</td></tr>
</table>

| ’247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, | The Atrius Selector (yellow) is installed with a trigger member (brown) in the fire control mechanism pocket that pivots on a transverse trigger member pivot axis between set and released positions and has a sear. The trigger member (brown) has a sear.  |
| wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member | The sear of the trigger member (brown) and sear catch of the hammer (red) are in engagement when the hammer and trigger member are in their set positions.  **Trigger Member Set Position** |

<table>
<tr><th>’247 Patent, Claim 15</th><th>The Atrius Selector</th></tr>
<tr><td>and are out of engagement in said released positions of said hammer and trigger member,</td><td>The sear of the trigger member (brown) and sear catch of the hammer (red) are out of engagement in the released position.<br><br>Trigger Member Released Position</td></tr>
<tr><td>said disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis,</td><td>The disconnector (orange) is adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis. The disconnector has a hook for engaging the hammer (red).<br><br>Disconnector Hook Engaged</td></tr>
</table>

| '247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| and a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, | The Atrius Selector has a cam and lever that is adapted to be movably mounted in the fire control mechanism pocket. (*See* image above depicting Atrius Selector, shown in yellow, in fire control mechanism pocket)  **Atrius Selector Cam with Lobe and Lever** |

| ’247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| said cam being movable between a first position and a second position, in said second position said cam lobe forces said trigger member towards said set position, | The cam is movable between a first position and a second position.  **Cam and Lobe First Position** In the second position, the cam lobe mechanically moves the trigger member (brown) toward the set position when the cam is in the “forced reset” semi-automatic mode.  **Cam and Lobe Second Position** |

| ’247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| whereupon in a standard semi-automatic mode, said cam is in said first position, | During at least part of the cycle in the standard semi-automatic mode, the cam is in the first position.  |
| rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, | Rearward movement of the bolt carrier causes rearward pivoting of the hammer (red) such that the disconnector (orange) hook catches the hammer hook.  |

| '247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| and thereafter the bolt carrier moves forward into battery, | Thereafter, the bolt carrier moves forward into battery,  |
| at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and | . . . at this time a user must manually release the trigger member (brown) to free said hammer (red) from the disconnector (orange) to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm  |

| ’247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| whereupon in a forced reset semi-automatic mode, | When in the “forced reset” semi-automatic mode,<br> |
| said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook, | . . . the cam is in the second position during at least part of the cycle and mechanically moves the trigger member toward the set position. Rearward movement of the bolt carrier causes rearward pivoting of the hammer (red) such that the disconnector (orange) hook is prevented from catching the hammer hook.<br> |

| '247 Patent, Claim 15 | The Atrius Selector |
|---|---|
| and thereafter the bolt carrier moves forward into battery, | Thereafter, the bolt carrier moves forward into battery,  |
| at which time the user can pull said trigger member to fire the firearm. | . . . at which time the user can pull said trigger member (brown) to fire the firearm.  |

86. On information and belief, in addition to direct infringement, Counterclaim Defendants take active steps to induce others, including Atrius's customers, to directly infringe the '247 patent. Counterclaim Defendants take such active steps knowing that those steps will induce,

encourage, and facilitate direct infringement by others. Such active steps include, but are not limited to, installation of, encouraging, advertising, promoting, and instructing others to use and/or how to use the Atrius Selector while selling products. One example of this is the promotional material found on Atrius's website (https://atrius.dev) that informs customers to install the Infringing Devices into an AR15:



atrius.dev/mil-spec-atrius-forced-reset-selector/

Products Merch Support Contact ATRIUS What can we help you find today?

This is the Atrius Mil-Spec FRS (single side) featuring a mil-spec selector switch and a traditional design that looks great, especially if you're working on a retro build.

It's the most robust solution on the market that enables the user to have 3 positions; SAFE, SEMI (Traditional) and FULL-SEMI. This Forced Reset Selector (FRS) is compatible with mil-spec/full-profile AR15 (chambered in .223/5.56/.300 BLK) fire control groups with no modifications required.

The Atrius FORCED RESET SELECTOR isn't just a safety, it's an advantage.



atrius.dev/support/

Products Merch Support Contact ATRIUS What can we help you find today?

Firearm Minimum Requirements

Installation Instructions

Before you begin installation, ensure that the firearm is safe and clear. Please also check to ensure you are using compatible parts.

1. Remove the pistol grip and selector spring and detent.
2. Remove the original selector.
3. Insert Atrius Detent Shaft through the right side of the receiver about halfway into the receiver.
4. Install the Spring and Cam-Lever before pushing the Detent Shaft all the way through the receiver. Ensure that both the left side switch and the right-side indicator/switch are both in the same firing position.
5. Reinstall your safety detent, spring and pistol grip and check for function.
   Watch our Installation Video here

87. Atrius's website instructs customers to watch the Atrius Selector (FRS) – Installation video, posted by the Atrius account on Rumble at https://rumble.com/v785h4w-atrius-

forced-reset-selector-frs-installation.html, which informs customers to install the Infringing Devices into an AR15.




88. Another example is the material found on Atrius's Compatibility webpage (https://atrius.dev/compatibility) that informs customers to install the Infringing Devices into a receiver with a trigger.




89. Another example is the "Master Sheet" found on Atrius's Compatibility webpage (https://atrius.dev/compatibility) that contains "Community Compatibility" information informing

customers to install the Infringing Devices in firearms. Atrius's Compatibility webpage also encourages, promotes, and instructs others to "test[]" the Atrius Selector with other parts and to "let [Atrius] know in the [response] form" so that Atrius can disseminate this information to others, including its customers.







90. On information and belief, Counterclaim Defendants know or should know that such activities induce others to directly infringe at least claim 15 of the '247 Patent.

91. On information and belief, Counterclaim Defendants also contribute to the infringement of the '247 Patent by others, including Atrius's customers. Acts by Counterclaim Defendants that contribute to the infringement of others include, but are not limited to, the sale, offer for sale, and/or importation by Counterclaim Defendants of the components of the Atrius Selector, such as the cam, lever arm, FRS Lever Standalone, and Lever Blocker Standalone. The components are not suitable for substantial noninfringing use as they are specially designed and adapted to be used in a fire control unit to forcibly reset a trigger mechanism and infringe the '247 Patent.

92. Exemplary photographs are shown below:







93. Counterclaim Defendants have engaged in egregious infringement behavior with knowledge of the ’247 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Counterclaim Defendants have known or should have known that their actions constituted and continue to constitute infringement of the ’247 Patent and that the ’247 Patent is valid at least from their relationship with non-party Anthony “Tony” McKnight and his companies and/or the date of their search referenced through Atrius’s Statement on Rare Breed Patent Allegations (https://atrius.dev/blog/statement-on-rare-breed-patent-allegations). Counterclaim Defendants could not reasonably or subjectively believe that their actions do not constitute infringement of the ’247 Patent, nor could they reasonably or subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Counterclaim Defendants have continued their infringing activities. As such, Counterclaim Defendants willfully infringe the ’247 Patent.

94. By their actions, Counterclaim Defendants have injured Counterclaim Plaintiffs and are liable to Counterclaim Plaintiffs for infringement of the ’247 Patent pursuant to 35 U.S.C. § 271.

95. By their actions, Counterclaim Defendants' infringement of the '247 Patent has irreparably injured Counterclaim Plaintiffs. Unless such infringing acts are enjoined by this Court, Counterclaim Plaintiffs will continue to suffer additional irreparable injury.

96. By their actions, Counterclaim Defendants' infringement of the '247 Patent has damaged and continues to damage Counterclaim Plaintiffs in an amount yet to be determined.

97. Counterclaim Defendants' infringement of the '247 patent is exceptional and entitles Counterclaim Plaintiffs to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

98. Counterclaim Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Counterclaim Plaintiffs' business, sales, reputation, and goodwill.

99. Counterclaim Plaintiffs have been substantially harmed by Counterclaim Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

**COUNTERCLAIM COUNT II — INFRINGEMENT OF THE '784 PATENT**

100. Counterclaim Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

101. In violation of 35 U.S.C. § 271, Counterclaim Defendants have infringed, induced others to infringe, and/or contributed to the infringement of one or more claims of the '784 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '784 patent. Such unlicensed products include forced-reset selector and trigger devices, including the Atrius Selector.

102. On information and belief, Counterclaim Defendants have and continue to willfully infringe, induce others to infringe, and/or contribute to the infringement of one or more claims of the ’784 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents.

103. An exemplary comparison of the Atrius Selector, when assembled and used as intended, with claim 1 of the ’784 Patent is illustrated in the chart below:

| ’784 Patent, Claim 1 | The Atrius Selector |
|---|---|
| 1. In a forced reset trigger mechanism, an extended trigger member locking device, comprising: | When installed and used as directed, the Atrius Selector is part of a “forced reset” trigger mechanism and functions as an extended trigger member locking device.<br><br>**Atrius Selector**<br><br>**Atrius Selector Installed**<br>(Plaintiff-generated renderings of Atrius Selector here and below; Locking member and bolt carrier shown here and below in section view for clarity) |

| ’784 Patent, Claim 1 | The Atrius Selector |
|---|---|
| a locking member that is movable between a first position in which it locks a trigger against pulling movement | The Atrius Selector operates as a locking member and has a first position in which it locks the trigger member against pulling movement.  **Locked First Position** |
| and a second position where it does not restrict movement of the trigger member, | The Atrius Selector is moveable from the first position to a second position where it does not restrict movement of the trigger member.  **Unlocked Second Position** |

| ’784 Patent, Claim 1 | The Atrius Selector |
|---|---|
| the locking member configured to be movably supported by a frame | The Atrius Selector is movably (pivotally about the axis depicted below) supported by a frame (the lower receiver).<br><br> |

| | |
|---|---|
| and including a generally upward extension portion configured to make actuating contact with a surface of the bolt carrier, | The Atrius Selector has an upward extending portion (yellow lever arm) configured to make actuating contact with a surface of the bolt carrier.<br><br><br>The body portion (purple) has a track with holes that are lined up to correspond to the selectable modes (Fire/ Standard Semi-Automatic, "Forced Reset" Semi-Automatic) which are positively stopped by a detent (blue). |

| ’784 Patent, Claim 1 | The Atrius Selector |
|---|---|
| |  **Section View of Body Portion (purple), Lower Receiver (grey), and Detent (blue)**<br><br>Once installed, the body portion (purple) is movably supported by the lower receiver (grey) using the detent (blue). |
| such actuating contact causing the locking member to move from the first position to the second position, | The actuation causes the locking member to move from the first position to the second position.<br><br>**Unlocked Second Position** |

| ’784 Patent, Claim 1 | The Atrius Selector |
|---|---|
| the locking member having a body portion that is movably supported | The Atrius Selector has a body portion (purple) that is movably supported by the lower receiver.  |

| ’784 Patent, Claim 1 | The Atrius Selector |
| --- | --- |
| and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position | The Atrius Selector has an upwardly extending deflectable portion (lever arm). The connection is designed to allow separate movement of the lever arm relative to the body portion between one position (depicted in red) where it is extended and another position where it is deflected (depicted in yellow).<br><br>Below illustrates the upward extending deflectable portion’s (lever arm) total separate travel with an overlay of the lever in both positions without the body portion moving.<br> |

| ’784 Patent, Claim 1 | The Atrius Selector |
|---|---|
| and a deflected position. | The lever is now shown deflected independent of the body.  |

104. On information and belief, in addition to direct infringement, Counterclaim Defendants take active steps to induce others, including Atrius’s customers, to directly infringe the ’784 patent. Counterclaim Defendants take such active steps knowing that those steps will induce, encourage, and facilitate direct infringement by others. Such active steps include, but are not limited to, installation of, encouraging, advertising, promoting, and instructing others to use and/or how to use the Atrius Selector while selling products. One example of this is the promotional material found on Atrius’s website (https://atrius.dev) that informs customers to install the Infringing Devices into an AR15:






105. Atrius's website instructs customers to watch the Atrius Selector (FRS) – Installation video, posted by the Atrius account on Rumble at https://rumble.com/v785h4w-atrius-forced-reset-selector-frs-installation.html, which informs customers to install the Infringing Devices into an AR15.



106. Another example is the material found on Atrius's Compatibility webpage (https://atrius.dev/compatibility) that informs customers to install the Infringing Devices into a receiver with a trigger.




107. Another example is the "Master Sheet" found on Atrius's Compatibility webpage (https://atrius.dev/compatibility) that contains "Community Compatibility" information informing customers to install the Infringing Devices in firearms. Atrius's Compatibility webpage also encourages, promotes, and instructs others to "test[]" the Atrius Selector with other parts and to "let [Atrius] know in the [response] form" so that Atrius can disseminate this information to others, including its customers.







108. On information and belief, Counterclaim Defendants know or should know that such activities induce others to directly infringe at least claim 1 of the ’784 Patent.

109. On information and belief, Counterclaim Defendants also contribute to the infringement of the ’784 Patent by others, including Atrius’s customers. Acts by Counterclaim Defendants that contribute to the infringement of others include, but are not limited to, the sale, offer for sale, and/or importation by Counterclaim Defendants of the components of the Atrius Selector, cam, lever arm, FRS Lever Standalone, and Lever Blocker Standalone. The components are not suitable for substantial noninfringing use as they are specially designed and adapted to be used in a fire control unit to forcibly reset a trigger mechanism and infringe the ’784 Patent.

110. Exemplary photographs are shown below:







111. Counterclaim Defendants have engaged in egregious infringement behavior with knowledge of the ’784 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Counterclaim Defendants have known or should have known that their actions constituted and continue to constitute infringement of the ’784 Patent and that the ’784 Patent is valid at least from their relationship with non-party Anthony “Tony” McKnight and his companies and/or the date of their search referenced through Atrius’s Statement on Rare Breed Patent Allegations (https://atrius.dev/blog/statement-on-rare-breed-patent-allegations). Counterclaim Defendants could not reasonably or subjectively believe that their actions do not constitute infringement of the ’784 Patent, nor could they reasonably or subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Counterclaim Defendants have continued their infringing activities. As such, Counterclaim Defendants willfully infringe the ’784 Patent.

112. By their actions, Counterclaim Defendants have injured Counterclaim Plaintiffs and are liable to Counterclaim Plaintiffs for infringement of the ’784 Patent pursuant to 35 U.S.C. § 271.

113. By their actions, Counterclaim Defendants' infringement of the '784 Patent has irreparably injured Counterclaim Plaintiffs. Unless such infringing acts are enjoined by this Court, Counterclaim Plaintiffs will continue to suffer additional irreparable injury.

114. By their actions, Counterclaim Defendants' infringement of the '784 Patent has damaged and continues to damage Counterclaim Plaintiffs in an amount yet to be determined.

115. Counterclaim Defendants' infringement of the '784 patent is exceptional and entitles Counterclaim Plaintiffs to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

116. Counterclaim Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Counterclaim Plaintiffs' business, sales, reputation, and goodwill.

117. Counterclaim Plaintiffs have been substantially harmed by Counterclaim Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

**COUNTERCLAIM COUNT III — INFRINGEMENT OF THE '159 PATENT**

118. Counterclaim Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

119. In violation of 35 U.S.C. § 271, Counterclaim Defendants have infringed, induced others to infringe, and/or contributed to the infringement of one or more claims of the '159 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '159 patent. Such unlicensed products include forced-reset selector and trigger devices, including the Atrius Selector.

120. On information and belief, Counterclaim Defendants have and continue to willfully infringe, induce others to infringe, and/or contribute to the infringement of one or more claims of the ’159 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents.

121. An exemplary comparison of the Atrius Selector, when assembled and used as intended, with claim 1 of the ’159 Patent is illustrated in the chart below:

<table>
<tr><th>’159 Patent, Claim 1</th><th>The Atrius Selector</th></tr>
<tr><td>1. A firearm trigger mechanism for a firearm having a fire control mechanism pocket and a reciprocating bolt means, the trigger mechanism operable in a first, standard semi-automatic mode and in a second, forced reset semi-automatic mode, the mechanism comprising:</td><td>When installed and used as directed, the Atrius Selector is part of a firearm trigger mechanism that uses a bolt means. With the Atrius Selector installed, the trigger mechanism operates in a standard semi-automatic mode and a “forced reset” semi-automatic mode<br><br>Atrius Selector<br><br>Atrius Selector (Installed)<br>(Plaintiff-generated renderings of the Atrius Selector here and below)</td></tr>
</table>

| '159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| a hammer having a sear surface and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver | The Atrius Selector (yellow) is installed in a fire control mechanism pocket of a receiver along with a hammer (red) that has a sear surface and a hook for engaging a disconnector (orange).<br><br><br>**Atrius Selector (Installed)** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt means, | The hammer (red) pivots on a transverse hammer pivot axis between set and released positions, depicted below. The hammer is adapted to be pivoted rearward by rearward movement of a bolt means.<br><br><br>**Hammer Set Position**<br><br>**Hammer Released Position** |
| a trigger member having a trigger sear surface and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis | The Atrius Selector (yellow) is installed with a trigger member (brown) in the fire control mechanism pocket and the trigger member pivots on a transverse trigger member pivot axis between set and released positions. The trigger member has a sear surface. |

| ’159 Patent, Claim 1 | The Atrius Selector |
| --- | --- |
| between set and<br><br>released positions, | <br>**Trigger Member Set Position**<br><br>**Trigger Member Released Position** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| wherein the trigger member sear surface and hammer sear surface are in engagement in the set positions of the hammer and trigger member | The sear surface of the trigger member (brown) and sear surface of the hammer (red) are in engagement when the hammer and trigger member are in their set positions.   **Trigger Member and Hammer Member Set Position** |
| and are out of engagement in the released positions of the hammer and trigger member, | The sear surface of the trigger member (brown) and sear catch surface of the hammer (red) are out of engagement in the released position.   **Trigger Member and Hammer Member Released Positions** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| the disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and | The disconnector (orange) is adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis. The disconnector has a hook for engaging the hammer (red).  **Disconnector Hook Engaged** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, | The Atrius Selector has a cam with a cam lobe and lever that is adapted to be movably mounted in the fire control mechanism pocket. (*See* image above depicting Atrius Selector, shown in yellow, in fire control mechanism pocket)   **Atrius Selector Cam with Lobe and Lever** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| the cam being movable between a first position and a second position, in the second position the cam lobe forces the trigger member toward the set position, | The cam is movable between a first position and a second position.<br><br>**Cam and Lobe First Position**<br><br>In the second position, the cam lobe mechanically moves the trigger member (brown) toward the set position when the cam is in the “forced reset” semi-automatic mode.<br><br>**Cam and Lobe Second Position** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| whereupon in the first mode, | While in the first (standard semi-automatic) mode,<br><br>**Cam in the First (Semi-Automatic) Mode** |
| rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, | Rearward movement of the bolt means causes rearward pivoting of the hammer (red) such that the disconnector (orange) hook catches the hammer hook.<br><br>**Disconnector Hook Catches the Hammer** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| and thereafter the bolt means moves forward into battery, | Thereafter, the bolt means moves forward into battery,<br><br><br>**Pressure on Trigger Member Prevents Reset** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm, and | . . . at which time a user must manually reduce pressure on the trigger member (brown) to free the hammer (red) from the disconnector (orange) to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm.<br><br>**Reduced Pressure on Trigger Member Allows Reset** |
| whereupon in a second mode, | When in the second (“forced reset” semi-automatic) mode,<br><br>**Cam in the Second (“Forced Reset” Semi-Automatic) Mode** |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook is prevented from holding the hammer, | Rearward movement of the bolt means causes rearward pivoting of the hammer (red) and the cam to mechanically move the trigger member toward the reset position such that the disconnector (orange) hook is prevented from holding the hammer hook.  |
| and thereafter the bolt means moves forward into battery, | Thereafter, the bolt means moves forward into battery and the hammer moves to its reset position,  |

| ’159 Patent, Claim 1 | The Atrius Selector |
|---|---|
| at which time the user can pull the trigger member to fire the firearm. | . . . at which time the user can pull the trigger member (brown) to fire the firearm without having to first release pressure on the trigger member.  |

122. On information and belief, in addition to direct infringement, Counterclaim Defendants take active steps to induce others, including Atrius’s customers, to directly infringe the ’159 patent. Counterclaim Defendants take such active steps knowing that those steps will induce, encourage, and facilitate direct infringement by others. Such active steps include, but are not limited to, installation of, encouraging, advertising, promoting, and instructing others to use and/or how to use the Atrius Selector while selling products. One example of this is the promotional material found on Atrius’s website (https://atrius.dev) that informs customers to install the Infringing Devices into an AR15:


atrius.dev/mil-spec-atrius-forced-reset-selector/

Products Merch Support Contact ATRIUS What can we help you find today?

This is the Atrius Mil-Spec FRS (single side) featuring a mil-spec selector switch and a traditional design that looks great, especially if you're working on a retro build.

It's the most robust solution on the market that enables the user to have 3 positions; SAFE, SEMI (Traditional) and FULL-SEMI. This Forced Reset Selector (FRS) is compatible with mil-spec/full-profile AR15 (chambered in .223/5.56/.300 BLK) fire control groups with no modifications required.

The Atrius FORCED RESET SELECTOR isn't just a safety, it's an advantage.


atrius.dev/support/

Products Merch Support Contact ATRIUS What can we help you find today?

Firearm Minimum Requirements

Installation Instructions

Before you begin installation, ensure that the firearm is safe and clear. Please also check to ensure you are using compatible parts.

1. Remove the pistol grip and selector spring and detent.
2. Remove the original selector.
3. Insert Atrius Detent Shaft through the right side of the receiver about halfway into the receiver.
4. Install the Spring and Cam-Lever before pushing the Detent Shaft all the way through the receiver. Ensure that both the left side switch and the right-side indicator/switch are both in the same firing position.
5. Reinstall your safety detent, spring and pistol grip and check for function.
   Watch our Installation Video here

123. Atrius's website instructs customers to watch the Atrius Selector (FRS) – Installation video, posted by the Atrius account on Rumble at https://rumble.com/v785h4w-atrius-forced-reset-selector-frs-installation.html, which informs customers to install the Infringing Devices into an AR15.




124. Another example is the material found on Atrius's Compatibility webpage (https://atrius.dev/compatibility) that informs customers to install the Infringing Devices into a receiver with a trigger.




125. Another example is the "Master Sheet" found on Atrius's Compatibility webpage (https://atrius.dev/compatibility) that contains "Community Compatibility" information informing customers to install the Infringing Devices in firearms. Atrius's Compatibility webpage also encourages, promotes, and instructs others to "test[]" the Atrius Selector with other parts and to

"let [Atrius] know in the [response] form" so that Atrius can disseminate this information to others, including its customers.







126. On information and belief, Counterclaim Defendants know or should know that such activities induce others to directly infringe at least claim 1 of the '159 Patent.

127. On information and belief, Counterclaim Defendants also contribute to the infringement of the '159 Patent by others, including Atrius's customers. Acts by Counterclaim Defendants that contribute to the infringement of others include, but are not limited to, the sale, offer for sale, and/or importation by Counterclaim Defendants of the components of the Atrius Selector, cam, lever arm, FRS Lever Standalone, and Lever Blocker Standalone. The components are not suitable for substantial noninfringing use as they are specially designed and adapted to be used in a fire control unit to forcibly reset a trigger mechanism and infringe the '159 Patent.

128. Exemplary photographs are shown below:







129. Counterclaim Defendants have engaged in egregious infringement behavior with knowledge of the ’159 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Counterclaim Defendants have known or should have known that their actions constituted and continue to constitute infringement of the ’159 Patent and that the ’159 Patent is valid at least through the preparation of Atrius’s Complaint for Declaratory Judgment. Counterclaim Defendants could not reasonably or subjectively believe that their actions do not constitute infringement of the ’159 Patent, nor could they reasonably or subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Counterclaim Defendants have continued their infringing activities. As such, Counterclaim Defendants willfully infringe the ’159 Patent.

130. By their actions, Counterclaim Defendants have injured Counterclaim Plaintiffs and are liable to Counterclaim Plaintiffs for infringement of the ’159 Patent pursuant to 35 U.S.C. § 271.

131. By their actions, Counterclaim Defendants’ infringement of the ’159 Patent has irreparably injured Counterclaim Plaintiffs. Unless such infringing acts are enjoined by this Court, Counterclaim Plaintiffs will continue to suffer additional irreparable injury.

132. By their actions, Counterclaim Defendants' infringement of the '159 Patent has damaged and continues to damage Counterclaim Plaintiffs in an amount yet to be determined.

133. Counterclaim Defendants' infringement of the '159 patent is exceptional and entitles Counterclaim Plaintiffs to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

134. Counterclaim Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Counterclaim Plaintiffs' business, sales, reputation, and goodwill.

135. Counterclaim Plaintiffs have been substantially harmed by Counterclaim Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

**COUNTERCLAIM COUNT IV — INFRINGEMENT OF THE '403 PATENT**

136. Counterclaim Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

137. In violation of 35 U.S.C. § 271, Counterclaim Defendants have infringed, induced others to infringe, and/or contributed to the infringement of one or more claims of the '403 patent, including but not limited to claim 38, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '403 patent. Such unlicensed products include forced-reset selector and trigger devices, including the Atrius Selector.

138. On information and belief, Counterclaim Defendants have and continue to willfully infringe, induce others to infringe, and/or contribute to the infringement of one or more claims of

the ’403 patent, including but not limited to claim 38, literally and/or under the doctrine of equivalents.

139. An exemplary comparison of the Atrius Selector, when assembled and used as intended, with claim 38 of the ’403 Patent is illustrated in the chart below:

| **’403 Patent, Claim 38** | **The Atrius Selector** |
|---|---|
| 38. A forced reset trigger mechanism, comprising: | When installed and used as directed, the Atrius Selector is part of a trigger mechanism.<br><br>**Atrius Selector** |
| a hammer having a hammer hook and adapted to pivot on a transverse hammer pivot axis; | The Atrius Selector (yellow) is installed in a fire control mechanism pocket along with a hammer (red) that has a hammer hook and pivots on a transverse axis.<br><br>**Atrius Selector (Installed)**<br>(Plaintiff-generated renderings of Atrius Selector here and below) |

| ’403 Patent, Claim 38 | The Atrius Selector |
|---|---|
| a disconnector having a disconnector hook and adapted to pivot on a transverse disconnector pivot axis;<br><br>a trigger member; and | The Atrius Selector is installed along with a disconnector (orange) which has a disconnector hook and pivots on a transverse disconnector pivot axis, and a trigger member (brown).<br><br>**Disconnector and Trigger Member** |
| a safety selector adapted to be movable between a standard semi-automatic position | The Atrius Selector is a safety selector adapted to be movable between a standard semi-automatic position,<br><br>**Atrius Selector (installed) in Standard Semi-Automatic Position** |

| ’403 Patent, Claim 38 | The Atrius Selector |
|---|---|
| and a forced reset semi-automatic position, | . . . and a “forced reset” semi-automatic position.<br><br>**Atrius Selector (installed) in “Forced Reset” Semi-Automatic Position** |
| wherein when the safety selector is in the standard semi-automatic position and the trigger member is rearwardly actuated, | When safety selector is in the standard semi-automatic position the trigger member (brown) is rearwardly actuated.<br> |

| ’403 Patent, Claim 38 | The Atrius Selector |
|---|---|
| and after the hammer pivots rearward to a position where the hammer hook is past the disconnector hook, | The hammer (red) pivots rearward to a position where the hammer hook is past the disconnector hook (orange),  |
| rearward pressure on the trigger member must be reduced to permit the trigger member to then be actuated to fire a firearm. | Rearward pressure on the trigger member (brown) must be reduced to permit the trigger member to then be actuated to fire a firearm.  |

140. On information and belief, in addition to direct infringement, Counterclaim Defendants take active steps to induce others, including Atrius’s customers, to directly infringe the ’403 patent. Atrius takes such active steps knowing that those steps will induce, encourage, and

facilitate direct infringement by others. Such active steps include, but are not limited to, installation of, encouraging, advertising, promoting, and instructing others to use and/or how to use the Atrius Selector while selling products. One example of this is the promotional material found on Atrius's website (https://atrius.dev) that informs customers to install the Infringing Devices into an AR15:


atrius.dev/mil-spec-atrius-forced-reset-selector/

Products Merch Support Contact ATRIUS What can we help you find today?

This is the Atrius Mil-Spec FRS (single side) featuring a mil-spec selector switch and a traditional design that looks great, especially if you're working on a retro build.

It's the most robust solution on the market that enables the user to have 3 positions; SAFE, SEMI (Traditional) and FULL-SEMI. This Forced Reset Selector (FRS) is compatible with mil-spec/full-profile AR15 (chambered in .223/5.56/.300 BLK) fire control groups with no modifications required.

The Atrius FORCED RESET SELECTOR isn't just a safety, it's an advantage.


atrius.dev/support/

Products Merch Support Contact ATRIUS What can we help you find today?

Firearm Minimum Requirements

Installation Instructions

Before you begin installation, ensure that the firearm is safe and clear. Please also check to ensure you are using compatible parts.

1. Remove the pistol grip and selector spring and detent.
2. Remove the original selector.
3. Insert Atrius Detent Shaft through the right side of the receiver about halfway into the receiver.
4. Install the Spring and Cam-Lever before pushing the Detent Shaft all the way through the receiver. Ensure that both the left side switch and the right-side indicator/switch are both in the same firing position.
5. Reinstall your safety detent, spring and pistol grip and check for function.
   Watch our Installation Video here

141. Atrius's website instructs customers to watch the Atrius Selector (FRS) – Installation video, posted by the Atrius account on Rumble at https://rumble.com/v785h4w-atrius-forced-reset-selector-frs-installation.html, which informs customers to install the Infringing Devices into an AR15.




142. Another example is the material found on Atrius's Compatibility webpage (https://atrius.dev/compatibility) that informs customers to install the Infringing Devices into a receiver with a trigger.




143. Another example is the "Master Sheet" found on Atrius's Compatibility webpage (https://atrius.dev/compatibility) that contains "Community Compatibility" information informing customers to install the Infringing Devices in firearms. Atrius's Compatibility webpage also encourages, promotes, and instructs others to "test[]" the Atrius Selector with other parts and to

"let [Atrius] know in the [response] form" so that Atrius can disseminate this information to others, including its customers.







144. On information and belief, Counterclaim Defendants know or should know that such activities induce others to directly infringe at least claim 38 of the '403 Patent.

145. On information and belief, Counterclaim Defendants also contribute to the infringement of the '403 Patent by others, including Atrius's customers. Acts by Counterclaim Defendants that contribute to the infringement of others include, but are not limited to, the sale, offer for sale, and/or importation by Counterclaim Defendants of the components of the Atrius Selector, such as the cam, lever arm, FRS Lever Standalone, and Lever Blocker Standalone. The components are not suitable for substantial noninfringing use as they are specially designed and adapted to be used in a fire control unit to forcibly reset a trigger mechanism and infringe the '403 Patent.

146. Exemplary photographs are shown below:







147. Counterclaim Defendants have engaged in egregious infringement behavior with knowledge of the ’403 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Counterclaim Defendants have known or should have known that their actions constituted and continue to constitute infringement of the ’403 Patent and that the ’403 Patent is valid at least through the preparation of Atrius’s Complaint for Declaratory Judgment in the case *Atrius Dev. Grp. Corp., Inc. v. ABC IP, LLC et al.*, No. 7:26-cv-00211-DC-DTG (W.D. Tex. May 26, 2026). Counterclaim Defendants could not reasonably or subjectively believe that their actions do not constitute infringement of the ’403 Patent, nor could they reasonably or subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Counterclaim Defendants have continued their infringing activities. As such, Counterclaim Defendants willfully infringe the ’403 Patent.

148. By their actions, Counterclaim Defendants have injured Counterclaim Plaintiffs and are liable to Counterclaim Plaintiffs for infringement of the ’403 Patent pursuant to 35 U.S.C. § 271.

149. By their actions, Counterclaim Defendants' infringement of the '403 Patent has irreparably injured Counterclaim Plaintiffs. Unless such infringing acts are enjoined by this Court, Counterclaim Plaintiffs will continue to suffer additional irreparable injury.

150. By their actions, Counterclaim Defendants' infringement of the '403 Patent has damaged and continues to damage, Counterclaim Plaintiffs in an amount yet to be determined.

151. Counterclaim Defendants' infringement of the '403 patent is exceptional and entitles Counterclaim Plaintiffs to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

152. Counterclaim Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Counterclaim Plaintiffs' business, sales, reputation, and goodwill.

153. Counterclaim Plaintiffs have been substantially harmed by Counterclaim Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiffs respectfully request that this Court enter judgment against Counterclaim Defendants as follows:

a. Each of the Counterclaim Patents has been and continues to be infringed by Counterclaim Defendants;

b. Counterclaim Defendants' infringement of each of the Counterclaim Patents has been, and continues to be, willful;

c. Each of the Counterclaim Patents is enforceable and not invalid;

d. A preliminary injunction enjoining Counterclaim Defendants and their principals, agents, successors, assigns, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of each of the Counterclaim Patents during the pendency of this case, or other such equitable relief as the Court determines is warranted;

e. A permanent injunction enjoining Counterclaim Defendants and their principals, agents, successors, assigns, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of each of the Counterclaim Patents, or other such equitable relief as the Court determines is warranted;

f. An award of damages adequate to compensate Counterclaim Plaintiffs for the infringement of each of the Counterclaim Patents that has occurred, together with pre-judgment interest and costs, post-judgment interest and costs, and an accounting;

g. An award of all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

h. A finding that this action is an exceptional case under 35 U.S.C. § 285 and an award to Counterclaim Plaintiffs of their costs and attorneys' fees incurred in this action; and

i. Any and all other relief, at law or equity, to which Counterclaim Plaintiffs may show themselves to be entitled or which this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Counterclaim Plaintiffs, under Rule 38 of the Federal Rules of Civil Procedure, request a trial by jury of any issues so triable by right.

DATED: September 21, 2026

Respectfully submitted,

*/s/ Matthew A. Colvin*

Matthew A. Colvin
Texas Bar No. 24087331
Carl E. Bruce
Texas Bar No. 24036278
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, TX 75201
E-mail: colvin@fr.com
bruce@fr.com
Tel: (214) 747-5070
Fax: (214) 747-2091

Benjamin J. Christoff (*Pro hac vice*)
DC Bar No. 1025635
**FISH & RICHARDSON P.C.**
1000 Maine Avenue SW, Suite 1000
Washington, DC 20024
E-mail: christoff@fr.com
Tel: (202) 783-5070
Fax: (202) 783-2331

Melissa R. Smith
Texas State Bar No. 24001351
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Fax: (903) 934-9257
E-mail: melissa@gillamsmithlaw.com

Glenn D. Bellamy
**WOOD HERRON & EVANS LLP**
600 Vine Street, Suite 2800
Cincinnati, OH 45202
E-mail: gbellamy@whe-law.com
Tel: (513) 707-0243
Fax: (513) 241-6234

*Attorneys for Defendants/Counterclaim-Plaintiffs ABC IP, LLC and Rare Breed Triggers, Inc.; and for Defendants Rare Breed Firearms LLC, Lawrence DeMonico, Kevin Maxwell, and Cole Leleux*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on September 21, 2026, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

*/s/ Matthew A. Colvin*
Matthew A. Colvin